**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| GRIDKOR, LLC; and GRIDKOR TRUCKING AND LOGISTICS LLC, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | Civil Action No. 5:23-cv-3563 |
| | : | |
| IGOR GORBACH; WILLIAM COLLINS; | : | JURY TRIAL DEMANDED |
| OLEKSANDR MAYDANSKYY; UCHA | : | |
| MATCHARASHVILI; MILOS MITIC; | : | |
| PAVLO TUPYCHAK; and JONATHAN | : | |
| JACOBS, | : | |
| | : | |
| Defendants. | : | |

**<u>VERIFIED COMPLAINT</u>**

Plaintiffs GridKor, LLC ("GridKor") and GridKor Trucking and Logistics LLC ("GTL"), by and through their undersigned counsel, by way of complaint against the Defendants identified above and herein, aver as follows:

**<u>Summary and Introduction</u>**

1. In late 2022, Defendants induced GridKor to enter into agreements with a fictitious entity or entities purportedly called "MGM Linehaul Inc.," "MGM Linehaul Consulting, Inc.," and/or "MGM Linehaul Consulting" under which Plaintiffs then paid and/or caused to be paid nearly $5 million to purchase a majority ownership interest in each of five Pennsylvania trucking companies (which GridKor in turn assigned to its subsidiary, GTL), with the purported MGM entity retaining the minority interests in and managing the operations of all five companies pursuant to a management agreement. *See* Paras. 21 through 63, *infra*.

2. Under the contract, Defendants, purportedly operating through MGM, were required to deliver certain businesses and assets and expected to manage the companies

appropriately and in compliance with all legal and contractual requirements. However, Defendants failed to do so, and it quickly became apparent Defendants had misrepresented the operations and assets of the companies and were seeking to substitute newly-acquired, less valuable assets for those which Defendants had represented the acquired companies owned and controlled. *See* Paras. 64 through 83, *infra*.

3. After giving Defendants repeated opportunities to cure their failures of performance and in an effort to mitigate their losses, in early April 2023 GridKor entered into a new agreement with the purported MGM entity backed up by promissory notes executed by five individual defendants—Defendants Gorbach, Collins, Maydanskyy, Matcharashvili, and Mitic—pursuant to which MGM was to return $3.5 million to GridKor. Plaintiffs in turn agreed to relinquish their interest in four of the companies, but absorbed 100 percent ownership of the fifth company, PSI Logistics Inc. *See* Paras. 84 through 100, *infra*.

4. The April 2023 agreement and the terms of each of the five promissory notes required MGM and Defendants to return $3,500,000 previously paid by Plaintiffs, over time, with penalties triggered in the event MGM and Defendants failed to comply with the deadlines for making those payments. *See* Paras. 88 through 98, *infra*.

5. Plaintiffs then learned of additional information that Defendants had misrepresented or concealed. Plaintiffs learned that "MGM Linehaul Inc.," "MGM Linehaul Consulting, Inc.," and/or "MGM Linehaul Consulting" were sham entities that did not actually exist, but instead names of a fictitious company or companies through which Defendants concealed their control and ownership of various trucking companies; that Defendants operated all five of the companies they had purported to sell to Plaintiff in violation of numerous legal and contractual requirements; that Defendant Gorbach (and possibly others) had been the subject of investigations

2

by FedEx Ground Package System, Inc. ("FedEx") and the FBI in Utah relating to their business practices; that Defendants' use of "MGM" was an effort to conceal the involvement of Defendant Gorbach and others from FedEx; and that Defendant Mitic and one or more of the five companies were under investigation by FedEx. FedEx ultimately suspended all five companies and moved to terminate its relationships with them, eliminating the entirety of the business of all five companies—including PSI Logistics, Inc, ownership of which Defendants had induced Plaintiffs to take over entirely instead of Defendants returning all of the money Plaintiffs had paid.

6.     The Defendants then proceeded to fail to make the payments required by the April 2023 Agreement and the promissory notes. *See* Paras. 106 through 117, *infra*.

7.     Plaintiff, therefore, brings this action for unjust enrichment, civil conspiracy, fraud, and violations of the Pennsylvania Securities Act and seeks to recover compensatory, consequential, and punitive damages.

**Parties**

8.     Plaintiff GridKor, LLC ("GridKor") is a limited liability company formed and existing under the laws of Wyoming with its principal place of business located in Allegheny County, Pennsylvania. The members of GridKor are citizens of Pennsylvania, Massachusetts, New Mexico and Texas.

9.     GridKor Trucking and Logistics LLC ("GTL") is a limited liability company formed and existing under the laws of Pennsylvania with its principal place of business located in Allegheny County, Pennsylvania. The citizenships attributed to GTL via its members are the same as those of GriKor.

10.     On information and belief, Defendant Igor Gorbach is a resident and citizen, for purposes of 28 U.S.C. § 1332, of Connecticut who conducts business from 9883 Old US 22 in

Breinigsville, Pennsylvania 18031, and regularly travels to Lehigh County and other locations in Pennsylvania for business purposes.

11. On information and belief, Defendant William "Billy" Collins is a citizen and resident of New York who conducts business from 9883 Old US 22 in Breinigsville, Pennsylvania 18031, and regularly travels to Lehigh County and other locations in Pennsylvania for business purposes.

12. On information and belief, Defendant Oleksandr "Sacha" Maydanskyy is a resident and citizen, for purposes of 28 U.S.C. § 1332, of New York who conducts business from 9883 Old US 22 in Breinigsville, Pennsylvania 18031, and regularly travels to Lehigh County and other locations in Pennsylvania for business purposes.

13. On information and belief, Defendant Ucha Matcharashvili is a resident and citizen, for purposes of 28 U.S.C. § 1332, of New York who conducts business from 9883 Old US 22 in Breinigsville, Pennsylvania 18031, and regularly travels to Lehigh County and other locations in Pennsylvania for business purposes.

14. On information and belief, Defendant Milos Mitic is a resident and citizen, for purposes of 28 U.S.C. § 1332, of Florida who conducts business from 9883 Old US 22 in Breinigsville, Pennsylvania 18031, and regularly travels to Lehigh County and other locations in Pennsylvania for business purposes.

15. On information and belief, Defendant Pavlo Tupychak is resident and citizen, for purposes of 28 U.S.C. § 1332, of New York who conducts business from 9883 Old US 22 in Breinigsville, Pennsylvania 18031, and regularly travels to Lehigh County and other locations in Pennsylvania for business purposes.

4

16.     On information and belief, Defendant Jonathan Jacobs is a citizen and resident of New York who has conducted business from 9883 Old US 22 in Breinigsville, Pennsylvania 18031, and regularly traveled to Lehigh County and other locations in Pennsylvania for business purposes.

17.     Defendants Gorbach, Collins, Maydanskyy, Matcharashvili, and Mitic hold themselves out as operating one or more similarly-named companies which, on information and belief, do not have an actual legal existence.  Among the non-existent companies through which Defendants purport to do business are the following:

    a.     "MGM Linehaul Inc.";

    b.     "MGM Line Haul Consulting, Inc.";

    c.     "MGM Linehaul Consulting, Inc.";

    d.     "MGM Line Haul Consultants, LLC"; and

    e.     "MGM Linehaul Consulting, LLC".

### Jurisdiction and Venue

18.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) and/or (a)(3) as this is a civil action between citizens of different states and/or citizens of different states and in which citizens or subjects of a foreign state are additional parties, and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

19.     This Court has personal jurisdiction over Defendants because they transacted business in this District, including the execution of the agreements and notes and the conduct at issue in this case.

20.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

**Facts**

***Defendants' Misrepresentations and Material Omissions***

21.     In the late summer of 2022, the principals who would ultimately form GridKor responded to a posting on an Internet website listing for sale a number of linehaul trucking routes for FedEx based in Pennsylvania.  The Internet post stated that 5 to 7 routes were for sale, each of which the post represented generated a net profit equal to 20 percent of revenue.

22.     Tyler Szymanski initially spoke to Defendant Gorbach on the telephone, who introduced himself as "Jerry."  Defendant Gorbach explained that a "route" referred to a specific tractor, *i.e.*, a large truck used to pull a trailer, identified and registered with FedEx and the subject of a contract with FedEx to perform certain specifically-identified regular linehaul trucking runs. The routes were also referred to as "teams" because involve a tractor and one or two drivers performing the work.  Defendant Gorbach confirmed to Mr. Szymanski that he and his colleagues had many routes for sale, and that the routes did indeed produce profits of 20 percent of revenue. Defendant Gorbach invited Mr. Szymanski and his colleagues to visit MGM's supposed offices in the Allentown area to discuss a potential transaction.

23.     The following day, Mr. Szymanski and Michael Bryant traveled to Lehigh County for an in-person meeting.  Defendant Gorbach directed them to a facility located at 9883 Old US 22 in Breinigsville, Pennsylvania 18031, which he represented was the offices and yard of a company called "MGM Linehaul, Inc."

24.     According to Defendant Gorbach, "MGM" was a company he owned jointly with Defendants William Collins and Oleksandr Maydanskyy.  Defendant Gorbach stated that through MGM they managed the operations of a number of companies who contracted with FedEx to

perform linehaul trucking services.  Each of the Defendants (along with others working with or for them) typically referred to the company as "MGM."

25.    In their first trip to the MGM offices and yard, Messrs. Bryant and Szymanksi met with Defendants Gorbach, Collins, and Maydanskyy.  During that meeting, Defendants Gorbach, Collins, and Maydanskyy confirmed that they jointly owned MGM and proposed to sell five companies which they claimed operated a total of 35 trucks performing services for FedEx.

26.    Specifically, Defendants Gorbach, Collins, and Maydanskyy proposed to sell the following entities, all Pennsylvania stock corporations and all supposedly managed by MGM:

    a.    Cha Cha Logistics Inc. (purportedly owned by Defendant Maydanskyy);

    b.    Xpress Logistics Inc. (purportedly owned by Defendant Mitic);

    c.    PSI Logistics Inc. (purportedly owned by Defendant Tupychak);

    d.    Victoria Logistics Inc. (purportedly owned by Defendant Jacobs); and

    e.    HEB Logistics Inc. (purportedly owned by Domenick Desimore).

27.    Defendants Gorbach, Collins, and Maydanskyy represented that MGM managed the operations of each of the above-listed companies for their owners, that both MGM and each company it managed was an approved FedEx contractor in good standing, and that each company held certain routes or lanes which they ran using certain specifically-identified trucks owned by the company contracted with FedEx to operate that route or lane.

