# EXHIBIT 6

STOCK PURCHASE AGREEMENT

THIS STOCK PURCHASE AGREEMENT (this "**Agreement**"), is entered into effective September 1, 2022 (the "Effective Date"), by and among, Xpress Logistics Inc., owned by Milo Mitic, PSI Logistics Inc., owned by Pavlo Tupichak, Victoria Logistics Inc., owned by Jonathan Jacobs, Cha Cha Logistics Inc., owned by Oleksandr Maydansky, and HEB Logistics Inc., owned by Domenick Desimore, all Pennsylvania Corporations in the business of FedEx Line Haul contracts ( collectively the "**Sellers**"), and Gridkor LLC (the "**Purchaser**"). The Managers of the Sellers are Oleksandr Maydanskyy, Igor Gorbach, Milos Mltic, and William J. Collins, operating MGM Linehaul Consulting, LLC, hereinafter the "**Owners**". The Purchaser is owned and managed by Michael Bryant, Matt Tobin, Paul Tobin hereinafter the "**Member**". The Owners, the Sellers, The Member, and the Purchaser may be referred to herein as a "**Party**" or together referred to herein as the "**Parties**".

WITNESSETH:

WHEREAS, the following are the shareholders of record of the Sellers as of the Effective Date:

| Name of Stockholder | Number of shares Held | Percentage of Interest |
| --- | --- | --- |
| Oleksandr Maydansky, Cha Cha Logistics | 1,000 | 100% |
| Milo Mitic, Xpress Logistics Inc. | 1,000 | 100% |
| Pavlo Tupichak, PSI Logistics Inc | 1,000 | 100% |
| Jonathan Jacobs, Victoria Logistics Inc | 1,000 | 100% |
| Domenick Desimore, HEB Logistics Inc | 1,000 | 100% |

WHEREAS, the Owners desire to sell, and the Purchaser desires to purchase, 67% of capital stock held by the Owners in the Sellers (the "Stock") in accordance with and subject to the terms and conditions of this Agreement;

WHEREAS, the Owners will retain 33% ownership in each of the Sellers and be responsible for the day to day operations, maintenance, growth, and management of the Sellers;

Whereas, the percentage of interest takes precedence over the number of shares held in the event of a discrepancy for number of shares held by each corporation.

NOW, THEREFORE, in consideration of the premises and the mutual representations, warranties, covenants, agreements and conditions herein contained, the parties hereto agree as follows:

## Article I
### SALE OF STOCK

**Section 1.1 Sale of Stock.** On the terms and subject to the conditions herein stated, the Owners agree to sell, assign, transfer and deliver to the Purchaser at the Closing, and the Purchaser agrees to purchase and accept from the Seller at the Closing, all of the Stock.

**Section 1.2 Purchase Price.** At the Closing, in consideration for the sale, assignment, transfer and delivery of the Stock, the Purchaser will remit to the Seller a cash payment (the "Cash Payment") of $4,941,179.18 (the "**Purchase Price**"). The entire purchase price of $4,941,179.18 is to be satisfied upon final closing as specified in Section 2.2(d).

**Section 1.3 Arm's Length Negotiation.** The Parties agree that the Purchase Price is the result of arm's length negotiations between the Purchaser and the Seller.

**Section 1.4 Earnest Money.** The purchasers agree to put $605,000.00 into escrow by September 7, 2022. The $605,000.00 shall be removed from the total purchase price at time of closing. If the deal does not consummate, the earnest money is to be returned to the purchaser within 7 business days.

**Article II**

**Section 2.1 Closing.** The closing of the transactions contemplated hereby (the "**Closing**") shall take place at 9:00 a.m., EST time, on the date that is the first business day following the date on which the conditions and last of the consents referred to below are satisfied or delivered, or at such earlier or later time as may be agreed to by the parties (the "**Closing Date**"), by the exchange by overnight courier or facsimile or email of executed counterpart signature pages.

**Section 2.2 Purchaser's Conditions.** The obligations of the Purchaser and the Owners to consummate the Closing are subject to the waiver by Purchaser or Owners or the fulfillment on or prior to the Closing of each of the following conditions:

(a) **Warranties.** Each of the representations and warranties contained in this Agreement of Seller shall be true and correct in all material respects as of the Closing with the same effect as though all such representations and warranties had been made at the Closing.

(b) **Performance.** The Seller shall have performed and complied with all agreements, obligations and conditions contained in this Agreement that are required to be performed by it or with which it is required to have complied in all material respects on or before the Closing.

(c) **Entry into Transaction Documents.** All parties other than Purchaser shall have executed the documents contemplated by this Transaction.

(d) **Closing Date.** Buyer agrees to have funding executed by December 7, 2022.
The Purchaser shall confirm that the foregoing conditions shall have been satisfied or waived at or before the Closing.

