# EXHIBIT 13



# Deposition of
# **William Collins**

**Date:** July 22, 2024

**Case:** GRIDKOR, LLC, et al. v. IGOR GORBACH, et al.

**No.** 5:23-cv-03563

**Court Reporter:** Allison L. Shearer, RPR

Paszkiewicz Court Reporting
Phone:  618-307-9320
Toll-Free:  855-595-3577
Fax:  618-855-9513
www.spreporting.com

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

GRIDKOR, LLC, et al.,      ) Civil Action No.:

      Plaintiffs      ) 5:23-cv-03563

  V.                       )

                          )

IGOR GORBACH, et al.,      )

      Defendants      )

_____

        REMOTE VIDEOTAPED DEPOSITION OF WILLIAM COLLINS, produced, sworn, and examined on behalf of the Plaintiffs, commenced on Monday, July 22, 2024, between the hours of 1:03 p.m. and 2:07 p.m. EST, before Allison L. Shearer, Registered Professional Stenographic Reporter.

APPEARANCES:

On behalf of the Plaintiff:

Daniel Marino, Esquire

Emily Smith, Esquire

Tillman Finley, Esquire

MARINO FINLEY LLP

818 Connecticut Avenue, Northwest

Suite 801

Washington, DC 20006

(202) 223-8888

dmarino@marinofinley.com

On behalf of Defendants William Collins, Olesandr
Maydanskyy, Ucha Matcharashvili, Milos Mitic, and
Pavlo Tupychak:

Jeffrey Bukowski, Esquire

SMITH BUKOWSKI, LLC

1050 Spring Street, Suite 1

Wyomissing, PA 19610

(610) 685-1600

jbukowski@smithbukowski.com

Page 3

APPEARANCES (Continued):

ALSO PRESENT:  Mike Lewis, Videographer

Maura Jenkins, Notary Public

mauraajenkins@gmail.com

Olesandr Maydanskyy

Paul Tobin

EXAMINATION INDEX


WILLIAM COLLINS
     BY MR. MARINO                                    6


               EXHIBIT INDEX

1      Mr Route Dime Bank Statement,              18
       March 2024

2      Mr Route Dime Bank Statement,              21
       September 2023

3      Mr Route Dime Bank Statement,              36
       October 2023

4      Mr Route Dime Bank Statement,              42
       November 2023



     INDEX OF QUESTIONS REFUSED TO ANSWER

     Q.   Who?                                      19

     Q.   Who is the person?                        20

     Q.   When you say an investor, an              27
          investor in what?

     Q.   When you say an investor, an              27
          investor in what?

     Q.   What kind of expense is it?               38

     Q.   Who is that?                              43

VIDEOGRAPHER:  We are now on the record. This is the videotaped deposition of William Collins.  Today's date is July 22nd, 2024.  The time is now 1:03 p.m. Eastern.

This is the case of Gridkor, LLC, et al., versus Igor Gorbach, et al.  Case No. 5:2023cv03563.  My name is Mike Lewis.  I am representing Paszkiewicz Court Reporting.  The Court reporter is Allison Shearer also representing Paszkiewicz Court Reporting, and this deposition is taking place over the Zoom platform.

All participants are remote.  Counselors, please state your appearance for the record.

MR. MARINO:  Dan Marino here on behalf of Gridkor.

MR. BUKOWSKI:  This is Jeff Bukowski on behalf of the deponent, William Collins, and all of the other defendants other than Mr. Jacobs.

So that's Olesandr Maydanskyy, Ucha Matcharashvili, Milos Mitic, and Pavlo Tupychak.

VIDEOGRAPHER: All right.  And the notary will swear in the witness.

WILLIAM COLLINS, the Deponent, called for examination by the Plaintiff, being first duly sworn to tell the

truth, the whole truth, and nothing but the truth, testified as follows:

EXAMINATION

BY MR. MARINO:

Q.   Good afternoon, Mr. Collins.  This is Dan Marino again.  Can you hear me okay?

**A.   Yes, sir.**

Q.   Okay.  Are you in a room alone, or do you have --

**A.   I am.**

Q.   Okay.  And I assume you're not communicating with people on your phone while we're taking your testimony.

Would that be correct?

**A.   Yes.**

Q.   Okay.  I mean --

**A.   Am I not allowed to?**

Q.   You're certainly not allowed to, no. You're not allowed to communicate with people about your testimony.

MR. BUKOWSKI:  The only thing we might do, Dan, and I'll tell you if and when that occurs, is if the witness needs to take a break to confer with me, he and I may.