28.    While MGM managed all five companies' operations, the owners of at least four of the companies personally participated in and supported MGM's efforts to sell a majority interest in the companies to Plaintiffs.  Defendant Maydanskyy (Cha Cha Logistics Inc.) held himself out as a principal of MGM, and personally participated in meetings and other communications with Plaintiffs.  Defendant Tupychak (PSI Logistics Inc.) was Defendant Maydanskyy's cousin, and the

7

two spoke about the business on a daily basis. Defendant Mitic (Xpress Logistics Inc.) was the principal manager of operations for MGM and personally communicated with Plaintiffs. Defendant Jacobs (Victoria Logistics Inc.) himself participated in meetings with Plaintiffs about their acquisition.

29.    Defendants Gorbach, Collins, and Maydanskyy further represented that the companies' FedEx runs were guaranteed, that MGM had an established working relationship with FedEx, that they met with and communicated with FedEx on a regular basis, that they were very familiar with all of FedEx's guidelines, and that MGM and each of the companies identified in Paragraph 26 above were in compliance with everything FedEx required and in excellent standing with FedEx.

30.    Defendants Gorbach, Collins, and Maydanskyy again confirmed that each of the five companies were producing 20 percent profits.

31.    Defendants Gorbach, Collins, and Maydanskyy stated that the value of each route was approximately $200,000, making the value of all five companies more than $7 million.

32.    Mr. Bryant asked if MGM would be willing to continue to manage the companies and whether MGM would be willing to enter into a seller-financed deal in which the purchase price wasfor the companies would be paid over time out of the profits generated by the companies. Defendants Gorbach, Collins, and Maydanskyy indicated a willingness to continue to manage the companies, but pushed back on the idea of a seller-financed transaction. Defendants wanted to do a cash deal.

33.    The parties met again one to two weeks later in State College, Pennsylvania. This time, Messrs. Bryant and Szymanski were joined by Paul Tobin while Defendants Gorbach,

Collins, and Maydanskyy again participated purportedly on behalf of MGM and the five companies proposed for sale.

34. Messrs. Bryant and Tobin asked Defendants to bring information and documentation to help them evaluate the deal. In State College, Defendant Collins provided Mr. Tobin with a stack of paper files and documents. Among these documents were a series of documents purporting to break down the weekly expenses associated with the operations, one of which specifically stated "All are Existing runs with provable track record." (**Exhibit 1**.) The materials provided by Defendant Collins also included a number of "Weekly Settlement Statements" from FedEx showing payments earned for various trucks and routes. Another document entitled "FedEx Line Haul Projected Data Gathering Worksheet" purported to summarize the financial performance of one of the five companies, Cha Cha Logistics Inc., on "Year to Date," 2021," and "Annual" bases and then calculate an asking price based upon the company's projected net profits going forward. This document used the same $13,000 gross weekly revenue per route/team figure Defendants Gorbach, Collins, and Maydanskyy had previously represented was produced by the routes/teams MGM managed, applied it to a five route/team company, and showed an annual "cash flow" or net profit of $732,160, specifically stating "Net =21.7% of gross." The document noted, however, that it did not include monthly driver bonuses or "4+ weeks of Peak season increase in revenue of 20%+, on the gross" and stated that, if these were accounted for, "the routes should net approx. an additional 100K+ year." (**Exhibit 2**.)

35. Defendant Collins also provided another, similarly-titled and similarly-structured document providing the same information for a 15-route/team package, showing an annual "cash flow" or net profit of $2,305,940, described as "= 22.7% after 15 truck payments." (**Exhibit 3**.)

36.    The materials provided by Defendant Collins were accompanied by a number of additional documents relating to as many as nine different companies, not just the five companies identified in Paragraph 26.  For some of those companies, Defendant Collins provided either or both of the following documents:

a.    documents entitled "Attachment A-1" to a Transportation Service Provider Agreement with FedEx listing "Assigned Runs" (runs with the same, established sequence of origins and destinations, each comprising a leg, to be run every week) and "Positions on Unassigned Run Rotations" (runs with a defined starting location, but varying destinations to be identified by FedEx on an as-needed basis); and/or

b.    documents entitled "FEDEX GROUND WEEKLY INDEPENDENT CONTRACTOR SETTLEMENT STATEMENT" showing the teams that ran for a given company in a given week; the calculation and amount of the gross payment for those runs; any fuel purchases, chargebacks, or other adjustments for that week; the total gross earned; and the net settlement paid.

37.    The documents Defendant Collins provided showed a number of both assigned and unassigned runs generating weekly gross revenue amounts of $13,000 or higher, including some approaching, and even exceeding, $20,000.  In addition, the settlement statements showed varying other runs beyond those identified on the A-1s which generated additional income for each company.

38.    Defendants Gorbach, Collins, and Maydanskyy reiterated their previous representations that they would deliver five companies with a total of 35 existing, established routes that had produced, and would continue to produce, profits of more than 20 percent of revenue.

39.    Defendants Gorbach, Collins, and Maydanskyy, however, continued to resist a deal that was seller financed and did not involve a substantial initial cash payment, but reiterated MGM's willingness to stay on to manage the companies.

40.    Following the meeting in State College, the parties agreed to move forward. Defendants Gorbach, Collins, and Maydanskyy stated they would contact their attorney and have him prepare a proposed contract.

41.    On or around August 19, 2022, Defendant Maydanskyy emailed Mr. Bryant a draft proposed agreement.  This first draft reflected an all-cash purchase price of $7,337,000 for a 67 percent ownership interest in each of the five companies.  The initial draft identified the companies to be acquired, but did not identify specific tractors or routes/teams to be included in the deal.

42.    In telephone conversations with Defendants Gorbach, Collins, and Maydanskyy, Messrs. Bryant and Tobin requested that the deal identify the 35 specific tractors and associated FedEx runs to be included and pressed that at least some component of the deal be seller-financed. Defendants Gorbach, Collins, and Maydanskyy agreed to identify the trucks and associated FedEx teams/routes and ultimately agreed to include a seller-financed component.

43.    On September 1, 2023, the parties executed a Stock Purchase Agreement by which Plaintiff GridKor, LLC would obtain 67 percent of the stock of each of the five companies in exchange for a cash payment of $4,076,000 to be paid at closing with an additional $1,200,000 to be paid over time from the companies' expected cash flow.  The Stock Purchase Agreement included an Exhibit A listed 35 trucks by current company, FedEx tractor number, and Vehicle Identification Number (VIN).  (**Exhibit 4**.)

44.    Eleven of the trucks identified on Exhibit 3 were associated with Colonial Valley Transportation, another company managed by Defendants.  Defendants Gorbach, Collins, and

11

Maydanskyy represented that those trucks and associated runs would all be transferred from Colonial Valley to one of the five companies in which GridKor was acquiring a 67 percent interest.

45.     On September 6, 2022, one of the members of GridKor (MPT Microgrid Services, LLC) paid a deposit of $25,000 toward the purchase price.

46.     GridKor and its principals then set about preparing for closing by arranging financing and identifying a corporate structure through which to receive, hold and manage the interests to be acquired.

47.     A short time later, Defendant Gorbach asked Mr. Bryant to send an additional $80,000, claiming he needed funds to arrange for new or additional trucks to cover certain routes. GridKor agreed to do so and, on September 13, 2022, MPT Microgrid Services, LLC sent a second wire transfer on behalf of GridKor, this time in the amount of $80,000.  This transfer was sent to an account identified by Defendant Gorbach, which Plaintiffs later learned was the bank account of another company owned by Defendant Matcharashvili.

48.     As the parties worked toward a closing on the deal, Messrs. Bryant and Tobin continued to communicate and meet with Defendants Gorbach, Collins, Maydanskyy and others working with them and MGM.  Specifically, Plaintiff met and communicated with Milos Mitic. Defendant Mitic was the owner of Xpress Logistics Inc., but also did the bulk of the day-to-day work for MGM managing its various operations.  Defendant Mitic represented that FedEx routes were a good deal, he had no problem running and managing everything, and that Defendants Gorbach, Collins, and Maydanskyy's representations of a 20 percent profit rate were accurate.

49.     Defendant Ucha Matcharashvili also communicated with Messrs. Bryant and Tobin, similarly confirming that MGM ran the operation well, it was established and had a good

12

relationship with FedEx, and that the routes MGM managed generated roughly 20 percent profit on gross revenues.

50.     Prior to closing being scheduled, Defendant Gorbach continued to push to remove the seller-financed component from the deal.  In a meeting in Harrisburg, Pennsylvania, Defendant Gorbach adamantly confirmed his and the others' previous representations that the routes/teams produced an average of $13,000 in gross revenue per week per route/team, 20 percent or more of which was net profit.  According to Defendant Gorbach, this rate of profitability was established, regular, and consistent.  Defendant Gorbach argued there was no need for him and his partners to be paid out of the revenues going forward; the "cash flow" would be there and GridKor should pay cash up front to acquire the rights to it.  To further this point, Defendant Gorbach explained that 35 routes/teams earning $13,000 each week would produce $455,000 in weekly gross revenue, or approximately $1,820,000 each month.  At least 20 percent of that ($364,000) would be net profit, 67 percent of which ($243,880) would be going to Plaintiffs each and every month.  Rounding this figure down slightly, Defendant Gorbach guaranteed that Plaintiffs would receive $242,500 in distributions each month and they had nothing to be concerned about.

51.     On October 21, 2022, MPT Microgrid Services, LLC made a third payment on behalf of GridKor toward the purchase price, this time in the amount of $500,000.

52.     On or about November 7, 2022, Defendants Gorbach, Collins, Maydanskyy and Jacobs traveled to Pittsburgh for a meeting at GridKor's offices to finalize the deal.  The parties all sat together in a conference room discussing the deal.  Plaintiff's officers and principals asked a series of questions relating to every aspect of the business and the financials.  Paul Tobin, Plaintiff's Vice President, specifically went around the room and asked that each of Defendants Gorbach, Collins, Maydanskyy and Jacobs confirm that the revenues and expenses of all five

13

companies were as they had been represented and would produce the $242,500 net profit per month distribution that Defendant Gorbach had assured Plaintiff would be the result of Plaintiff acquiring a 67 percent share in these five companies.  Each of Defendants Gorbach, Collins, Maydanskyy and Jacobs confirmed this was all correct.

53.    Later that evening, at a dinner at The Capital Grille, Defendant Jacobs, the owner of Victoria Logistics Inc. (one of the five companies to be acquired by Plaintiff), again corroborated the data provided and representations made by Defendants.  Specifically, Mr. Jacobs told Paul Tobin (GridKor's Vice President) that MGM did an excellent job operating Victoria Logistics Inc. and that he was receiving a 25 to 30 percent return on his investment.  Mr. Jacobs said he was "clearing 13K per week per truck" and stated that it "should be no problem to hit" the numbers Defendants had provided.

54.    From November 8 through 11, 2022, Defendant Collins' son shared with Mr. Bryant, via Google Drive, a series of additional documents.  Among these documents was a pdf file entitled "35 Team Runs P&L" that showing revenues and expenses for 35 runs, each earning weekly gross revenue of $13,000 and yielding a "Net +22.8% of gross."  (**Exhibit 5**.)