**Section 2.3 Seller's Conditions.** The obligations of the Seller to consummate the Closing are subject to the waiver by Seller or the fulfillment on or prior to the Closing of the following conditions:

(a) **Warranties.** Each of the representations and warranties contained in this Agreement of Purchaser and the Owners shall be true and correct in all material respects as of the Closing with the same effect as though all such representations and warranties had been made at the Closing.

(b) **Performance.** The Purchaser and the Owners shall have performed and complied with all agreements, obligations and conditions contained in this Agreement that are required to be performed by it or with which it is required to have complied in all material respects on or before the Closing, including without limitation the payment of the Purchase Price.

(c) **Entry into Transaction Documents.** All Parties and the Guarantors shall have executed the documents contemplated by this Transaction.

The Seller shall confirm that the foregoing conditions shall have been satisfied or waived at or before the Closing.

**Section 2.4 Closing Deliveries.**

(a) At or before the Closing, the Purchaser shall:

(i) pay to the Seller, by wire transfer of immediately available funds to the account designated by the Seller, the Cash Payment;

(ii) confirmation that $100,000 is remaining in Owner's operating account associated with the Sellers;

(iii) deliver to the Seller a copy of the Employment Agreements (as defined below) and the Covenants Not to Compete (as defined below);

(iv) deliver to the Seller the guarantees and covenants of the Guarantors as requested by Seller; and

(v) deliver to the Seller a counterpart of this Agreement together with such documents, instruments and writings as may be reasonably requested by the Seller at or prior to the Closing pursuant to this Agreement or otherwise in connection herewith.

(b) At or before the Closing, the Seller shall deliver to the Purchaser:

(i) one or more certificates representing the Stock, which shall be duly endorsed in blank in proper form for transfer (or an assignment separate from certificate together with a lost certificate indemnity, if applicable); and

(ii) an executed counterpart of this Agreement.

(iii) delivery of all current Shareholder Agreements pertaining to the Sellers and Owners.

### Section 2.5 Post Closing Deliverables.

(a) Purchaser will return to Seller, for holding, pursuant to the Pledge Agreement, Stock Certificates in his name in denominations consistent with the release provisions in the Pledge Agreement, along with appropriate stock powers, all of which Seller will hold in trust pursuant to the terms of the Pledge Agreement.

(b) any employment agreements per Section 6.2

### Article III
### REPRESENTATIONS OF THE SELLER

The Seller hereby represents and warrants to the Purchaser as follows:

**Section 3.1 Ownership of Stock.** The Seller has good and valid title to the Stock, free and clear of all liens, encumbrances, charges, mortgages, pledges, security interests, restrictions and claims of every kind and character ("**Encumbrances**"), other than the contractual limitations set forth in the Original Stock Purchase Agreement that are being terminated and released by this Agreement as set forth below. Assuming the Purchaser has the requisite power and authority to be the lawful owner of the Stock, upon the delivery to the Purchaser at the Closing of certificates representing the Stock, duly endorsed by the Seller for transfer to the Purchaser, and upon the Seller's receipt of the consideration to be received pursuant to Section 1.2, good and valid title to the Stock will pass to the Purchaser, free and clear of any and all Encumbrances.

**Section 3.2 Authorization, Validity and Execution of Agreement.** The Seller has the requisite corporate power and authority to execute and deliver this Agreement, to perform its obligations hereunder and to consummate the transactions contemplated hereby. The execution, delivery and performance of this Agreement by the Seller, and the consummation by it of the transactions contemplated hereby, will have been duly authorized and approved by its board of directors on or prior to the Closing Date, and no other corporate or stockholder action on the part of the Seller or its stockholders is necessary to authorize the execution, delivery and performance of this Agreement by the Seller and the consummation of the transactions contemplated by this Agreement. This Agreement has been duly executed and delivered by the Seller and, assuming the due execution of this Agreement by the Purchaser, is a valid and binding obligation of the Seller, enforceable against the Seller in accordance with its terms, except to the extent that its enforceability may be subject to applicable bankruptcy, insolvency, reorganization, moratorium, receivership and similar laws affecting the enforcement of creditors' rights generally and to general equitable principles.

**Section 3.3 No Conflicting Obligations.** The execution and delivery of this Agreement and the performance by Seller of its obligations hereunder and the consummation of the transactions contemplated hereby: (a) do not and will not conflict with or violate any provision of Seller's certificate of incorporation or bylaws; (b) do not and will not result in any violation or breach of, constitute a default under any contract, instrument, or commitment to which Seller is a party; and (c) do not and will not conflict with or violate any law, statute, ordinance, regulation, rule or decree binding upon or applicable to Seller which would have a material adverse effect on the ability of the Seller to consummate the transactions contemplated hereby.

**Section 3.4 Covenants of the Seller.** The Seller has made its own independent determination of the value and of the Stock and the terms of sale. The Seller will never make any claim that it did not receive a fair price for the Stock even if the Purchaser or the Owners in the future sells such asset for more than the Purchase Price.