MR. MARINO:  Correct.  That's fine.

MR. BUKOWSKI:  Yeah.

MR. MARINO:  Yeah, if he just lets us know that.  But, you know, for example, you shouldn't be --

MR. BUKOWSKI:  Yup.

MR. MARINO:  -- comparing notes with Mr. Maydanskyy or somebody else.

THE WITNESS:  No.  No.  No.  I'm not doing that.

BY MR. MARINO:

Q.  All right.  We're here for a very limited deposition today.  It shouldn't take as much as even an hour so I appreciate you making yourself available.

**A.  No problem.**

Q.  Essentially I'm going to have some questions about some transactions that have taken place since September of last year, and the judge has sort of authorized us to do that.  So I'm going to start with a couple of general questions.

Were you present or at least by video for the deposition of Mr. Jacobs that we took a couple of weeks ago?

**A.  I was on the line.**

Q.  Okay.  And do you recall Mr. Jacobs

testifying that you sent certain funds to him -- I believe about $200,000 -- to him --

A.     Yes.

Q.     -- during November of last year?

A.     Yes.

Q.     Okay.  And he indicated in his testimony that the reason you sent that money to him was to satisfy a debt which incurred -- you incurred with him in an investment back in, I believe, the spring of 2022.

Do you recall that testimony?

A.     Yes.

Q.     And was that testimony correct?

A.     **I believe it was.**

Q.     Okay.  And what was the nature of the investment if you could tell us?

A.     **As I recall, Jonathan had invested with us on a couple of occasions.  One, the first one, was with regard to Victoria Logistics.**

**There were two loans and there was a trailer deal and there was another deal that -- I think there were five total transactions between Jacobs and either our group or Igor personally as far as trailers go and maybe another transaction.**

Q.     So this -- if I understand you correctly,

this was an investment that Mr. Jacobs had made in a trucking company of some kind prior to the spring of 2022, right?

A.   Yes.

Q.   Okay.  And so -- and was it an investment or was it a loan?

A.   **The first one was an investment for Victoria Logistics.**

Q.   And the $200,000 which you paid him in November of last year, was that repayment of a loan in Victoria Logistics or return of his investment?

A.   **As far as I was concerned, there became a point in time that it became one loan that was due, and it was a loan that, as far as I was concerned, we -- not a loan.**

**But it was repayment of $3.2 million that was -- that was total owed, and that $200,000 that came from me was towards that $3.2 or $3.1 and change I believe it was.**

Q.   And did another $300,000 come from Mr. Gorbach to your knowledge?

A.   **Yes.**

Q.   And was that -- to your knowledge, was that also repayment of an investment or repayment of a loan?

A.   **Whatever you want to call it, yes.**

Q.   Well, I mean, what did you regard it as?

A.   **Both.**

Q.   Okay.  And at the time that you made the payment of $200,000 and Mr. Gorbach paid the payment of $300,000, you understood that there was a preliminary injunction in place prohibiting you from making those payments to Mr. Jacobs, correct?

MR. BUKOWSKI:  Objection.  I think that mischaracterizes the order, but you can -- he can answer if he knows what the order is.  If your question was was an order in place, that's one thing.

I think he and I probably disagree whether those payments were permitted under the order.

MR. MARINO:  You can answer the question.

THE WITNESS:  Ask it again, please.

BY MR. MARINO:

Q.   Yeah.  Do you understand that the Court had entered an order prohibiting you from making those -- at least the payment of $200,000 to Mr. Jacobs at that time?

MR. BUKOWSKI:  Objection.

THE WITNESS:  No, I didn't understand it

to mean that.

BY MR. MARINO:

Q.   Why did you decide to make the payment to Mr. Jacobs at that point?

A.   **Because that money was owed to Jacobs prior to the injunction.  I would have asked the judge if we were allowed to do that, but the judge died and we didn't have a lawyer at that time because our lawyer fired us.**

**So I was in a position where I didn't know what to do, so I did what I thought was right, which was to send money to Jacobs because it was a prior money that was owed.**

Q.   Why did you decide to make that payment, just at least the payment that you made in November of last year?  Why didn't you make the payment before that in other words?

A.   **I explained.  I thought it was the right thing to do because we owed Jacobs money prior to that court order.**

Q.   Poor question.  Why didn't you make the payment to Jacobs before November?

A.   **We didn't have it.**

Q.   Well, where did you get the money to pay him?

off the written record regarding screen share.)