55.    In reliance on all of the above-described documents, statements, and representations, GridKor agreed to remove the seller-financed component of the deal and proceed to closing on a new deal involving a larger cash payment.

### *The Stock Purchase Agreement Closes*

56.    On December 5, 2022, Messrs. Bryant, Tobin, and Clingensmith travelled to Lehigh County for the purpose of executing a revised Stock Purchase Agreement, made effective as of September 1, 2022, by which GridKor purchased a 67 percent interest in each of the five companies identified in Paragraph 6, while the remaining 33 percent would be owned by a limited

14

liability company to be formed by Defendants and to be called "MGM Linehaul Consulting, LLC," or something similar. A true and correct copy of the executed Stock Purchase Agreement is attached hereto as **Exhibit 6**.

57.    Under the Stock Purchase Agreement executed in December 2022, GridKor was to pay $4,941,179.18 for a 67 percent ownership interest in each of Cha Cha Logistics Inc., Xpress Logistics Inc., PSI Logistics Inc., Victoria Logistics Inc., and HEB Logistics Inc.

58.    Defendants Gorbach, Collins, and Maydanskyy each signed the Stock Purchase Agreement as "Member, MGM Linehaul Consulting." Therein, they each specifically represented that, among other things,

a.    the Seller's execution and delivery off the Stock Purchase Agreement "do not and will not result in any violation or breach of, constitute a default under any contract, instrument, or commitment to which Seller is a party" (§ 3.3(b));

b.    Defendants Gorbach, Collins, Maydanskyy and Mitic "are operating under MGM Linehaul Consulting LLC, a Limited Liability Company, validly existing and in good standing under the laws of its jurisdiction of organization" (§ 4.1); and

c.    Defendants Gorbach, Collins, Maydanskyy and Mitic "operating MGM Linehaul Consulting, LLC" "are duly qualified or licensed as a Linehaul Management company to conduct its business in states outside its jurisdiction of organization as is currently being conducted" (§ 4.1).

59.    In addition, attached as Exhibit A to the Stock Purchase Agreement was a list of 35 pairs of FedEx tractor numbers and VINs, which Defendants represented to be the trucks and routes or runs to be operated by the five companies.

60.     At the same time, GridKor also executed a Management Agreement with "MGM LINE HAUL CONSULTING, Inc." purporting to be located at 517 Oak St. Copiague, NY 11726. Defendant Maydanskyy signed the Management Agreement as "Managing Member" of "MGM Linehaul Consulting, Inc."

61.     In the Management Agreement, Defendant Maydanskyy further represented, among other things, that:

a.     MGM was "an Independent FedEx Contractor itself" and that it "is an approved FedEx entity as of the signing of this Agreement";

b.     MGM was "fully authorized to operate as an approved Company and will run under the FedEx approved MC and DOT authorizations";

c.     MGM would be "responsible for managing the relationship between FedEx and all PARTIES, as well as assigning loads, managing and designating drivers, dispatching of all runs, negotiating new contracts and rates at the contract renewal intervals, maintaining performance times, performing all scheduled and unscheduled truck fleet maintenance, maintaining and instituting Safety plans as required by FedEx, and maintaining all necessary motor MGM compliances";

d.     MGM would be "responsible for monitoring all Auto debit accounts such as fuel cards, truck insurance, truck payments, Workers Comp. insurance, IFTA, ELD logbooks, and LYTX accounts relating to truck support";

e.     MGM would "handle phone calls, facsimiles, and emails, FedEx, Drivers, Insurances, Safety records, ELD logbooks, and LYTX"; and

f.     MGM would be "responsible to comply with all applicable state and federal regulations pertaining to the operation of the FedEx Business."

62.     Principals of GridKor formed a subsidiary entity, Plaintiff GridKor Trucking and Logistics LLC ("GTL"), through which the newly-acquired trucking company interests would be held and managed.

63.     On December 7, 2022, GridKor sent or caused to be sent three wire transfers totaling $4,336,179.84, each of which was sent, pursuant to Defendant's direction, to what Plaintiffs understood to be the attorney trust account maintained by MGM's attorney.  Combined with the three previous payments made on behalf of GridKor in September and October, Plaintiffs thus paid the full amount of the $4,941,179.18 purchase price under the Stock Purchase Agreement.

### *Plaintiffs Learn of Misrepresentations and Defendants Breach the SPA*

64.     Following the closing of the deal and Plaintiffs' payment of the nearly $5 million purchase price, Defendants failed to deliver on their promises.

65.     By early January 2023, the A-1s of the five companies reflected only 13 of the runs listed on Exhibit A to the Stock Purchase Agreement.  Defendants had not transferred any of the Colonial Valley runs listed on Exhibit A to any of the five companies.

66.     Further, 11 of the runs specifically identified with one of the five companies on Exhibit A were now entirely absent from the companies' A-1s, including at least three routes missing from Xpress's A-1 that had been present on the version of Xpress's A-1 Defendants had provided to Plaintiffs prior to closing.

67.     Defendants also failed to deliver the actual trucks identified on Exhibit A to the Stock Purchase Agreement.  Plaintiffs were unable to locate trucks with all of the VINs listed on Exhibit A in MGM's yard or anywhere else, the title for many of the trucks they did locate was in

the name of another company, and at least one of the VINs identified on Exhibit A was not for a truck at all, but a trailer.

68.    Further, even for the trucks that were performing runs for the five companies (whether or not they were owned by any of the companies), *none* of them were performing the guaranteed, assigned runs those companies were contracted with FedEx to perform each week.

69.    Almost instantly after the closing of the deal, the gross revenue generated by the companies fell off substantially.  For example, Xpress Logistics Inc. had averaged gross revenue of more than $52,000 per week in the 10 weeks preceding closing, but by the week ending December 30, 2022, its gross revenues were less than $20,000.  Victoria Logistics Inc. similarly had averaged weekly gross revenue of nearly $44,000 for the same period, but for the week ending December 16, 2022, gross revenue was less than $18,000, and the following week it was just $13,477.06.

70.    The first monthly net profit distributions were to occur on January 7, 2023, but that date came and went without any distribution payments from MGM or any of the five companies.

71.    Unable to understand why Defendants had failed to deliver the runs or the trucks promised, why Defendants had failed to make any profit distribution (much less the repeatedly-promised amount of $242,500), and why the companies' gross revenues had fallen off a cliff as soon as the transaction closed, Mr. Bryant and Paul Tobin travelled to MGM's offices for meetings on January 16 and 17, 2023.

72.    At the meeting, Defendant Maydanskyy explained they had spent roughly $1 million to purchase at least 13 trucks for inclusion in the 35-truck package, but Defendants had not been able to run any of those trucks yet because they had not been "cleared by FedEx" and they

18

did not yet have license plates.  Defendants blamed "a lady at FedEx" who they said kept sending the trucks back "to get more stuff fixed/updated."

73.    Defendant Gorbach also stated six other trucks were not operating because of "transmission issues," and had been "sitting at the dealerships" for two months awaiting repairs.

74.    With only 16 of the 35 trucks operating, Defendants claimed they were not making enough to cover costs and could not pay any profits.

75.    On information and belief though, Defendants were, in fact, running some or all of the runs that were supposed to be performed by Xpress, Victoria, Cha Cha, PSI and HEB *through other companies owned and/or controlled by Defendants*, thereby redirecting the revenues and profits from those runs to themselves.

76.    At the January 16-17 meeting, Defendant Gorbach also disclosed that a large number of the runs the five companies were performing were essentially "trial runs," meaning the runs were not assigned or guaranteed to the company, but if the company built a good record performing them then FedEx will consider assigning them more permanently.  Defendant Metic indicated his agreement with the explanation provided by Defendant Gorbach.

77.    Defendants had not disclosed any of this at any point during the discussions leading up to the December 2022 execution of the Stock Purchase Agreement and Plaintiffs' payment of the purchase price.  To the contrary, Defendants had repeatedly represented that the runs and trucks that were included in the agreement were existing, established, and already operating and generating revenue.  Defendants had said nothing about any of the runs being "trial" runs or being otherwise provisional or temporary.

78.    Defendant Gorbach assured Plaintiffs "we are going to pay you back for these two missing months and we are going to figure it out."  Defendants said it would take three weeks to

19

get everything fixed, but Defendant Gorbach confidently declared it may be even earlier.  He specifically stated "We are going to be making more money than what Billy said in the P&L."

79.    Defendants promised to pay Plaintiffs $112,500 by January 24, 2023, less than half the promised monthly distribution.  Defendant Collins stated that if he had to, he would personally write the check to make sure Defendants did not miss that commitment.

80.    On January 19, 2023, Defendant Jacobs sent GridKor a wire transfer in the amount of $112,500.

81.    On February 7, 2023, Defendants again failed to make any distribution of net profits.  Plaintiffs continued to take issue with Defendants' failures, and Defendants continued to blame the delays on FedEx.

82.    The same happened again on March 7, 2023.

83.    Three months after closing, Defendants had failed to deliver five companies collectively operating either 35 trucks or 35 FedEx runs, much less the established, performing trucks and runs Defendants had represented the companies had.  Further, Defendants had yet to make the promised monthly net profit distribution of $242,500 even once, the gross revenues of all five companies were well below where they had been, what revenue the companies had was being consumed by unexplained expenses that appeared unrelated to the operations of these five companies, and Defendants appeared no closer to fixing any of this than they had been in January.

84.    By the end of March, it became apparent that the five companies Defendants sold to Plaintiffs had not, in fact, had the trucks, routes, or revenues that Defendants had represented they did.  Instead, Defendants appeared to be in the process of moving trucks and routes into the companies they had sold Plaintiff and/or seeking to obtain new routes from FedEx for the

20

companies to run.  In short, Defendants were trying to build or create what they had represented was already established and in place.  And Defendants were not succeeding even at that.

85.    Frustrated with Defendants' deception, Plaintiffs looked to part ways with Defendants and sought to mitigate their damages.  Plaintiffs demanded that Defendants return their money and more negotiations ensued.

### Defendants Induce Plaintiffs to Enter Into a New Agreement with MGM, This Time Supported by Personal Promissory Notes

86.    Defendants ultimately agreed to return a substantial portion of the nearly $5 million and to allow Plaintiffs to take 100 percent ownership of the largest of the five companies, PSI Logistics Inc.

87.    GridKor executed a new agreement purportedly with MGM, dated April 6, 2023 (hereinafter "the April 6 Agreement"), a true and correct copy of which is attached hereto as **Exhibit 7**.