**Section 3.5 Disclaimer of Certain Warranties.** EXCEPT AS SPECIFICALLY SET FORTH IN THIS ARTICLE III, THE STOCK IS CONVEYED TO PURCHASER "AS IS" WITHOUT WARRANTY OF ANY KIND. The Seller does not make any representation or warranty to the Purchaser, express or implied, with respect to the Stock or the Owners, including any representation or warranty as to title.

ownership, use, possession, merchantability, fitness for a particular purpose, quantity, value, condition, liabilities, operation, capacity, future results or otherwise, other than as expressly provided in Article III of this Agreement. Without limiting the foregoing, the Seller does not make any representation or warranty to the Purchaser, express or implied, with respect to (a) any information provided to the Purchaser prior to the date of this Agreement in connection with the sale, or (b) any financial statements, financial projections or forecasts relating to the Owners.

## Article IV
### REPRESENTATIONS OF THE OWNERS

The Owners hereby represents and warrants to the Purchaser and the Seller as set forth below.

**Section 4.1 Existence and Good Standing**. The Owners are operating under MGM Linehaul Consulting LLC, a Limited Liability Company, validly existing and in good standing under the laws of its jurisdiction of organization. The Owners are duly qualified or licensed as a Linehaul Management company to conduct its business in states outside its jurisdiction of organization as is currently being conducted.

**Section 4.2 Capital Stock**. The authorized capital stock of the Owners consists of 1,650 shares and the Purchaser consists of 3,350 shares of common stock, no par value, of which the shares issued and outstanding are set forth in the Recitals hereto. Following the Closing of the transactions contemplated by this Agreement, the Owners, Purchaser, and Member will be the record and beneficial owner of all of the outstanding capital stock of the Sellers. All of the outstanding shares of capital stock of the Owners have been duly authorized and validly issued and are fully paid and nonassessable and subject to no preemptive rights.

## Article V
### REPRESENTATIONS OF THE PURCHASER

The Purchaser hereby represents and warrants to the Seller as set forth below.
**Section 5.1 Authorization, Validity and Execution of Agreement**. The Purchaser has the requisite power and authority to execute and deliver this Agreement, to perform its obligations hereunder and to consummate the transactions contemplated hereby. This Agreement has been duly executed and delivered by the Purchaser and, assuming the due execution of this Agreement by the Seller, will constitute a valid and binding obligation of the Purchaser enforceable against the Purchaser in accordance with its terms, except to the extent that enforceability may be subject to applicable bankruptcy, insolvency, reorganization, moratorium, receivership and similar laws affecting the enforcement of creditors' rights generally and to general equitable principles.

**Section 5.2 Securities Laws Representations**.

(a) The Purchaser is acquiring the Stock in good faith solely for his own account with the present intention of holding such Stock for purposes of investment, and the Purchaser is not acquiring the Stock with a view to or for subdivision, distribution, fractionalization or distribution thereof, in whole or in part, or as an underwriter or conduit to other beneficial owners or subsequent purchasers.

(b) The Purchaser acknowledges and understands that (i) the Stock has not been registered under the Securities Act of 1933, as amended (the "**1933 Act**"), or qualified under the securities or "blue sky" laws of applicable states in reliance upon exemptions from registration or qualification thereunder; (ii) the Stock may not be sold, offered, transferred, assigned, pledged, hypothecated or otherwise disposed of or encumbered, except in compliance with the 1933 Act and such laws; (iii) the Owners has no obligation, and does not currently intend, to cause the Stock to be registered or qualified under the 1933 Act and applicable state securities or "blue sky" laws or to comply with an exemption under the 1933 Act (including any exemption pursuant to Rule 144 promulgated thereunder) and such laws which would permit the Purchaser to sell the Stock; (iv) for an indefinite period of time, it may not be possible for the Purchaser to liquidate its investment in the Stock on an emergency or other basis; (v) it is not anticipated that there will be a public market for the Stock; and (vi) the practical and legal consequences of the foregoing means that the Purchaser may bear the economic risk of its investment in the Stock for an extended and indefinite period of time. The Purchaser has adequate means of providing for its current liabilities and possible contingencies and has no need for liquidity in the investment it is making in the Stock.

(c) The Purchaser has (i) received and reviewed carefully all information regarding the Owners it has requested and deemed necessary or advisable, and (ii) to the extent it has deemed necessary or advisable, reviewed the aforementioned information and this Agreement with its investment, tax, accounting and legal advisors who are unaffiliated with and who are not compensated by the Seller or the Owners. The Purchaser and such advisors have been given a full opportunity to ask questions of and to receive answers from the Seller and the Owners concerning the acquisition of the Stock and the business, operations and financial condition of the Owners and have received or been given access to such information and documents as are necessary to verify the accuracy

of the information furnished to the Purchaser concerning an investment in the Stock as the Purchaser of such advisors have requested.