MR. MARINO: This is the statement ending for March of 2024, right?

MS. SMITH: Yes.

(Whereupon, Exhibit No. 1 was marked for identification.)

BY MR. MARINO:

Q. If you look at the credits -- go down to March 20, 2024. Do you see that?

A. **Yes.**

Q. Okay. And it looks like you have a credit. It looks like there was a wire transfer for $251,000 on that date from Consolidated Logistics, Inc.

A. **Correct.**

Q. Can you tell me what that was for?

A. **Yes. That was for a deal that I brokered between Consolidated Logistics and a Florida management company that he was purchasing it from.**

Q. I'm sorry. Who is he?

A. **Consolidated.**

Q. Is Consolidated a person or an entity?

A. **It's an entity.**

Q. Is it owned by a person or managed by a person?

A.   Yes.

Q.   Who?

A.   I'd rather not say.

Q.   Well, I'm going to have to ask you to tell me.  I'm sure you might rather not say, but I need to know.

MR. BUKOWSKI:  Why do you need to know that?

MR. MARINO:  I don't have to explain that.

MR. BUKOWSKI:  Yeah, you do.  I mean, if --

MR. MARINO:  Are you directing him not --

MR. BUKOWSKI:  No, I'm not.  But you're delving into transactions that aren't related to this case.  You can see what happened.  But I don't think you're entitled to go into all the details inside and out of any -- you know, any business transactions.

MR. MARINO:  Well, I think I'm entitled to follow large movements of money in these accounts.

MR. BUKOWSKI:  Right.  And he's explained that to you.

MR. MARINO:  I'm not going to listen --

Jeff... Jeff, I'm not going to argue.

MR. BUKOWSKI: Okay.

MR. MARINO: Are you directing him not to answer that question?

MR. BUKOWSKI: I'm not directing him not to answer.

MR. MARINO: All right. Then Mr. Collins, please don't waste time. Let's answer the question, please.

BY MR. MARINO:

Q. Who is the person?

**A. I need a court order for that to answer that question. If I get that from the judge, I'll answer that.**

Q. But otherwise you're refusing to answer despite the fact that you're here by order of the judge, right?

**A. I need a -- I need a specific statement by the court telling me to answer that.**

Q. Okay. Let's -- again, just to be clear, you're refusing to answer without an additional order from the court. I've got it.

MR. MARINO: Let's go to the statement for 9-29-23, please, Emily.

Do you have that?

MR. MARINO: Right. I got it. I got it. Look, I really want to complete this.

MR. BUKOWSKI: I do, too.

MR. MARINO: All right. Let's move on. I'm going down to page 4 of that statement, please.

BY MR. MARINO:

Q. Do you see there's a series of transactions in the middle of the page starting with a wire transfer on 9-28?

In the middle right after it says checking withdrawal, there's a wire transfer to Victoria Logistics, $5,000.

What was that for?

**A. Truck payments.**

Q. Truck payments for what? Pursuant to a contract? For purchasing a truck, or what?

**A. They were truck payments made to Victoria Logistics, just like it says, for two trucks that Jonathan is making payments on through the bank that we were obligated to make on his behalf.**

Q. What is Victoria Logistics or what was it?

**A. That was an entity that Gridkor purchased.**

Q. And you said that Jonathan was supposed

to be making those payments?

A.    He was responsible for making those payments because he got those trucks under his name.

Q.    Okay.  And so did -- did he have an outstanding note for payments on those trucks?

A.    Yes, I believe so.

Q.    And you were making those payments for him?

A.    Correct.  We were obligated to.

Q.    When you say you were obligated to, I mean, were you a counter-party on the note, or were you -- did you sign the note that he was obligated on?

A.    Me personally, no.  I believe we as a management company were obligated to make those payments on it for Victoria Logistic.