88.    Under the April 6 Agreement, "MGM Linehaul Inc." agreed to pay Plaintiff a total of $3.5 million to buy Plaintiff out of its 67 percent stake in each of Cha Cha Logistics, Inc., Xpress Logistics, Inc., Victoria Logistics, Inc. and HEB Logistics, Inc. while MGM agreed to transfer its 33 percent interest in PSI Logistics, Inc. to Plaintiff.  The end result thus was that Plaintiff would keep only PSI Logistics, Inc., owning it 100 percent, while MGM would take full ownership of the other four companies in their entirety and return $3.5 million to Plaintiff.

89.    The April 6 Agreement required MGM to make the $3.5 million payment by:

   a.    paying a deposit of $300,000 on or before April 16 or 20, 2023[1];

---

[1] The Agreement references in two places the obligation to make a $300,000 initial payment "on or before April 16, 2023," but in the second place Defendant Collins handwrote an "X" over the 16 and wrote "20" above it and initialed next to the change.  Defendant Collins, however, did not make such a change in the other place were the deadline of April 16, 2023 is identified.

b.    paying an additional amount of $1,700,000 on or before July 4, 2023 for Plaintiffs' interest in Cha Cha, Victoria, and HEB; and

c.    paying an additional amount of $1,500,000 for Plaintiffs' interest in Xpress on or before July 4, 2023, if Plaintiffs did not exercise a 30-day option to also take 100 percent of Xpress.[2]

90.    In the event MGM failed to timely make the initial payment of $300,000, the April 6 Agreement provided that "MGM shall be liable to pay Gridkor a penalty of $50,000 per week, effective on April 16, 2023." (**Exh. 7** at p. 2.)

91.    In the event MGM failed to timely make the Additional Payment(s), the April 6 Agreement provided that "MGM shall be liable to pay Gridkor a penalty of $150,000 per month, effective on day 91 (July 5, 2023) …." (**Exh. 7** at p. 2.)

92.    Attached to the April 6 Agreement was "Exhibit A – Truck VINs," which the April 6 Agreement expressly incorporated by reference, purporting to list the VINs of the 14 trucks owned by PSI Logistics, Inc.

93.    Also attached to the April 6 Agreement was "Exhibit B – Route Identification," which referenced "Attachment A-1" to PSI's Transportation Service Provider Agreement with FedEx, which was in turn attached to the April 6 Agreement as Exhibit H and listed the specific "Assigned Runs" for PSI. (*See* **Exh. 7** at Exhs. B & H.)

94.    In a section entitled "Guaranteed Weekly Gross Revenue per Truck," MGM expressly guaranteed gross revenue of $105,000 per week for PSI and agreed that if that guarantee

---

[2] The April 6 Agreement gave GridKor "a 30 day option" to also acquire Xpress, the exercise of which was to be "at the discretion of" GridKor and conditioned upon MGM bringing the value of Xpress up to $1,500,000 by earning an average of $240,000 per month in revenue. (**Exh. 7** at pp. 1-2.) Neither MGM nor Xpress met that condition and Plaintiffs did not exercise the option on Xpress.

was not met, "MGM shall pay GridKor the difference between the actual gross revenue generated … and the Guaranteed Weekly Gross Revenue within (10) business days of the end of that week." (**Exh. 7** at p. 4.)  The April 6 Agreement expressly stated that this obligation "shall be in addition to any other obligations MGM has under this Agreement, including but not limited to the payment of the deposit, additional consideration, and any penalties." (*Id.* at pp. 4-5.)

95.     Under the heading "Personal Guarantee," the April 6 Agreement further provided that "[i]n consideration of Grid Kor entering into this Agreement with MGM, the undersigned individual(s) (the 'Guarantor(s)') hereby unconditionally and irrevocably guarantee(s) the full, prompt, and complete performance by MGM of all its present and future obligations, financial or otherwise, arising under this Agreement, including but not limited to the payment of the deposit, additional consideration, and any penalties as set forth herein, as well as the payment of any other amounts owed by MGM to GridKor …." (**Exh. 7** at p. 5.)

96.     Defendants Gorbach, Collins, Matcharashvili, Maydanskyy, and Mitic each signed or initialed the April 6 Agreement, and each separately executed individual promissory notes attached to the April 6 Agreement as Exhibits C through G.

97.     The April 6 Agreement made clear that "[t]he Guarantor(s)' liability under this personal guarantee shall be joint and several, if there are multiple Guarantors, and shall be absolute and unconditional, without regard to the validity, regularity, or enforceability of the Agreement or the promissory note, or any other circumstances that might otherwise constitute a legal or equitable discharge or defense of a guarantor." (**Exh. 7** at p. 5.)

98.     In the five promissory notes, Defendants Gorbach, Collins, Matcharashvili, Maydanskyy, and Mitic each:

a.    "unconditionally promise[d] to pay to the order of GridKor, LLC ('Payee'), the principal sum of three million five-hundred thousand dollars ($3,500,000.00), together with any accrued and unpaid interest, in accordance with the terms and conditions set forth in [the April 6 Agreement] between GridKor, LLC and MGM Linehaul Inc.'";

b.    "agree[d] to pay the principal sum and any accrued and unpaid interest according to the payment schedule and other terms and conditions specified in the Agreement" and do so "without set-off or counterclaim";

c.    agreed to pay interest "at a rate of 9% per annum, calculated on the basis of a 365-day year for the actual number of days elapsed";

d.    agreed that "[p]enalties as described in the agreement above will be added into the final number if target dates are missed or violation of non-solicitation";

e.    agreed that if any payment is not made when due or any obligation under the note or the April 6 Agreement is not performed, Plaintiff "may, at its option, declare the entire unpaid principal balance, together with all accrued and unpaid interest, immediately due and payable without presentment, demand, protest, or notice of any kind, all of which are hereby expressly waived"; and

f.    agreed that upon any default, Plaintiff "shall have all rights and remedies available under the Agreement, this Promissory Note, and applicable law, including but not limited to the right to recover any costs, expenses, and reasonable attorneys' fees incurred in connection with the collection or enforcement of this Promissory Note."

99.    The April 6 Agreement further provided as follows:

In the event of any dispute, claim, or controversy arising out of or relating to this Agreement, the prevailing party shall be entitled to recover, in addition to any other relief awarded or granted, its reasonable costs and expenses (including attorneys'

24

fees) incurred in the dispute, claim, or controversy, as well as in any appeal or enforcement of any judgment or award resulting therefrom.

(**Exh. 7** at p. 2.)

100.    Also on April 6, 2023, Defendant Tupychak, MGM, and Plaintiffs executed a separate assignment of ownership agreement by which Defendant Tupychak formally conveyed 100 percent of the capital stock of PSI Logistics Inc. to GTL.

### *Plaintiffs Learn of More Misrepresentations*

101.    Following the execution of the April 6 Agreement, Mr. Bryant traveled to Long Island, New York to meet Defendant Tupychak for the purpose of transferring PSI's bank accounts.  At the bank, Defendant Tupychak confirmed that all of the trucks listed on Exhibit A to the April 6 Agreement were "in PSI," meaning they were owned by PSI.

102.    On April 14, 2023, a truck performing one of PSI's routes was involved in an accident on I-94 near Hixton, Wisconsin.   Defendants provided Plaintiffs with what they represented to be the policy number and other insurance information for the truck involved in the accident, which Plaintiffs then used to submit a notice to the carrier.  The carrier, however, subsequently advised that the referenced truck *was not* covered under the policy of insurance.

103.    On April 20, 2023, Plaintiffs learned that FedEx employees had told a team of PSI drivers in Harrisburg, Pennsylvania that PSI was no longer showing in the FedEx system and they could not assign loads to them.

104.    That same day, April 20, Mr. Bryant traveled to Lehigh County and met with Defendants Gorbach, Collins, Matcharashvili, Maydanskyy and Mitic at MGM's purported offices at 9883 Old US 22 in Breinigsville.

105.    In that meeting, Defendants disclosed and/or admitted the following:

25

a.  FedEx had "shut down" Cha Cha, Xpress, Victoria and HEB on April 17, 2023, and stopped assigning those companies any loads;

b.  FedEx was investigating those four companies *and* PSI;

c.  All five companies were now informally "suspended" by FedEx;

d.  An employee who had handled payroll and financial matters for MGM had parted ways with Defendants in January 2023 and sent a "bad email" threatening that she was "taking everything to FedEx"; and

e.  That the issues referenced by the disgruntled former employee related to "cybersecurity rules," the companies' provision of 1099s to drivers for portions of their compensation, and drivers sharing and/or multiple drivers using the same credentials and/or identification documents.

***Defendants Fail to Make the Payments Due Under the April 23 Agreement and Notes***

106.  In the meeting on April 20, 2023, Defendants Gorbach, Collins, Matcharashvili, Maydanskyy and Mitic also told Mr. Bryant that they were not going to be able to make the initial payment of $300,000 due under the April 6 Agreement.

107.  Mr. Bryant agreed on behalf of Plaintiffs to allow Defendants to make half of the initial payment ($150,000) on April 21, 2023, and the remaining half by May 19, 2023.  Mr. Bryant further agreed on behalf of Plaintiffs that, so long as the full payment (*i.e.*, both payments of $150,000) were made by May 19, Plaintiffs would not enforce the penalty provisions in the April 6 Agreement.  However, if any of the initial payment was not received on the due date as modified, the full penalty of $200,000 would be due and MGM and the five individuals who signed the promissory notes in connection with the April 6 Agreement would pay that penalty.  All other terms and conditions of the April 6 Agreement were to remain unchanged.

108.    Defendants, however, failed to make the initial payment even under the modified terms.

109.    On April 21, 2023, GTL received a wire transfer from Defendant Collins in the amount of just $70,000, less than half of the $150,000 due that day under the modified terms.

110.    On April 24, 2023, Defendant Gorbach sent GTL a wire transfer in the amount of $50,000.

111.    On May 19, 2023, Defendant Maydanskyy sent GTL a wire transfer in the amount of $22,000.

112.    Plaintiffs have not received any other payments from or on behalf of Defendants.

113.    Accordingly, Defendants made payments totaling only $142,000, and did not make even those by April 21, 2023, as required by the parties' agreement.  Defendants never paid any payments towards the other $150,000 due on May 19, 2023.

114.    Defendants also failed to pay the penalty due for failing to make the $300,000 initial payment.

115.    Defendants further failed to pay anything towards the $3,200,000 in additional payments due on or before July 4, 2023.

116.    Defendants also failed to pay the penalties due for failing to make the $3,200,000 additional payments.

117.    Further, PSI never produced the $105,000 per week in gross revenue Defendants guaranteed, yet Defendants have failed to pay the difference between PSI's actual revenues and the guaranteed amount.

118.    In addition, Plaintiffs discovered that none of the 14 trucks owned by PSI Logistics Inc. identified on Exhibit A to the April 6 Agreement were, in fact, owned by PSI.