**Section 5.3 Available Funds**. The Purchaser has or will have sufficient funds to perform all of its obligations under this Agreement, including its obligation to make the payments required hereunder.

**Section 5.4 Prior Relationship; No Knowledge of Misrepresentations or Omissions**.

(a) Prior to the date of the Original Purchase Agreement, the businesses operated by the Owners was solely owned by the Owners. The Owners are familiar with the day-to-day operations of the Company and agree to continue operations of the Company in good faith.

(b) The Parties agree to execute a Partnership Agreement within a reasonable time after the Closing date of this Agreement that will elucidate the Parties responsibilities and positions in the new Partnership with respect to managing and growing the Sellers.

(c) Neither the Purchaser nor Member have any knowledge that the representations and warranties of the Seller or the Owners made in this Agreement are not true and correct.

(d) Neither the Purchaser nor Member have any knowledge of: (a) any material liability of the Owners (contingent or otherwise) that is not reflected on the Owners's balance sheets; or (b) any litigation,

proceeding or controversy that has been threatened or is pending that would or may materially adversely affect the Owners or the Stock.

**Section 5.5 No Conflicting Obligations.** The execution and delivery of this Agreement and the performance by Purchaser of its obligations hereunder and the consummation of the transactions contemplated hereby: (a) do not and will not result in any violation or breach of, constitute a default under any contract, instrument, or commitment to which the Purchaser or the Owners is a party; (b) do not and will not conflict with or violate any law, statute, ordinance, regulation, rule or decree binding upon or applicable to Purchaser or the Owners; and (c) do not and will not require any consent, waiver, authorization, or declaration of, filing or registration with any governmental department, commission, board, bureau, agency, or instrumentality on the part of Purchaser or the Owners.

### Article VI
#### CERTAIN AGREEMENTS

**Section 6.1 Confidentiality**. The Purchaser and Owners acknowledge that (a) any and all information provided to them by the Seller or the Seller's representatives or affiliates concerning the Seller, including matters relating to the other businesses of the Seller and its affiliates, and (b) the terms of this Agreement and the other agreements entered into in connection herewith (including, without limitation, the amount of the Purchase Price and its components), shall remain confidential except as may be publicly disclosed by Seller in any press release.

**Section 6.2 Employment Agreements**. The Purchaser and the Existing Shareholder acknowledge that the Purchaser and the Owners will enter into Management Agreements and Covenants Not to Compete.

**Section 6.3 Original Stock Purchase Agreement**. The Parties acknowledge that the Original Stock Purchase Agreement has been satisfied and, without limitation, the Member acknowledges receipt of all required Corporate documents and Shareholder records related to the Sellers.

**Section 6.4 Indemnity**. With respect to any losses or damages arising from any liability or claim in connection with the business of the Owners pertaining to the operations of the Sellers and Owners prior to the date of the Closing of this Agreement, the Owners shall jointly and severally, indemnify the Purchaser and Member.

**Section 6.6 Indemnity/Transactions following the Record Date**. The parties hereto agree that the Record Date of this transaction, for purposes of Owners transactions, financial records, income and

**Section 6.7 Use of Name, Logos and Other Marks.** As soon as practical after the Effective Date (but in no event later than 120 days after the effective Date), the Member and the Purchaser shall cause the Owners to, and the Owners shall:

> (a) return to the Seller all materials and intellectual property provided or owned by the Owners related to the Sellers.

**Section 6.8 Cooperation.** After the Closing, the Purchaser, the Member, and the Owners shall promptly make available or cause to be made available to Sellers, as reasonably requested, and to any taxing authority, all information, records or documents relating to tax liabilities, potential tax liabilities or otherwise reasonably required in connection with the filing of any tax return, amended tax return or claim for refund, determining any liability for taxes or right to refund of taxes or any audit or other proceeding in respect of taxes and shall preserve all such information, records and documents with respect to such matters until the expiration of any applicable statute of limitations or extensions thereof. To the extent such information has not been otherwise provided to the other Party, each Party shall prepare and provide to the other Party any tax information packages reasonably requested by the other Party for use in preparing its tax returns. Each Party shall bear its own expenses in complying with the foregoing provisions.

### MISCELLANEOUS

**Section 7.1 Survival of Representations and Warranties.** Each of the representations or warranties made in this Agreement by Seller shall survive the Effective Date for a period of twelve (12) months; provided however, that Sections 6.5 shall survive and continue after the Effective Date. The warranties, representations and covenants of the Owners, the Existing Shareholder and the Purchaser contained in or made pursuant to this Agreement shall survive the execution and delivery of this Agreement and the Effective Date. Any representation or warranty as to which a claim with respect to which specific notice has been given is unresolved at the time of the expiration of the applicable period shall survive such expiration until resolved.