Q.    And this is a Mr. Route bank account?

A.    Yes.

Q.    When you refer to the management company, are you referring to Mr. Route?

A.    No.

Q.    So why was Mr. Route making these payments?

A.    Because that's where the money came into.

Q.   And where did it come from?

A.   **Jorge Aragon.**

Q.   What was the total amount of money that Jorge Aragon sent you?

A.   **At different times?**

Q.   Total.

A.   **$500,000 as I stated previous.**

Q.   What about PTK Development, $5400, on that date.  What is PTK Development?

A.   **The same thing, two truck payments.**

Q.   And, again, was that money that came from Mr. Aragon?

A.   **Yes.**

Q.   And was -- were these payments that you were obligated to make on behalf of Mr. Jacobs?

A.   **No.**

Q.   Why were you making payments then?

A.   **They were payments that we were obligated to make under somebody else, not Jonathan.**

Q.   Who was the somebody else?

A.   **Pavlo Tupychak.**

Q.   He's one of your co-defendants?

A.   **Yes.**

Q.   Okay.  What about the Law Office of Andrew Ralstow, who is that?

A.     The first lawyer.

Q.     And Hurricane Logistics, who is that, $20,000 payment?

A.     An investor.

Q.     When you say an investor, an investor in what?

A.     I'm not going to answer that question without a court order.

Q.     But why were you making a $20,000 payment to an investor when you had a court order prohibiting you from making payments?

MR. BUKOWSKI:  Objection to form. Misstates the order.

THE WITNESS:  I didn't understand the order to mean that.  It said under the normal -- other than the normal course of business.  I was sending payments in the normal course of business.

BY MR. MARINO:

Q.     Okay.  How am I supposed to know if it's a normal course of business if you won't tell me what it was for?

A.     I did tell you.  It was for an investor that we owed money to.

Q.     Who?

A.     I don't want to tell you.  I'm not going

to answer that.

Q.   You owed money to my clients too, right?

A.   Yes.

Q.   Why did you pay the investor instead of paying my clients?

A.   Because I didn't want to be in five more lawsuits.

Q.   Okay.  You already had a court order requiring you to preserve money for my clients, right?

MR. BUKOWSKI:  Objection.

BY MR. MARINO:

Q.   Where did you get the money to send to the secret investor?

A.   All of these that you have highlighted, all of these monies were made from the money that we got from Jorge Aragon.

Q.   Well, so far you've got well in excess of $500,000 that you're paying out to people, and as I understand it, you only got $500,000 from Mr. Aragon.

Have I got that wrong?

A.   Right.  I don't know if you do or not.

Q.   Do you know how much money you got from Mr. Aragon?

Q.   Okay.  Where was that shop?

A.   Breinigsville, PA.

Q.   What was the address?

A.   I forget.  It's probably -- it's Old Route 22, Breinigsville, Pennsylvania.

Q.   What about ON Transport, what is that?

A.   ON Transport is a company owned by Olesandr Maydanskyy and Gorbach Trucking is owned by Igor.

Q.   Why were you paying ON Transport $33,000?

A.   I'm sorry?

Q.   Why -- what was the purpose of the $33,000 payment to ON Transport?

A.   I believe it was for money that was owed, each of us, for ongoing expenses that we all had.

Q.   Expenses for what?

A.   Expenses for running the trucking business.

Q.   Which trucking business?

A.   The management company.

Q.   Can you identify the management company employees?

A.   BOI was -- well, I can't even really say that.  For running everything in Pennsylvania.  For the Breinigsville operation.

Q.   Well, other than rent with that operation, what other expenses did you have there?

**A.   Trucking expenses, all the expenses that go with running a business.**

Q.   So this $33,000 went to ON Transport, correct?

**A.   ON Transport, yes.**

Q.   ON Transport.  And is that a Pennsylvania company?

**A.   I don't know the answer to that.  I believe New York, but I don't know.**

Q.   Does it have a general ledger?

**A.   You would have to ask the owner of ON Transport.  That's not my business.  I'm sorry.  I should have said that.  ON Transport is not my business.**

Q.   Whose business is that?

**A.   I did say that.  Olesandr Maydanskyy.**

Q.   Okay.  So in other words, the $33,000 went to Mr. Maydanskyy, your co-defendant, correct?

**A.   Yes.**

MR. BUKOWSKI:  Objection.

BY MR. MARINO:

Q.   And for his expenses?

**A.   I believe so.**

Q.   And what if -- can you tell me whether those expenses are reported somewhere in a general ledger?

**A.   I cannot.  You would have to ask him that as the owner of ON Transport.**

Q.   Did he send you an invoice for $33,000?

**A.   No.**

Q.   Well, why did you decide to send him $33,000 without an invoice?

**A.   It was on an honor system, that that's what he said that he was owed.**

Q.   And where did that $33,000 come from?

**A.   I believe from Jorge Aragon.**

Q.   So you got $33,000 from Mr. Aragon. Mr. Maydanskyy told you he was owed that much and you gave it to him.

Have I got that right?