27

119.    Plaintiffs repeatedly demanded that Defendants cause the titles for those trucks to be transferred to PSI.  To date, however, Defendants have only transferred the title of five trucks to PSI.

120.    Meanwhile, on information and belief, FedEx has terminated its relationships with Cha Cha, Xpress, Victoria, and HEB.

121.    FedEx has informed Plaintiffs that it also expects to terminate its relationship with PSI and that it will not consider working with PSI in the future, even under different and independent ownership.

122.    In summary, Defendants operated a group of at least five Pennsylvania corporations performing linehaul trucking services under at least five separate contracts with FedEx, employing practices that violated numerous staffing, safety, and tax requirements and doing so through a web of relationships (and a non-existent purported business called "MGM" or "MGM Linehaul") apparently designed to conceal from FedEx the overlapping ownership and effective control of these entities and/or the involvement of one or more bad actors known to FedEx.

123.    Through numerous misrepresentations and material omissions, Defendants then induced Plaintiffs to pay them nearly $5 million for a 67 percent interest in these five companies. When Plaintiffs became dissatisfied with the performance of the companies and frustrated with Defendants' management of them, Defendants agreed to take four of the companies back and return $3.5 million to Plaintiffs.  But Defendants only paid $142,000 of the amount owed and it was revealed that the one company Defendants induced Plaintiff to keep (PSI Logistics Inc.) was essentially worthless because it did not actually own the assets Defendants had represented it did, it was under investigation by FedEx for numerous violations of legal requirements and its

contractual obligations to FedEx, and its other principal asset (its agreement with FedEx) was subject to termination.

## COUNT I
## UNJUST ENRICHMENT
## All Defendants

124.    Plaintiffs hereby repeat the averments set forth in the previous paragraphs and incorporate the same by reference as if set forth fully herein.

125.    Plaintiffs conferred benefits on Defendants, namely payments totaling $4,941,179.18 which Plaintiffs made or caused to be made to bank accounts identified by Defendants.

126.    Plaintiffs conferred said benefits under a purported Stock Purchase Agreement between GridKor, LLC and a company called "MGM Linehaul Consulting" on behalf of which Defendants Gorbach, Collins, and Maydansky purported to sign as members of that company.

127.    Defendants purported to execute or acknowledge other agreements on behalf of "MGM Linehaul Consulting" and/or "MGM Linehaul Inc." including a Management Agreement, the April 6 Agreement, and an Assignment of Ownership Agreement.

128.    Defendants each further made various representations to Plaintiffs about the existence, performance, operations, capabilities, track record, and relationships of "MGM Linehaul Consulting" and/or "MGM Linehaul Inc."

129.    However, on information and belief, there is no legal entity by the name of "MGM Linehaul Consulting" or "MGM Linehaul Inc." and each of the above-referenced agreements was void from the start.

130.    Defendants each appreciated the benefits conferred by Plaintiffs.

29

131.    Defendants accepted and retained the benefits conferred by Plaintiffs under such circumstances that it would be inequitable for Defendants to retain the benefit without returning anything of commensurate value to Plaintiffs.

132.    Additionally, and in the alternative should a valid company by the name of "MGM Linehaul Consulting" or "MGM Linehaul Inc." actually exist and should Defendants have had actual authority to act on behalf of such company, Defendants obtained the benefits conferred by Plaintiffs through tortious conduct (*i.e.*, material misrepresentations and omissions about themselves and the operations, performance, and assets of the companies they purported to sell to Plaintiffs) and they should not be permitted to keep the benefit of their tortious conduct.

**COUNT II**
**CIVIL CONSPIRACY**
**All Defendants**

133.    Plaintiffs hereby repeat the averments set forth in the previous paragraphs and incorporate the same by reference as if set forth fully herein.

134.    Defendants Gorbach, Collins, Maydanskyy, Mitic, Matcharashvili, Tupychak and Jacobs combined with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose, to wit: inducing Plaintiffs to pay them nearly $5 million for five trucking companies by misrepresenting the companies' assets, past performance, and projected future performance and concealing the fact that Defendants operated those companies unlawfully and in violation of numerous safety, regulatory, and contractual requirements.

135.    Defendants engaged in at least one (and, in fact, many) overt acts in pursuance of that common purpose, including but not limited to:

    a.    Defendant Gorbach's participation in numerous phone calls and multiple meetings with Plaintiff in Lehigh County, Harrisburg, and Pittsburgh;

30

b.      Defendant Collins' provision of documents and information regarding the five companies and his participation in numerous phone calls and multiple meetings with Plaintiff in Lehigh County, Harrisburg, and Pittsburgh;

c.      Defendant Maydanskyy's participation in numerous phone calls and multiple meetings with Plaintiff in Lehigh County, Harrisburg, and Pittsburgh;

d.      Defendant Mitic's participation in meetings with Plaintiffs in Lehigh County and his provision of information regarding the assets and operations of the five companies to Plaintiffs;

e.      Defendant Matcharashvili's participation in meetings with Plaintiffs in Lehigh County and his provision of information regarding the assets and operations of the five companies to Plaintiffs;

f.      Defendant Tupychak's allowing his cousin, Defendant Maydanskyy, and the other co-conspirators to use his name as the owner and operator of PSI Logistics Inc., and his statements to and provision of information about PSI to Plaintiffs; and

g.      Defendant Jacbobs' participation in meetings with Plaintiffs in Lehigh County and in Pittsburgh and has statements and representations regarding MGM and Victoria Logistics Inc.

136.    Plaintiff have suffered damages as a result of Defendants' fraudulent conduct in an amount to be determined at trial, including funds they were fraudulently induced to pay to Defendants, lost profits and/or dividends, and other compensatory and/or consequential damages.

137.    Defendants' conduct was malicious, wanton, willful, oppressive, or exhibited a reckless indifference to the rights of others.

138.    Defendants are liable for punitive damages in an amount to be determined at trial.

31

## COUNT III
## FRAUD
## Igor Gorbach

139.    Plaintiffs hereby repeat the averments set forth in the previous paragraphs and incorporate the same by reference as if set forth fully herein.

140.    Defendant Igor Gorbach misrepresented the following material facts to Plaintiffs with knowledge of the falsity of the statements, or recklessness as to the truth or falsity of the statement:

    a.    that "MGM Linehaul Inc.," "MGM Linehaul Consulting LLC," or any similarly-named entity was an existing company approved and authorized to do business with FedEx;

    b.    that Cha Cha Logistics Inc., Xpress Logistics Inc., PSI Logistics Inc., Victoria Logistics Inc. and HEB Logistics Inc. were established businesses collectively operating 35 existing routes under contracts with FedEx;

    c.    that Cha Cha Logistics Inc., Xpress Logistics Inc., PSI Logistics Inc., Victoria Logistics Inc. and HEB Logistics Inc. generated, and would continue to generate, net profits of 20 percent or more of revenues;

    d.    that the revenues and expenses of Cha Cha Logistics Inc., Xpress Logistics Inc., PSI Logistics Inc., Victoria Logistics Inc. and HEB Logistics Inc. were, and would continue to be, such that a 67 percent interest in those companies would be expected to produce a monthly net profit to Plaintiff of $242,500;

    e.    that PSI Logistics Inc. owned certain specifically-identified trucks.

141.    Defendant Gorbach further concealed the following material facts from Plaintiff, which concealment was calculated to deceive Plaintiff:

a.    that Defendant Gorbach (and possibly others) had been involved in a company or companies that had been the subject of investigations by FedEx and the FBI in Utah;

b.    that Defendants operated Cha Cha Logistics Inc., Xpress Logistics Inc., PSI Logistics Inc., Victoria Logistics Inc. and HEB Logistics Inc. in violation of numerous laws, regulations, and FedEx requirements;

c.    that FedEx was investigating Defendant Mitic and/or at least one of Cha Cha Logistics Inc., Xpress Logistics Inc., PSI Logistics Inc., Victoria Logistics Inc. and HEB Logistics Inc.; and

d.    that, in January 2023, an MGM employee had sent or threatened to send an email to FedEx disclosing Defendants' violations and misconduct.

142.    Defendant Gorbach made the above misrepresentations and concealed the above facts with the intent of misleading Plaintiffs into relying upon his misrepresentations and concealments.

143.    Plaintiffs justifiably relied on Defendant Gorbach's misrepresentations.

144.    Plaintiffs have suffered damages as a result of Defendant Gorbach's fraudulent conduct in an amount to be determined at trial, including funds they were fraudulently induced to pay to Defendants, lost profits and/or dividends, and other compensatory and/or consequential damages.

145.    Defendant Gorbach's conduct was malicious, wanton, willful, oppressive, or exhibited a reckless indifference to the rights of others.

146.    Defendant Gorbach is liable for punitive damages in an amount to be determined at trial.

## COUNT IV
## FRAUD
## William Collins

147. Plaintiffs hereby repeat the averments set forth in the previous paragraphs and incorporate the same by reference as if set forth fully herein.

148. Defendant William Collins misrepresented the following material facts to Plaintiffs with knowledge of the falsity of the statements, or recklessness as to the truth or falsity of the statement:

a. that "MGM Linehaul Inc.," "MGM Linehaul Consulting LLC," or any similarly-named entity was an existing company approved and authorized to do business with FedEx;

b. that Cha Cha Logistics Inc., Xpress Logistics Inc., PSI Logistics Inc., Victoria Logistics Inc. and HEB Logistics Inc. were established businesses collectively operating 35 existing routes under contracts with FedEx;

c. that Cha Cha Logistics Inc., Xpress Logistics Inc., PSI Logistics Inc., Victoria Logistics Inc. and HEB Logistics Inc. generated, and would continue to generate, net profits of 20 percent or more of revenues; and

d. that the revenues and expenses of Cha Cha Logistics Inc., Xpress Logistics Inc., PSI Logistics Inc., Victoria Logistics Inc. and HEB Logistics Inc. were, and would continue to be, such that a 67 percent interest in those companies would be expected to produce a monthly net profit to Plaintiff of $242,500;

e. that PSI Logistics Inc. owned certain specifically-identified trucks.

149. Defendant Collins further concealed the following material facts from Plaintiffs, which concealment was calculated to deceive Plaintiffs:

a.      that Defendant Gorbach (and possibly others) had been involved in a company or companies that had been the subject of investigations by FedEx and the FBI in Utah;

b.      that Defendants operated Cha Cha Logistics Inc., Xpress Logistics Inc., PSI Logistics Inc., Victoria Logistics Inc. and HEB Logistics Inc. in violation of numerous laws, regulations, and FedEx requirements;

c.      that FedEx was investigating Defendant Mitic and/or at least one of Cha Cha Logistics Inc., Xpress Logistics Inc., PSI Logistics Inc., Victoria Logistics Inc. and HEB Logistics Inc.; and

d.      that, in January 2023, an MGM employee had sent or threatened to send an email to FedEx disclosing Defendants' violations and misconduct.