**Section 7.2 Expenses.** Whether or not the transactions contemplated hereby are consummated, and except as otherwise expressly provided herein, the Parties hereto shall pay all of their own costs and expenses relating to the transactions contemplated by this Agreement, including the costs and expenses of their respective counsel, financial advisors and accountants.

**Section 7.3 Amendments and Waivers.** Any term of this Agreement may be amended and the observance of any term of this Agreement may be waived (either generally or in a particular instance and either retroactively or prospectively), only with the written consent of the Owners, the Purchaser and the Seller.

**Section 7.4 Notices.** Any notice, consent, authorization or other communication to be given hereunder shall be in writing and shall be deemed duly given and received when delivered personally or transmitted by facsimile transmission with receipt acknowledged by the addressee or three (3) days after being mailed by first class mail, or the next business day after being deposited for next-day delivery with a nationally recognized overnight delivery service, charges and postage prepaid, properly addressed to the party to receive such notice at the following address for such party (or at such other address as shall be specified by like notice):

**Xpress Logistics Inc.**

Milo Mitic
712 Borbeck Ave
Philadelphia, PA 19111
FedEx ID C7666224

**PSI Logistics**

Pavlo Tupichak
1008 School Lane
South Hampton, PA
FedEx ID C8630208

**Victoria Logistics Inc**

Jonathan Jacobs
1008 School Lane
South Hampton, PA

**Cha Cha Logistics Inc.**
Oleksandr Maydansky
2101 WooMont Circle
Macungie PA 18062,
FedEx ID C8794208

**HEB Logistics Inc.**

Domenick Desimore
9883 OLD US 22
Breinigsville PA 18033
FedEx ID C8660077

**Grikor LLC**
Michael Bryant
311 Rouser Rd, Floor 3,
Moon Twp., PA 15108

**Section 7.5 Entire Agreement.** This Agreement, including the Schedules and Exhibits and the other documents executed in connection with this Agreement, contains the entire agreement of the parties and supersedes all prior negotiations, correspondence, agreements and understandings, written and oral, between or among the parties regarding the subject matter hereof. The Recitals are incorporated as a part of this Agreement and the Parties acknowledge that the Recitals are true and correct.

**Section 7.6 Successors and Assigns.** This Agreement shall insure to the benefit of and be binding upon the respective heirs, representatives, successors and permitted assigns of the parties. Nothing in this Agreement, express or implied, is intended to confer upon any party other than the parties hereto or their respective heirs, representatives, successors and permitted assigns any rights, remedies, obligations, or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement.

**Section 7.7 Severability.** If any provision of this Agreement, or the application of such provision to any person or circumstance, shall be held invalid or unenforceable, the remainder of this Agreement, or the application of such provision to persons or circumstances other than those to which it is held to be invalid or unenforceable, shall not be affected thereby.

**Section 7.8 Governing Law.** This Agreement shall be governed by and construed and interpreted in accordance with the Law of the State of Pennsylvania, without regard to that state's conflict of laws principles. Venue for any dispute arising under this Agreement shall lie in a court of competent jurisdiction in Dauphin, County, Pennsylvania.

**Section 7.9 Attorneys' Fees.** If any action at law or in equity is necessary to enforce or interpret the terms of this Agreement, the prevailing party shall be entitled to reasonable attorneys' fees, costs and necessary disbursements in addition to any other relief to which such party may be entitled.

**Section 7.10 Interpretation.** This Agreement shall be construed according to its language. All Parties have contributed to the drafting of this Agreement. The rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement.

**Section 7.11 Further Assurances.** Each Party shall execute such other and further certificates, instruments and other documents as may be reasonably necessary and proper to implement, complete and perfect the transactions contemplated by this Agreement.

**Section 8.12 Counterparts.** This Agreement may be executed in any number of counterparts, each of which shall constitute an original, and all of which together shall be considered one and the same agreement.

**Section 7.13 Assignment.** The Seller may freely assign or transfer all or any part of its rights under this Agreement. The Owners and the Purchaser shall not assign this Agreement or any rights hereunder or delegate any duties hereunder until payment-in-full of the Purchase Price. Any attempted or purported assignment or delegation in violation of the preceding sentence shall be void.

**Section 7.14 Titles and Subtitles.** The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.

**Section 7.15 Mediation.** All claims, disputes and other matters in question arising out of or relating to this

Agreement, or the breach or interpretation thereof, shall be resolved by binding mediation before a representative member, selected by the mutual agreement of the parties, of this agreement are to mediate in the confines and county of section 7.8 Governing Law.