**A.   Yes.  And so we came up -- we can make this a little bit faster.  But the answer is the same for Gorbach's Trucking.**

Q.   And Gorbach's Trucking, is that Igor Gorbach?

**A.   Yes.**

Q.   And you took $33,333 of Mr. Aragon's money and you gave that to Igor Gorbach?

MR. BUKOWSKI: Objection.

THE WITNESS: For expenses, yes.

BY MR. MARINO:

Q. Did Gorbach Trucking have a general ledger to your knowledge?

**A. Not to my knowledge.**

Q. Did Mr. Gorbach give you an invoice saying I need this $33,000?

**A. He did not.**

Q. How about Richard Davolio, who is he, the person you gave $50,000 to?

**A. A lawyer.**

Q. And what was that for?

**A. To help settle a different lawsuit.**

Q. What lawsuit was that?

**A. One that involved another trucking deal.**

Q. And who were the defendants in that -- I assume you were a defendant in that lawsuit?

**A. It's actually -- it's not a lawsuit at this point. It was -- it was the threat of a lawsuit.**

Q. Okay. And --

**A. I think.**

Q. And did you get an invoice from Mr. Davolio?

A.    No.

Q.    Well, why did you give him $50,000 without an invoice?

A.    **As part of a settlement.**

Q.    I'm sorry.  Did the money go to Mr. Davolio or to --

A.    **Yes.**

Q.    Well, and did he keep the money to your knowledge, or did he give it to someone else to settle the case?

A.    **He gave it to his client.**

Q.    Oh, okay.  So Mr. Davolio was the lawyer representing someone that was adverse to you, right?

A.    **Yes.**

Q.    Okay.  And on September 28, 2023, you decided to pay that other person $50,000 to settle their lawsuit, right?

A.    **Correct.**

Q.    And why didn't you give that $50,000 to my clients?

A.    **Again, same reason as before.  To avoid another lawsuit.**

Q.    Well, you already had a lawsuit with my clients.  Why didn't you pay them?

A.   I -- for the simple reason I'd rather have one lawsuit than three or four or five.

Q.   You didn't think that was a violation of Judge Schmehl's order?

A.   I did not.  I saw it as making payments in the normal course of business.

Q.   Right.  Okay.  And what about Georgian Transportation?

A.   Another defendant in this case.

Q.   Igor Gorbach?

A.   No.

Q.   Which defendant?

A.   Ucha Matcharashvili.

Q.   And why did you give your co-defendant $66,000?

A.   Because he was responsible for making 18 truck payments I believe.

Q.   And where did you get the $66,000 to give him?

A.   Jorge Aragon.

Q.   And if your co-defendant was responsible for making the payments, why did you give him Mr. Aragon's money?

A.   Can you ask the question again?

Q.   Yeah.  You said Ucha was responsible for

making these truck payments. Why didn't Ucha make the truck payments instead of you?

**A. Because they were under numerous different companies. That was one payment of eight, 10, 12 -- like I said, up to 18 different trucks. That could have been 18 different banks. It wasn't. But for all I know, it was.**

Q. In other words, that was an expense?

MR. MARINO: Emily, can you put up the statement for period ending October 31st, please?

MS. SMITH: Sure. Just a moment. October 31?

MR. MARINO: Yes, please.

(Brief pause.)

MR. MARINO: Do we have that up?

MS. SMITH: Not yet. Just a moment. Okay. That should be up now.

THE WITNESS: Yes.

(Whereupon, Exhibit No. 3 was marked for identification.)

BY MR. MARINO:

Q. Okay. And the credit section, I take it that these payments of it looks like $199,000 total, right? On October 2 through October 4, those are monies you received from Mr. Aragon?

A.     Yes.

Q.     If you go to the next page, October 10, 2023, there's a wire transfer for Alinea Transportation, Inc.  Can you tell me who they are?

**A.     Yes.  That was a company that also worked out of the Breinigsville address with us.**

Q.     Okay.

**A.     And then it went to them for -- at one time we had a deal with them to buy their company and that was a deposit to buy that company.**

Q.     Go to the next page, on 10-23.  There's a wire transfer to Georgian Transportation for $15,000.

Can you tell me what that is for?

**A.     Expense to truck payments.**

Q.     And -- and who is Georgian Transportation, the individual?

**A.     Same person as it was before.  Ucha Matcharashvili.**

MR. BUKOWSKI:  Objection.  It's a legal entity.