150.    Defendant Collins made the above misrepresentations and concealed the above facts with the intent of misleading Plaintiffs into relying upon his misrepresentations and concealments.

151.    Plaintiffs justifiably relied on Defendant Collins' misrepresentations.

152.    Plaintiffs have suffered damages as a result of Defendant Collins' fraudulent conduct in an amount to be determined at trial, including funds they were fraudulently induced to pay to Defendants, lost profits and/or dividends, and other compensatory and/or consequential damages.

153.    Defendant Collins' conduct was malicious, wanton, willful, oppressive, or exhibited a reckless indifference to the rights of others.

154.    Defendant Collins is liable for punitive damages in an amount to be determined at trial.

35

## COUNT V
## FRAUD
## Ucha Matcharashvili

155. Plaintiffs hereby repeat the averments set forth in the previous paragraphs and incorporate the same by reference as if set forth fully herein.

156. Defendant Ucha Matcharashvili misrepresented the following material facts to Plaintiffs with knowledge of the falsity of the statements, or recklessness as to the truth or falsity of the statement:

a. that "MGM Linehaul Inc.," "MGM Linehaul Consulting LLC," or any similarly-named entity was an existing company approved and authorized to do business with FedEx;

b. that Cha Cha Logistics Inc., Xpress Logistics Inc., PSI Logistics Inc., Victoria Logistics Inc. and HEB Logistics Inc. were established businesses collectively operating 35 existing routes under contracts with FedEx;

c. that Cha Cha Logistics Inc., Xpress Logistics Inc., PSI Logistics Inc., Victoria Logistics Inc. and HEB Logistics Inc. generated, and would continue to generate, net profits of 20 percent or more of revenues;

d. that the revenues and expenses of Cha Cha Logistics Inc., Xpress Logistics Inc., PSI Logistics Inc., Victoria Logistics Inc. and HEB Logistics Inc. were, and would continue to be, such that a 67 percent interest in those companies would be expected to produce a monthly net profit to Plaintiff of $242,500; and

e. that PSI Logistics Inc. owned certain specifically-identified trucks.

157. Defendant Matcharashvili further concealed the following material facts from

Plaintiffs, which concealment was calculated to deceive Plaintiff:

a.      that Defendant Gorbach (and possibly others) had been involved in a company or companies that had been the subject of investigations by FedEx and the FBI in Utah;

b.      that Defendants operated Cha Cha Logistics Inc., Xpress Logistics Inc., PSI Logistics Inc., Victoria Logistics Inc. and HEB Logistics Inc. in violation of numerous laws, regulations, and FedEx requirements;

c.      that FedEx was investigating Defendant Mitic and/or at least one of Cha Cha Logistics Inc., Xpress Logistics Inc., PSI Logistics Inc., Victoria Logistics Inc. and HEB Logistics Inc.; and

d.      that, in January 2023, an MGM employee had sent or threatened to send an email to FedEx disclosing Defendants' violations and misconduct.

158.    Defendant Matcharashvili made the above misrepresentations and concealed the above facts with the intent of misleading Plaintiffs into relying upon his misrepresentations and concealments.

159.    Plaintiffs justifiably relied on Defendant Matcharashvili's misrepresentations.

160.    Plaintiffs have suffered damages as a result of Defendant Matcharashvili's fraudulent conduct in an amount to be determined at trial, including funds they were fraudulently induced to pay to Defendants, lost profits and/or dividends, and other compensatory and/or consequential damages.

161.    Defendant Matcharashvili's conduct was malicious, wanton, willful, oppressive, or exhibited a reckless indifference to the rights of others.

162.    Defendant Matcharashvili is liable for punitive damages in an amount to be

37

determined at trial.

**COUNT VI**
**FRAUD**
**Oleksandr Maydanskyy**

163.    Plaintiffs hereby repeat the averments set forth in the previous paragraphs and incorporate the same by reference as if set forth fully herein.

164.    Defendant Oleksandr Maydanskyy misrepresented the following material facts to Plaintiffs with knowledge of the falsity of the statements, or recklessness as to the truth or falsity of the statement:

a.    that "MGM Linehaul Inc.," "MGM Linehaul Consulting LLC," or any similarly-named entity was an existing company approved and authorized to do business with FedEx;

b.    that Cha Cha Logistics Inc., Xpress Logistics Inc., PSI Logistics Inc., Victoria Logistics Inc. and HEB Logistics Inc. were established businesses collectively operating 35 existing routes under contracts with FedEx;

c.    that Cha Cha Logistics Inc., Xpress Logistics Inc., PSI Logistics Inc., Victoria Logistics Inc. and HEB Logistics Inc. generated, and would continue to generate, net profits of 20 percent or more of revenues;

d.    that the revenues and expenses of Cha Cha Logistics Inc., Xpress Logistics Inc., PSI Logistics Inc., Victoria Logistics Inc. and HEB Logistics Inc. were, and would continue to be, such that a 67 percent interest in those companies would be expected to produce a monthly net profit to Plaintiff of $242,500; and

e.    that PSI Logistics Inc. owned certain specifically-identified trucks.

165.    Defendant Maydanskyy further concealed the following material facts from

Plaintiffs, which concealment was calculated to deceive Plaintiffs:

a. that Defendant Gorbach (and possibly others) had been involved in a company or companies that had been the subject of investigations by FedEx and the FBI in Utah;

b. that Defendants operated Cha Cha Logistics Inc., Xpress Logistics Inc., PSI Logistics Inc., Victoria Logistics Inc. and HEB Logistics Inc. in violation of numerous laws, regulations, and FedEx requirements;

c. that FedEx was investigating Defendant Mitic and/or at least one of Cha Cha Logistics Inc., Xpress Logistics Inc., PSI Logistics Inc., Victoria Logistics Inc. and HEB Logistics Inc.; and

d. that, in January 2023, an MGM employee had sent or threatened to send an email to FedEx disclosing Defendants' violations and misconduct.

166. Defendant Maydanskyy made the above misrepresentations and concealed the above facts with the intent of misleading Plaintiffs into relying upon his misrepresentations and concealments.

167. Plaintiffs justifiably relied on Defendant Maydanskyy's misrepresentations.

168. Plaintiffs have suffered damages as a result of Defendant Maydanskyy's fraudulent conduct in an amount to be determined at trial, including funds they were fraudulently induced to pay to Defendants, lost profits and/or dividends, and other compensatory and/or consequential damages.

169. Defendant Maydanskyy's conduct was malicious, wanton, willful, oppressive, or exhibited a reckless indifference to the rights of others.

170. Defendant Maydanskyy is liable for punitive damages in an amount to be

determined at trial.

**COUNT VII**
**FRAUD**
**Milos Mitic**

171.    Plaintiffs hereby repeat the averments set forth in the previous paragraphs and incorporate the same by reference as if set forth fully herein.

172.    Defendant Milos Mitic misrepresented the following material facts to Plaintiffs with knowledge of the falsity of the statements, or recklessness as to the truth or falsity of the statement:

a.    that "MGM Linehaul Inc.," "MGM Linehaul Consulting LLC," or any similarly-named entity was an existing company approved and authorized to do business with FedEx;

b.    that Cha Cha Logistics Inc., Xpress Logistics Inc., PSI Logistics Inc., Victoria Logistics Inc. and HEB Logistics Inc. were established businesses collectively operating 35 existing routes under contracts with FedEx;

c.    that Cha Cha Logistics Inc., Xpress Logistics Inc., PSI Logistics Inc., Victoria Logistics Inc. and HEB Logistics Inc. generated, and would continue to generate, net profits of 20 percent or more of revenues;

d.    that the revenues and expenses of Cha Cha Logistics Inc., Xpress Logistics Inc., PSI Logistics Inc., Victoria Logistics Inc. and HEB Logistics Inc. were, and would continue to be, such that a 67 percent interest in those companies would be expected to produce a monthly net profit to Plaintiff of $242,500; and

e.    that PSI Logistics Inc. owned certain specifically-identified trucks.

173.    Defendant Mitic further concealed the following material facts from Plaintiffs,

which concealment was calculated to deceive Plaintiffs:

      a.    that Defendant Gorbach (and possibly others) had been involved in a company or companies that had been the subject of investigations by FedEx and the FBI in Utah;

      b.    that Defendants operated Cha Cha Logistics Inc., Xpress Logistics Inc., PSI Logistics Inc., Victoria Logistics Inc. and HEB Logistics Inc. in violation of numerous laws, regulations, and FedEx requirements;

      c.    that FedEx was investigating Defendant Mitic and/or at least one of Cha Cha Logistics Inc., Xpress Logistics Inc., PSI Logistics Inc., Victoria Logistics Inc. and HEB Logistics Inc.; and

      d.    that, in January 2023, an MGM employee had sent or threatened to send an email to FedEx disclosing Defendants' violations and misconduct.

174. Defendant Mitic made the above misrepresentations and concealed the above facts with the intent of misleading Plaintiffs into relying upon his misrepresentations and concealments.

175. Plaintiffs justifiably relied on Defendant Mitic's misrepresentations.

176. Plaintiffs have suffered damages as a result of Defendant Mitic's fraudulent conduct in an amount to be determined at trial, including funds they were fraudulently induced to pay to Defendants, lost profits and/or dividends, and other compensatory and/or consequential damages.

177. Defendant Mitic's conduct was malicious, wanton, willful, oppressive, or exhibited a reckless indifference to the rights of others.

178. Defendant Mitic is liable for punitive damages in an amount to be determined at trial.

## COUNT VIII
## FRAUD
## Pavlo Tupychak

179.    Plaintiffs hereby repeat the averments set forth in the previous paragraphs and incorporate the same by reference as if set forth fully herein.

180.    Defendant Pavlo Tupychak misrepresented the following material facts to Plaintiffs with knowledge of the falsity of the statements, or recklessness as to the truth or falsity of the statement:

    a.    that PSI Logistics Inc. was an established business operating 14 existing routes under contracts with FedEx; and

    b.    that PSI Logistics Inc. owned 14 trucks and that the trucks it owned were the trucks listed on Exhibit A to the April 6 Agreement.

181.    Defendant Tupychak further concealed the following material facts from Plaintiffs, which concealment was calculated to deceive Plaintiffs:

    a.    that Defendant Gorbach (and possibly others) had been involved in a company or companies that had been the subject of investigations by FedEx and the FBI in Utah;

    b.    that Defendants operated Cha Cha Logistics Inc., Xpress Logistics Inc., PSI Logistics Inc., Victoria Logistics Inc. and HEB Logistics Inc. in violation of numerous laws, regulations, and FedEx requirements;

    c.    that FedEx was investigating Defendant Mitic and/or at least one of Cha Cha Logistics Inc., Xpress Logistics Inc., PSI Logistics Inc., Victoria Logistics Inc. and HEB Logistics Inc.; and

    d.    that, in January 2023, an MGM employee had sent or threatened to send an

email to FedEx disclosing Defendants' violations and misconduct.