**Section 7.16 Pennsylvania Corporate Securities Law**. THE SALE OF THE SECURITIES WHICH ARE THE SUBJECT OF THIS AGREEMENT HAS NOT BEEN QUALIFIED WITH THE COMMISSIONER OF CORPORATIONS OF THE STATE OF Pennsylvania AND THE ISSUANCE OF SUCH SECURITIES OR THE PAYMENT OR RECEIPT OF ANY PART OF THE CONSIDERATION THEREFOR PRIOR TO SUCH QUALIFICATION OR THE AVAILABILITY OF AN EXEMPTION THEREFROM IS UNLAWFUL. THE RIGHTS OF ALL PARTIES WITH RESPECT TO SUCH SECURITIES ARE EXPRESSLY CONDITIONED UPON SUCH QUALIFICATION BEING OBTAINED OR AN EXEMPTION BEING AVAILABLE.

**Section 7.17 No Promotion**. The Parties shall cooperate to develop appropriate advertising and publicity identifying the transaction contemplated by this Agreement, provided, however, that any press releases or public statements by the Owners, the Purchaser, and the owners of the Purchaser shall be subject to prior approval by Seller before they are issued.

**Section 7.18 Delay**. No delay or forbearance by any Party to this Agreement in exercising or enforcing its rights under this Agreement shall be deemed to constitute a waiver or release of any rights of such Party, and no inference shall be made that any Party has waived or released any rights as a result of such Party's delay or forbearance in exercising or enforcing its rights under this Agreement.

**Section 7.19 Facsimile**. This Agreement may be executed by facsimile or other electronic signature with the same effect as original signature(s).

**Section 7.20 Third Party Beneficiaries**. Each Party hereto intends that this Agreement shall not benefit or create any right or cause of action in or on behalf of any person or entity other than the Parties hereto.

**Section 7.21 Brokers**. Each Party acknowledges that they have not incurred any fees, expenses and other costs payable to, or incurred by, brokers or finders in connection with the execution of this Agreement.

**Section 7.22 Waivers**. Except as otherwise provided in this Agreement, any failure of any of the parties to comply with any obligation, covenant, agreement or condition herein may be waived by the Party or Parties entitled to the benefits thereof only by a written instrument signed by the Party granting such waiver, but such waiver or failure to insist upon strict compliance with such obligation, covenant, agreement or condition shall not operate as a waiver of, or estoppel with respect to, any subsequent or other failure.

**Section 7.23 Severability**. If any provision of this Agreement (or any portion thereof) or the application of any such provision (or any portion thereof) to any person or circumstance shall be held invalid, illegal or unenforceable in any respect by a court of competent jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision hereof (or the remaining portion thereof) or the application of such provision to any other persons or circumstances.

**Section 7.24 Liabilities.** Any liabilities incurred before closing date belong to the Sellers. Any liabilities incurred after closing shall be responsible for after closing date December 7, 2022.

IN WITNESS WHEREOF, each of the parties has caused this Agreement to be duly executed, all as of the day and year first above written.

## (SIGNATURES ON THE FOLLOWING PAGE)

**PARTY:**

Michael Bryant

(Name)

President

(Position)

**PARTY:**

Oleksandr Maydansky

(Name)

Member, MGM Linehaul Consulting

(Position)

**PARTY:**

Igor Gorbach
(Name)
Member, MGM Linehaul Consulting
(Position)

**PARTY:**

William Collins
(Name)
Member, MGM Linehaul Consulting
(Position)

**PARTY:**

Paul Tobin

(Name)
Vice President, GridKor
(Position)