MR. MARINO:  I'm sorry.  Someone said something.  I didn't --

MR. BUKOWSKI:  Yeah, I said objection. It's a legal entity.  So I just wanted to make that

A.    No.

Q.    Did they make any other kind of threat to you?

A.    I didn't perceive that to be the only kind of threat that means you're under duress.

Q.    Well, I'm just asking you if they threatened you in some way?

A.    Not physically.

Q.    Did they threaten you with telling your wife you had an affair or something?

A.    No.

Q.    Well, in what way did they threaten you if not physically?

A.    With not leaving.

Q.    And you wanted them to leave?

A.    I said yes to that.

MR. MARINO:  Can we put up November -- the November statement, Emily, if it's not already.

MS. SMITH:  Give me just a moment.  Okay. Dan, it's up.

(Whereupon, Exhibit No. 4 was marked for identification.)

BY MR. MARINO:

Q.    Okay.  If you look at the first page, credits, there's a credit on November 8, 2023, a

wire transfer from William McCulloh.

He's an attorney, right?

A. Yes.

Q. And why was he sending you $668,000?

A. On behalf of his client.

Q. Who is that?

A. I'm not going to disclose that without a court order.

Q. What was the $668,000 for?

A. I just said for a deal that was on behalf of his client.

Q. And on what basis do you believe it's legal for you to refuse to answer this question?

MR. BUKOWSKI: Objection. I don't think he --

THE WITNESS: On the grounds it might incriminate me.

MR. MARINO: So you're invoking your 5th Amendment privilege?

THE WITNESS: Yes.

BY MR. MARINO:

Q. If you look at November 1st is a wire transfer to American Star Realty. Is that another one of these rent payments --

A. Yes.

Q.   -- that you made reference to before?

**A.   Yes.  Yes.**

Q.   Go down to November 8.  There're several wire transfers there to some of the companies we referenced before.  But then there's a payment on 11-8 to -- of $100,000 to Dominic DeSimone.

Can you tell me who that is?

**A.   Yes.  Another -- he was the person that I brokered the deal for between the company he purchased.  So you missed a payment from him.  So he deposited $100,000 and that -- to be honest, I don't remember.  I don't recall.  But I believe that was for a brokered deal with Dominic DeSimone and he deposited the same amount.**

Q.   If you go down to -- do you see the next entry there, that's the payment, the $200,000 payment, that you made to Jonathan Jacobs, right?

**A.   Yes.**

Q.   And that's the one we talked about previously?

**A.   Yes.**

Q.   Just going back to Mr. McCulloh for a second.  $668,000, you said that's on behalf of his client, right?

**A.   Yes.**

Q. Was his client Mr. Maydanskyy, your co-defendant?

**A. No.**

Q. Was it a relative of Mr. Maydanskyy?

**A. No.**

Q. Somebody totally independent of the Mandanskyys, right?

**A. Can you ask the question again? I want to make sure I understand it.**

Q. Yeah. No one related to the Maydanskyys at all? This person that you refuse --

**A. I'm not sure. I'm not trying to be difficult. Can you ask the whole question in its entirety starting over, please?**

Q. Yeah. Let me start over.

**A. Please.**

Q. You've refused to identify the client for whom this $668,000 came from, right?

**A. Yes.**

Q. And can you tell me what you did with the $668,000?

**A. I mean, wire transfers as shown in the statement for the next couple of months after that.**

Q. If you won't identify the person, the client from whom this came, can you tell me what

the purpose of the payment was?

A.    He was an investor.

Q.    Was it repayment of a loan?

A.    No.

Q.    Okay.  I mean, you said he's an investor.
But was this -- in fact, the $668,000, was that an
investment being provided to you to invest for him
or her?

A.    Yes.  Yes.

Q.    Now, I see another payment on November 17
to Richard Davolio.  This was another $50,000?

A.    Yes.

Q.    How much money total did you pay to
Mr. Davolio to settle a potential lawsuit?

A.    $150,000.

Q.    And what was the lawsuit about?

A.    His client feeling that he didn't get
what he was promised in a transaction.

MR. MARINO:  Okay.  I'm going to put you
on hold for a second.

VIDEOGRAPHER:  Do you want to go off the
record briefly, Dan?

MR. MARINO:  Yeah, let's go off.

VIDEOGRAPHER:  The time is 2:05 p.m.
Eastern.  We are going off the video record.