182. Defendant Tupychak made the above misrepresentations and concealed the above facts with the intent of misleading Plaintiffs into relying upon his misrepresentations and concealments.

183. Plaintiffs justifiably relied on Defendant Tupychak's misrepresentations.

184. Plaintiffs have suffered damages as a result of Defendant Tupychak's fraudulent conduct in an amount to be determined at trial, including funds they were fraudulently induced to pay to Defendants, lost profits and/or dividends, and other compensatory and/or consequential damages.

185. Defendant Tupychak's conduct was malicious, wanton, willful, oppressive, or exhibited a reckless indifference to the rights of others.

186. Defendant Tupychak is liable for punitive damages in an amount to be determined at trial.

### COUNT IX
### FRAUD
### Jonathan Jacobs

187. Plaintiffs hereby repeat the averments set forth in the previous paragraphs and incorporate the same by reference as if set forth fully herein.

188. Defendant Jonathan Jacobs misrepresented the following material facts to Plaintiffs with knowledge of the falsity of the statements, or recklessness as to the truth or falsity of the statement:

a. that "MGM Linehaul Inc.," "MGM Linehaul Consulting LLC," or any similarly-named entity was an existing company approved and authorized to do business with FedEx;

b.      that Cha Cha Logistics Inc., Xpress Logistics Inc., PSI Logistics Inc., Victoria Logistics Inc. and HEB Logistics Inc. generated, and would continue to generate, net profits of 20 percent or more of revenues;

c.      that the revenues and expenses of Cha Cha Logistics Inc., Xpress Logistics Inc., PSI Logistics Inc., Victoria Logistics Inc. and HEB Logistics Inc. were, and would continue to be, such that a 67 percent interest in those companies would be expected to produce a monthly net profit to Plaintiff of $242,500;

d.      that Defendants and MGM did an excellent job operating Victoria Logistics Inc. and that Defendant Jacobs was receiving a 25 to 30 percent return on his investment; and

e.      that Victoria Logistics Inc. was "clearing 13K per week per truck" and it "should be no problem to hit" the numbers that had been provided to Plaintiff.

189.    Defendant Jacobs further concealed the following material facts from Plaintiff, which concealment was calculated to deceive Plaintiff:

a.      that MGM and/or Defendant Gorbach owed Defendant Jacobs approximately $2.9 million;

b.      that Defendant Gorbach (and possibly others) had been involved in a company or companies that had been the subject of investigations by FedEx and the FBI in Utah;

c.      that Defendants operated Cha Cha Logistics Inc., Xpress Logistics Inc., PSI Logistics Inc., Victoria Logistics Inc. and HEB Logistics Inc. in violation of numerous laws, regulations, and FedEx requirements;

44

d.    that FedEx was investigating Defendant Mitic and/or at least one of Cha Cha Logistics Inc., Xpress Logistics Inc., PSI Logistics Inc., Victoria Logistics Inc. and HEB Logistics Inc.; and

e.    that, in January 2023, an MGM employee had sent or threatened to send an email to FedEx disclosing Defendants' violations and misconduct.

190.    Defendant Jacobs made the above misrepresentations and concealed the above facts with the intent of misleading Plaintiffs into relying upon his misrepresentations and concealments.

191.    Plaintiffs justifiably relied on Defendant Jacobs' misrepresentations.

192.    Plaintiffs have suffered damages as a result of Defendant Jacobs' fraudulent conduct in an amount to be determined at trial, including funds they were fraudulently induced to pay to Defendants, lost profits and/or dividends, and other compensatory and/or consequential damages.

193.    Defendant Jacobs' conduct was malicious, wanton, willful, oppressive, or exhibited a reckless indifference to the rights of others.

194.    Defendant Jacobs is liable for punitive damages in an amount to be determined at trial.

**COUNT X**
**ENFORCEMENT OF PROMISSORY NOTE**
**Igor Gorbach**

195.    Plaintiffs hereby repeat the averments set forth in the previous paragraphs and incorporate the same by reference as if set forth fully herein.

196.    On or about April 6, 2023, Defendant Gorbach executed a promissory note, which note was attached as Exhibit C to the April 6 Agreement and pursuant to which Defendant Gorbach:

45

a.      "unconditionally promises to pay to the order of GridKor, LLC ('Payee'), the principal sum of three million five-hundred thousand dollars ($3,500,000.00), together with any accrued and unpaid interest, in accordance with the terms and conditions set forth in [the April 6 Agreement] between GridKor, LLC and MGM Linehaul Inc.'";

b.      "agrees to pay the principal sum and any accrued and unpaid interest according to the payment schedule and other terms and conditions specified in the Agreement" and do so "without set-off or counterclaim";

c.      agrees to pay interest "at a rate of 9% per annum, calculated on the basis of a 365-day year for the actual number of days elapsed";

d.      agrees that "[p]enalties as described in the agreement above will be added into the final number if target dates are missed or violation of non-solicitation";

e.      agrees that if any payment is not made when due or any obligation under the note or the April 6 Agreement is not performed, GridKor "may, at its option, declare the entire unpaid principal balance, together with all accrued and unpaid interest, immediately due and payable without presentment, demand, protest, or notice of any kind, all of which are hereby expressly waived"; and

f.      agrees that upon any default, GridKor "shall have all rights and remedies available under the Agreement, this Promissory Note, and applicable law, including but not limited to the right to recover any costs, expenses, and reasonable attorneys' fees incurred in connection with the collection or enforcement of this Promissory Note."

197.    With the exception of $142,000, neither "MGM Linehaul Inc." nor any of Defendants have paid any of the amounts due to Plaintiffs under the April 6 Agreement.

46

198.    Defendant Gorbach is jointly and severally liable for the payment of all amounts due to Plaintiffs, including penalties, interest, costs, expenses and reasonable attorneys' fees.

## COUNT XI
## ENFORCEMENT OF PROMISSORY NOTE
## William Collins

199.    Plaintiffs hereby repeat the averments set forth in the previous paragraphs and incorporate the same by reference as if set forth fully herein.

200.    On or about April 6, 2023, Defendant Collins executed a promissory note, which note was attached as Exhibit D to the April 6 Agreement and pursuant to which Defendant Collins:

a.    "unconditionally promises to pay to the order of GridKor, LLC ('Payee'), the principal sum of three million five-hundred thousand dollars ($3,500,000.00), together with any accrued and unpaid interest, in accordance with the terms and conditions set forth in [the April 6 Agreement] between GridKor, LLC and MGM Linehaul Inc.'";

b.    "agrees to pay the principal sum and any accrued and unpaid interest according to the payment schedule and other terms and conditions specified in the Agreement" and do so "without set-off or counterclaim";

c.    agrees to pay interest "at a rate of 9% per annum, calculated on the basis of a 365-day year for the actual number of days elapsed";

d.    agrees that "[p]enalties as described in the agreement above will be added into the final number if target dates are missed or violation of non-solicitation";

e.    agrees that if any payment is not made when due or any obligation under the note or the April 6 Agreement is not performed, GridKor "may, at its option, declare the entire unpaid principal balance, together with all accrued and unpaid interest, immediately due and payable without presentment, demand, protest, or notice of any kind, all of which are hereby expressly waived"; and

f.      agrees that upon any default, GridKor "shall have all rights and remedies available under the Agreement, this Promissory Note, and applicable law, including but not limited to the right to recover any costs, expenses, and reasonable attorneys' fees incurred in connection with the collection or enforcement of this Promissory Note."

201.   With the exception of $142,000, neither "MGM Linehaul Inc." nor any of Defendants have paid any of the amounts due to Plaintiffs under the April 6 Agreement.

202.   Defendant Collins is jointly and severally liable for the payment of all amounts due to Plaintiffs, including penalties, interest, costs, expenses and reasonable attorneys' fees.

**COUNT XII**
**ENFORCEMENT OF PROMISSORY NOTE**
**Oleksandr Maydanskyy**

203.   Plaintiffs hereby repeat the averments set forth in the previous paragraphs and incorporate the same by reference as if set forth fully herein.

204.   On or about April 6, 2023, Defendant Maydanskyy executed a promissory note, which note was attached as Exhibit E to the April 6 Agreement and pursuant to which Defendant Maydanskyy:

a.      "unconditionally promises to pay to the order of GridKor, LLC ('Payee'), the principal sum of three million five-hundred thousand dollars ($3,500,000.00), together with any accrued and unpaid interest, in accordance with the terms and conditions set forth in [the April 6 Agreement] between GridKor, LLC and MGM Linehaul Inc.'";

b.      "agrees to pay the principal sum and any accrued and unpaid interest according to the payment schedule and other terms and conditions specified in the Agreement" and do so "without set-off or counterclaim";

c.      agrees to pay interest "at a rate of 9% per annum, calculated on the basis of a 365-day year for the actual number of days elapsed";

48

d.      agrees that "[p]enalties as described in the agreement above will be added into the final number if target dates are missed or violation of non-solicitation";

e.      agrees that if any payment is not made when due or any obligation under the note or the April 6 Agreement is not performed, GridKor "may, at its option, declare the entire unpaid principal balance, together with all accrued and unpaid interest, immediately due and payable without presentment, demand, protest, or notice of any kind, all of which are hereby expressly waived"; and

f.      agrees that upon any default, GridKor "shall have all rights and remedies available under the Agreement, this Promissory Note, and applicable law, including but not limited to the right to recover any costs, expenses, and reasonable attorneys' fees incurred in connection with the collection or enforcement of this Promissory Note."

205.    With the exception of $142,000, neither "MGM Linehaul Inc." nor any of Defendants have paid any of the amounts due to Plaintiffs under the April 6 Agreement.

206.    Defendant Maydanskyy is jointly and severally liable for the payment of all amounts due to Plaintiffs, including penalties, interest, costs, expenses and reasonable attorneys' fees.

## COUNT XIII
## ENFORCEMENT OF PROMISSORY NOTE
### Milos Mitic

207.    Plaintiffs hereby repeat the averments set forth in the previous paragraphs and incorporate the same by reference as if set forth fully herein.