## Exhibit A

XPRESS LOGISTICS 162245 3HSDZAPR3KN120829

XPRESS LOGISTICS 162267 1XKYD49X0NJ125536

XPRESS LOGISTICS 162273 1XKYD49X2NJ125540

XPRESS LOGISTICS 155927 3AKJHHDR1MSMZ8179

XPRESS LOGISTICS 155921 3AKJHHDRXMSMZ8181

XPRESS LOGISTICS VOLVO 164431 4V4NC9EH3KN208755

COLONIAL VALLEY TRANS 146766 4V4NB9EH8LN256658

COLONIAL VALLEY TRANS 154065 4V4NB9EH4LN256656

COLONIAL VALLEY TRANS 154424 4V4NB9EH6LN256660

COLONIAL VALLEY TRANS 155267 4V4NB9EH7LN225126

PSI LOGISTICS 164126 3HSDZAPR1LN814792

PSI LOGISTICS 164127 3HSDZAPR5LN814794

PSI LOGISTICS 164128 3HSDZAPR0LN814766

PSI LOGISTICS 164129 3HSDZAPR2LN883815

PSI LOGISTICS 164130 3HSDZAPRSKN121435

VICTORIA LOGISTICS 164404 3HSDZAPR5KN125286

VICTORIA LOGISTICS 164405 3HSDZAPR8KN125329

VICTORIA LOGISTICS 166809 4V4NC9EH4LN261661

VICTORIA LOGISTICS 166810 4V4NC9EH6LN228418

HEB LOGISTICS 166831 3AKJHHDR1KSKH5956

HEB LOGISTICS 166832 3AKJHHDR3KSKK9422

HEB LOGISTICS 166833 3AKJHHDR8MSMY9897

HEB LOGISTICS 166834 3AKJHHDR4MSMY9895
CHACHA 164940 3HSDZAPR9PN493283

CHACHA 164941 3AKJHHDR8MSMY9897

CHACHA 164942 3AKJHHDR4MSMY9895

CHACHA 164943 3HSDZAPR8PN424956

CHACHA 164944 4V4NC9EH6LN228418

COLONIAL VALLEY TRANS 146766 4V4NB9EH8LN256658

COLONIAL VALLEY TRANS 154065 4V4NB9EH4LN256656

COLONIAL VALLEY TRANS 154424 4V4NB9EH6LN256660

COLONIAL VALLEY TRANS 155267 4V4NB9EH7LN225126

COLONIAL VALLEY TRANS 164463 4V4NB9EH5LN256665

COLONIAL VALLEY TRANS 164464 4V4NB9EH8LN256661

COLONIAL VALLEY TRANS 164466 4V4NB9EH3LN256664

Exhibit B

Prior agreements between the Owners MGM Linehaul
Consulting and all Sellers to be attached and initialed.

# SERVICE PROVIDER – CONTRACTOR

MANGEMENT AGREEMENT
SCHEDULE "A"

This Agreement between SERVICE PROVIDER and GRIDKOR (hereinafter "Agreement") is made and entered into this 5th day of December, 2022, (the "effective date") by and between Michael Bryant and Paul Tobin, as owners and officers of GRIDKOR, Inc., now located at 311 Rouser Rd, Floor 3, Moon Township, PA 15108, herein referred to as, (GRIDKOR or PURCHASER), and MGM LINE HAUL CONSULTING, Inc. located at 517 Oak St. Copiague, NY 11726 herein referred to as the following; ("SERVICE PROVIDER", "MANAGEMENT COMPANY" and MGM).

WHEREAS, SERVICE PROVIDER is both, an Independent FedEx Contractor itself, and the Seller of Two Thirds, (67%) of the entity known as MGM LINE HAUL CONSULTANTS, LLC., as the Management Company, to the PURCASER, GRIDKOR, who will now be the majority SHAREHOLDER of the following subsidiaries, ChaCha Logistics, Victoria Logistics, Inc. PSI Logistics, Inc. Xpress Logistics, Inc. and HEB Logistics, Inc. and the remaining One third, 33% ownership of MGM will remain under the current ownership of Oleksandr Maydanskyy, Igor Gorbach and William Collins under the current name, of MGM LINE HAUL CONSULTING, LLC., Inc. As new majority owners of above subsidiares, GRIDKOR, hereby engages MGM, to fully run and manage all 5 corporations; as described in SHAREHOLDERS AGREEMENT, which currently consists of 35 lanes, all domiciled in Allentown, PA depot to the best of their ability. In exchange for it's 33.3% ownership, MGM agrees to continue to diligently run all current and future corporations to be added to MGM under the same terms as this agreement. TRANSPORTATION, INC, As of the Closing date 67% of all the assets and stock of all 5 Corporations

WHEREAS, To Be Clear, the SERVICE PROVIDER / MANAGEMENT COMPANY is also an independent FedEx CONTRACTOR who is an approved FedEx entity as of the signing of this Agreement. MANAGEMENT COMPANY is fully authorized to operate as an approved Company and will run under the FedEx approved MC and DOT authorizations. Therefore, MGM is hereby authorized by GRIDKOR, to run all facets of the everyday business of MGM LINE HAUL CONSULTANTS, LLC., and is thereby responsible for attaining drivers, dispatching in conjunction with FedEx dispatchers, and acquiring all needed registrations as well as running all other aspects of the MGM Business which the full responsibilities are more clearly spelled out in Section 1. located below in this Management Agreement.

WHEREAS, both SERVICE PROVIDER and GRIDKOR enter into this Agreement for the purpose of providing and receiving specified services with specified rates, mileage and expenses to be clearly spelled out in a FedEx weekly settlement sent to MGM and Gridkor from FedEx every week, and who both the Gridkor and Management Company will have full and complete access to. SERVICE PROVIDER and GRIDKOR deem it necessary to their respective interests to establish and maintain an excellent working relationship in order that both parties remain in good standing with both FedEx and DOT. Both Parties will maintain an "Independent Contractor" relationship in the execution and performance of this Agreement.