208.    On or about April 6, 2023, Defendant Mitic executed a promissory note, which note was attached as Exhibit F to the April 6 Agreement and pursuant to which Defendant Mitic:

a.      "unconditionally promises to pay to the order of GridKor, LLC ('Payee'), the principal sum of three million five-hundred thousand dollars ($3,500,000.00), together

49

with any accrued and unpaid interest, in accordance with the terms and conditions set forth in [the April 6 Agreement] between GridKor, LLC and MGM Linehaul Inc."'";

b. "agrees to pay the principal sum and any accrued and unpaid interest according to the payment schedule and other terms and conditions specified in the Agreement" and do so "without set-off or counterclaim";

c. agrees to pay interest "at a rate of 9% per annum, calculated on the basis of a 365-day year for the actual number of days elapsed";

d. agrees that "[p]enalties as described in the agreement above will be added into the final number if target dates are missed or violation of non-solicitation";

e. agrees that if any payment is not made when due or any obligation under the note or the April 6 Agreement is not performed, GridKor "may, at its option, declare the entire unpaid principal balance, together with all accrued and unpaid interest, immediately due and payable without presentment, demand, protest, or notice of any kind, all of which are hereby expressly waived"; and

f. agrees that upon any default, GridKor "shall have all rights and remedies available under the Agreement, this Promissory Note, and applicable law, including but not limited to the right to recover any costs, expenses, and reasonable attorneys' fees incurred in connection with the collection or enforcement of this Promissory Note."

209. With the exception of $142,000, neither "MGM Linehaul Inc." nor any of Defendants have paid any of the amounts due to Plaintiffs under the April 6 Agreement.

210. Defendant Mitic is jointly and severally liable for the payment of all amounts due to Plaintiffs, including penalties, interest, costs, expenses and reasonable attorneys' fees.

50

## COUNT XIV
## ENFORCEMENT OF PROMISSORY NOTE
## Ucha Matcharashvili

211.   Plaintiffs hereby repeat the averments set forth in the previous paragraphs and incorporate the same by reference as if set forth fully herein.

212.   On or about April 6, 2023, Defendant Matcharashvili executed a promissory note, which note was attached as Exhibit G to the April 6 Agreement and pursuant to which Defendant Matcharashvili:

a.   "unconditionally promises to pay to the order of GridKor, LLC ('Payee'), the principal sum of three million five-hundred thousand dollars ($3,500,000.00), together with any accrued and unpaid interest, in accordance with the terms and conditions set forth in [the April 6 Agreement] between GridKor, LLC and MGM Linehaul Inc.'";

b.   "agrees to pay the principal sum and any accrued and unpaid interest according to the payment schedule and other terms and conditions specified in the Agreement" and do so "without set-off or counterclaim";

c.   agrees to pay interest "at a rate of 9% per annum, calculated on the basis of a 365-day year for the actual number of days elapsed"

d.   agrees that "[p]enalties as described in the agreement above will be added into the final number if target dates are missed or violation of non-solicitation";

e.   agrees that if any payment is not made when due or any obligation under the note or the April 6 Agreement is not performed, GridKor "may, at its option, declare the entire unpaid principal balance, together with all accrued and unpaid interest, immediately due and payable without presentment, demand, protest, or notice of any kind, all of which are hereby expressly waived"; and

f.      agrees that upon any default, GridKor "shall have all rights and remedies available under the Agreement, this Promissory Note, and applicable law, including but not limited to the right to recover any costs, expenses, and reasonable attorneys' fees incurred in connection with the collection or enforcement of this Promissory Note."

213.    With the exception of $142,000, neither "MGM Linehaul Inc." nor any of Defendants have paid any of the amounts due to Plaintiffs under the April 6 Agreement.

214.    Defendant Matcharashvili is jointly and severally liable for the payment of all amounts due to Plaintiffs, including penalties, interest, costs, expenses and reasonable attorneys' fees.

## COUNT XV
## VIOLATION OF PENNSYLVANIA SECURITIES ACT
### All Defendants

215.    Plaintiffs hereby repeat the averments set forth in the previous paragraphs and incorporate the same by reference as if set forth fully herein.

216.    Defendants Gorbach and Collins acted as a broker-dealer or agent of Cha Cha Logistics Inc., Xpress Logistics Inc., PSI Logistics Inc., Victoria Logistics In., and HEB Logistics Inc. without registering under the Pennsylvania Securities Act in violation of 70 Pa. Stat. Ann. § 1-301(a).

217.    Defendant Maydanskyy acted as a broker-dealer or agent of Xpress Logistics Inc., PSI Logistics Inc., Victoria Logistics In., and HEB Logistics Inc. without registering under the Pennsylvania Securities Act in violation of 70 Pa. Stat. Ann. § 1-301(a).

218.    Defendants Gorbach, Collins, and Maydanskyy effected and induced Plaintiffs' purchase of securities by means of manipulative, deceptive or other fraudulent schemes, devices, or contrivances, in violation of 70 Pa. Stat. Ann. § 1-403.

52

219.    In connection with the offer and sale of securities, Defendants Gorbach, Collins, Matcharashvili, Maydanskyy, Mitic, Tupychak, and Jacobs each employed devices, schemes, or artifices to defraud; made untrue statements of material fact and/or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; and engaged in acts, practices, or courses of business which operated as a fraud or deceit upon Plaintiff, in violation of 70 Pa. Stat. Ann. §§ 1-401 and 1-501(a).

220.    Pursuant to 70 Pa. Stat. Ann. § 1-501(a), Defendants are liable to Plaintiffs for the consideration paid by Plaintiffs for the securities in Cha Cha Logistics Inc., Xpress Logistics Inc., PSI Logistics Inc., Victoria Logistics In., and HEB Logistics Inc., together with interest at the legal rate from the date of payment, less the amount of any income or distributions, or for damages.

**COUNT XVI**
**(in the alternative)**
**ALTER EGO LIABILITY FOR BREACH OF CONTRACT**
**Igor Gorbach, William Collins, Oleksandr Maydanskyy,**
**Milos Mitic, and Ucha Matcharashvili**

221.    Plaintiffs hereby repeat the averments set forth in the previous paragraphs and incorporate the same by reference as if set forth fully herein.

222.    On or about December 5, 2022, following discussions and negotiations with Defendants Gorbach, Collins, Maydanskyy, Mitic, and Matcharashvili, GridKor entered into the Management Agreement purportedly with "MGM Linehaul Inc."

223.    Defendant Maydanskyy signed the Management Agreement on behalf of "MGM Linehaul Inc."

224.    On or about April 6, 2023, following discussions and negotiations with Defendants Gorbach, Collins, Maydanskyy, Mitic, and Matcharashvili, Plaintiff GridKor, LLC entered into the April 6 Agreement purportedly with "MGM Linehaul Inc."

53

225.    Defendants Gorbach, Collins, Maydanskyy, Mitic, and Matcharashvili each signed and initialed the April 6 Agreement on behalf of "MGM Linehaul Inc."

226.    Further, by operation of the "Personal Guarantee" section on page 5 of the April 6 Agreement, Defendants Gorbach, Collins, Maydanskyy, Mitic, and Matcharashvili each "unconditionally and irrevocably guarantee(s) the full, prompt, and complete performance by MGM of all its present and future obligations, financial or otherwise, arising under [that] Agreement, including but not limited to the payment of the deposit, additional consideration, and any penalties as set forth [therein], as well as the payment of any other amounts owed by MGM to GridKor[.]"

227.    In the even that a legal entity by the name of "MGM Linehaul, Inc." exists and Defendants had authority to enter into contracts on behalf of such entity, on information and belief any such entity is an alter ego of Defendants Gorbach, Collins, Maydanskyy, Mitic, and Matcharashvili.

228.    Defendants Gorbach, Collins, Maydanskyy, Mitic, and Matcharashvili breached the Management Agreement by, among other things:

a.    Failing to provide for the smooth running and everyday duties of all loads and trucks;

b.    Failing to assign loads, manage and designate drivers, dispatch runs, negotiate new contracts at rates at the contract renewal intervals, maintain performance times, perform all scheduled and unscheduled truck fleet maintenance, maintain and institute Safety plans required by FedEx, and maintain all necessary motor MGM compliances;

c.    Failing to monitor all Auto debit accounts such as fuel cards, truck insurance, truck payments, Workers Comp. insurance, IFTA, ELD logbooks, and LYTX accounts relating to truck support; and

d.    Failing to comply with all applicable state and federal regulations pertaining to the operation of the FedEx Business.

229.    Defendants Gorbach, Collins, Maydanskyy, Mitic, and Matcharashvili breached the April 6 Agreement by, among other things:

a.    Paying only $142,000 of the $150,000 required to be paid on or before April 21, 2023 (per the extension and modification of the terms related to the deposit or initial payment agreed to by Plaintiff);

b.    Failing to pay the $150,000 due on or before May 19, 2023 (per the extension and modification of the terms related to the deposit or initial payment agreed to by Plaintiff);

c.    Failing to pay the penalty of $50,000 per week beginning on April 16, 2023, by virtue of Defendants' failure to make the initial payment of $300,000;

d.    Failing to pay the additional $3,200,000 due on or before July 4, 2023;

e.    Failing to pay the penalty of $150,000 per month beginning on July 5, 2023, by virtue of Defendants' failure to make the additional payment of $3,200,000;

f.    Failing to deliver PSI Logistics Inc. and all of its represented assets to Plaintiffs; and

g.    Failing to pay GridKor the difference between $105,000 and PSI's actual gross revenue for each week since April 6, 2023.

230.    GridKor has suffered damages as a result of Defendants' breaches, including

55

Defendants' failure to make payments due, the reduced value of the consideration received by GridKor, lost profits and/or dividends, and other consequential damages.

## JURY DEMAND

Plaintiffs GridKor, LLC and GridKor Trucking and Logistics LLC hereby request a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs GridKor, LLC and GridKor Trucking and Logistics LLC respectfully request that the Court:

1.     Enter judgment in favor of Plaintiffs and against each of the Defendants;

2.     Award Plaintiffs compensatory damages in an amount to be determined at trial, but no less than $5,000,000 plus interest;

3.     Award punitive damages against Defendants;

4.     Award Plaintiffs their attorneys' fees and costs; and

5.     Grant Plaintiffs such further relief as the Court may deem just and equitable.


Dated:  September 14, 2023                           Respectfully submitted,

                                                     **MARINO FINLEY LLP**


                                                     /s/ Daniel Marino
                                                     Daniel Marino (PA38892)
                                                     dmarino@marinofinley.com
                                                     Tillman J. Finley (*pro hac vice* forthcoming)
                                                     tfinley@marinofinley.com
                                                     818 Connecticut Avenue, N.W., Suite 801
                                                     Washington, DC  20006
                                                     (202) 223-8888

                                                     *Attorneys for Plaintiffs*

56

## VERIFICATION

I, Michael Bryant, am authorized to make this Verification on behalf of GridKor, LLC and GridKor Trucking and Logistics LLC.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the statements of fact made in the foregoing Verified Complaint are true and correct to the best of my information and belief and the information and belief of GridKor, LLC and GridKor Trucking and Logistics LLC.

DATE: September 14, 2023                     GRIDKOR, LLC

By: _____

Michael Bryant


GRIDKOR TRUCKING AND LOGISTICS LLC

By: _____

Michael Bryant