Obligations of SERVICE PROVIDER:
1.      SERVICE PROVIDER is responsible for the smooth running and everyday duties of all loads and trucks. In addition, the SERVICE PROVIDER is responsible for managing the relationship between FedEx and all PARTIES, as well as assigning loads, managing and designating drivers, dispatching of all runs, negotiating new contracts and rates at the contract renewal intervals, maintaining performance times, performing all scheduled and unscheduled truck fleet maintenance, maintaining and instituting Safety plans

# SERVICE PROVIDER – CONTRACTOR

as required by FedEx, and maintaining all necessary motor MGM compliances. SERVICE PROVIDER is also responsible for monitoring all Auto debit accounts such as fuel cards, truck insurance, truck payments, Workers Comp. insurance, IFTA, ELD logbooks, and LYTX accounts relating to truck support. In addition:

a. SERVICE PROVIDER agrees to handle phone calls, facsimiles, and emails, FedEx, Drivers, Insurances, Safety records, ELD logbooks, and LYTX.

b. SERVICE PROVIDER is responsible to comply with all applicable state and federal regulations pertaining to the operation of the FedEx Business.

c. SERVICE PROVIDER is responsible for the maintenance and repair of vehicles to the best of their ability.

d. SERVICE PROVIDER will also share with GRIDKOR all Logins and passwords for all FEDEX MyGroundBiz Corps, as well as all banking info for all 5 corps as well.

e. SERVICE PROVIDER will cover all normal routine maintenance costs to be debited from MGM equity distributions. Major overhaul costs over $8,500.00 will come off the top line revenue of each of the 5 corporations mentioned above. Major overhauls will be approved by the board prior to spend.

2. Obligations of GRIDKOR:

a. GRIDKOR gives SERVICE PROVIDER full authority and complete and continued access to all aspects of the MGM Business including, the MyGroundBiz Acct and all FedEx deposit accounts needed to successfully execute drivers weekly pay and all other auto debited expenses as outlined in Paragraph 1.

b. GRIDKOR grants SERVICE PROVIDER with access to all online accounts and e-mail related accounts which is needed in order to run proper transportation operations.

c. All decisions made by SERVICE PROVIDER pertaining to the different aspects of CONTRACTORS Business, will be the final. It is understood by both parties, that each will benefit most by SERVICE PROVIDER 1.) accepting the highest grossing loads possible while minimizing expenses where possible and 2. Keeping in mind FedEx dispatchers needs. This will help insure a continued strong relationship between both the SERVICE PROVIDER AND CONTRACTOR, which is needed in order to grow the overall business. All decisions made by SERVICE PROVIDER will be made with this in mind.

3. Payment terms for MGM of monthly equity distributions. will be in the form

4. Termination:

Since CONTRACTOR and SERVICE PROVIDER/ MANAGEMENT COMPANY are partners this agreement may not be cancelled by either party. If in the event either party wishes to terminate the agreement, in effect ending the partnership there are 2 options. 1.) either party may buy out the other for fair market value representing its percentage ownership of the corporation. 2). If this number cannot be figured out the entire entity will be split off and sold by each FedEx entity owned and the parties will split the proceeds 67% to GridKor and 33% to MGM.

# SERVICE PROVIDER – CONTRACTOR

5 .  Assigns:

The corporation may only be reassigned to a new Purchaser using the same table above regardless of which Party is responsible for bringing in the new Purchaser.

6.  Indemnification of CONTRACTOR:  The SERVICE PROVIDER agrees to reasonably indemnify the CONTRACTOR, wherever possible, regarding the running of the CONTRACTORS business and the day-to-day operations, in such case of any truck accidents or driver related injury.

8.  Term:

This Agreement shall become effective on the date shown in the first paragraph, shall remain in effect for the duration of the partnership.

9.  Non-Disclosure:

Gridkor acknowledges that all information being provided by SERVICE PROVIDER is the sole and exclusive property of SERVICE PROVIDER and that neither it, nor any employee, agent, or Subcontractor shall directly or indirectly, communicate or perform any service with or for FedEx either directly or indirectly unless contacted directly by FedEx or in the event of a mediation (Section 7.15 on the agreement signed December 5) whereas the Service Provider failed to perform.

10.  SEVERABILITY:

If any portion of this agreement is found by a court of jurisdiction to be void or unenforceable, the remaining parts will remain in full force.

11. JURISDICTION:

In the event any court proceeding is to be initiated to protect the rights of either party the court of jurisdiction will be in the Commonwealth State of PA.

IN WITNESS WHEREOF the undersigned have executed this Agreement as of the day and year above. The parties hereto agree that facsimile signatures shall be as effective as if originals. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

## SERVICE PROVIDER – CONTRACTOR

**CONTRACTOR/Purchaser:**

Company Name: _____Gridkor_____

Signature: CONTRACTOR/Purchaser _____

Print Name: _____Michael   Bryant_____

Title: _President_

**SERVICE PROVIDER:**

Company Name: _MGM Linehaul Consulting, INC_____ (if applicable)

Signature: _____

Print Name: _Oleksandr Maydansky_____

Title: _Managing  Member_

_____(if applicable)