**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____

| | | |
|---|---|---|
| GRIDKOR, LLC, *et al.*, | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | Civil No. 5:23-cv-03563-JLS |
| | : | |
| WILLIAM COLLINS, *et al.*, | : | |
| Defendants. | : | |

_____

**MEMORANDUM**

**SCHMEHL, J. -** */s/ JLS*                                                **AUGUST  7, 2025**

**INTRODUCTION**

Plaintiffs GridKor, LLC and Gridkor Trucking and Logistics, LLC, two limited liability

companies, brought this action, claiming the Defendants fraudulently induced them to enter into

a Stock Purchase Agreement ("SPA") with a fictitious entity (MGM Linehaul, Inc.) pursuant to

which Plaintiffs paid Defendants the sum of $4,941,179.18 to purchase a 67% majority

ownership interest in each of five Pennsylvania trucking companies performing services for

FedEx which Defendants allegedly represented generated net profits of 20 percent or more.

Named as Defendants are Igor Gorbach ("Gorbach"), William Collins ("Collins"), Oleksandr

Maydanskyy ("Maydanskyy"), Ucha Matcharashvili ("Matcharashvili"), Milos Mitic ("Mitic"),

Pavlo Tupychak ("Tupychak") and Jonathan Jacobs ("Jacobs"). Plaintiffs allege that Defendants

ultimately transferred the $4,941,179.18 to various accounts controlled by them and the

Defendants failed to deliver or produce any profits or distributions to Plaintiffs as promised or to

return to Plaintiffs anything more than $142,000.

**1**

Plaintiffs have asserted counts for unjust enrichment against all Defendants (Count I), civil conspiracy against all Defendants (Count II), fraud against Defendant Gorbach (Count III), fraud against Defendant Collins (Count IV), fraud against Defendant Matcharashvili (Count V), fraud against Defendant Maydanskyy (Count VI), fraud against Defendant Mitic (Count VII), fraud against Defendant Tupychak (Count VIII), fraud against Defendant Jacobs (Count IX), enforcement of a promissory note against Defendant Gorbach (Count X), enforcement of a promissory note against Defendant Collins (Count XI), enforcement of a promissory note against Defendant Maydanskyy (Count XII), enforcement of a promissory note against Defendant Mitic (Count XIII), enforcement of a promissory note against Defendant Matcharashvili (Count IV), violation of Pennsylvania Securities Act against all Defendants (Count XV) and alter ego liability for breach of contract against all Defendants except Jacobs (Count XVI). Jacobs has also filed a two-count counterclaim against Plaintiff/Counterclaim Defendants GridKor, LLC ("GridKor"), KorDev, LLC ("KorDev"), Michael Bryan, Paul Tobin, and Matt Tobin (collectively, the "Counterclaim Defendants").

By Order of January 7, 2025, the Court granted the Plaintiffs' motion for partial summary judgment and entered judgment on Count X in favor of Plaintiffs and against Defendant Gorbach in the amount of $6,229,765.81[1], on Count XI in favor of Plaintiffs and against Defendant Collins in the amount of $6,229,765.81, on Count XII in favor of Plaintiffs and against Defendant Maydanskyy in the amount of $6,229,765.81, on Count XIII, in favor of Plaintiffs and against Defendant Mitic in the amount of $6,229,765.81 and in Count XIV in favor of Plaintiffs and against Defendant Matcharashvili in the amount of $6,229,765.81. Presently before the

---

[1] On May 5, 2025, Plaintiffs and Gorbach filed a stipulation, pursuant to Rule 41(a) of the Federal Rules of Civil Procedure, that Plaintiffs' claims in Counts I, II, III, XV, XVI of the Verified Complaint are dismissed with prejudice against Gorbach. [ECF 129.]

Court are Plaintiffs' motion for summary judgment as to Defendant Jacobs on Counts One, Two, Nine and Fifteen of the Complaint and on Counts One and Two of Jacobs' counterclaim. Defendant Jacobs has also filed a motion for summary judgment against Plaintiffs on Counts One, Two, Nine and Fifteen. For the reasons that follow, Plaintiffs' motion is granted in part and denied in part and Jacobs' motion is granted in part and denied in part.

## STANDARD OF REVIEW

A court shall grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is "genuine" if there is a sufficient evidentiary basis on which a reasonable jury could return a verdict for the nonmoving party. *Kaucher v. Cnty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A factual dispute is "material" if it might affect the outcome of the case under governing law. Id. (citing Anderson, 477 U.S. at 248).

Under Rule 56, the Court must view the evidence presented on the motion in the light most favorable to the non-moving party. See *Anderson*, 477 U.S. at 255. However, "[u]nsupported assertions, conclusory allegations, or mere suspicions are insufficient to overcome a motion for summary judgment." *Betts v. New Castle Youth Dev.* Ctr., 621 F.3d 249, 252 (3d Cir. 2010).

The movant bears the initial responsibility for informing the Court of the basis for the motion for summary judgment and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the non-moving party bears the burden of proof on a particular issue, the moving party's initial burden can be met simply by "pointing out to the district court that there is an absence of

evidence to support the nonmoving party's case." Id. at 325. After the moving party has met the initial burden, the non-moving party must set forth specific facts showing that there is a genuinely disputed factual issue for trial by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c). Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

"The same standards and burdens apply on cross-motions for summary judgment." *Allah v. Ricci*, 532 F. App'x 48, 50 (3d Cir. 2013) (citing *Appelmans v. City of Phila.*, 826 F.2d 214, 216 (3d Cir. 1987)). "When confronted with cross-motions for  summary judgment ... 'the court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the summary judgment standard.'" *Transguard Ins. Co. of Am., Inc. v. Hinchey*, 464 F. Supp. 2d 425, 430 (M.D. Pa. 2006) (quoting *Marciniak v. Prudential Fin. Ins. Co. of Am.*, 184 F. App'x 266, 270 (3d Cir. 2006)). "If review of [the] cross-motions reveals no genuine issue of material fact, then judgment may be entered in favor of the party deserving of judgment in light of the law and undisputed facts." Id. (citing *Iberia Foods Corp. v. Romeo*, 150 F.3d 298, 302 (3d Cir. 1998)).

**<u>FACTS</u>**

The parties have stipulated to the following facts which the Court has essentially quoted verbatim:

1. In March 2022, Defendant Jacobs purchased 100% of the stock of Victoria Logistics Inc. for $600,000.

2. Mr. Jacobs did not manage the operations of Victoria Logistics Inc.

3. Defendants Gorbach and Maydanskyy managed Victoria Logistics Inc. and Defendant Jacobs was paid a guaranteed salary of $1,500 per week per truck.

4. Defendant Jacobs did not receive any distributions or profits from Victoria Logistics Inc.

5. In May 2022, Defendant Jacobs purchased a company called DND Express from Defendants Gorbach and Maydanskyy for $350,000.

6. Defendants Jacobs and Gorbach agreed to split DND Express 50/50, but to have the company owned in Defendant Jacobs' wife's name because Defendant Jacobs already owned Victoria Logistics Inc. and he was not allowed to have more than one account with FedEx.

7. In June 2022, Defendant Jacobs purchased from Defendant Gorbach 50 percent ownership in 21 53-foot dry van trailers for a price of $488,000 pursuant to terms by which Defendant Jacobs was guaranteed a return of $15,000 per month.

8. In August 2022, Defendant Jacobs invested $230,000 with Defendants Gorbach and Maydanskyy in an Amazon-related trucking company in Chicago, Illinois.

9. Defendants Gorbach, Collins, and Maydanskyy identified five companies to be the subject of a transaction, one of which was Victoria Logistics Inc.

10. On August 30, 2022, Defendant Gorbach told Defendant Jacobs that Plaintiffs were interested in getting into the trucking business and that Defendant Jacobs stood to receive

$900,000 from the sale of Victoria Logistics Inc. to Plaintiffs as part of a potential deal based on his ownership of Victoria Logistics Inc.

11. On September 1, 2022, Mr. Bryant, the then-President of GridKor, and Oleksandr Maydanskyy, purporting to be an officer of MGM Linehaul, Inc., signed a Stock Purchase Agreement by which Plaintiff GridKor, LLC would obtain 67 percent of the stock of each of Cha Cha Logistics Inc., Xpress Logistics Inc., PSI Logistics Inc., Victoria Logistics Inc., and HEB Logistics Inc. for a cash payment of $4,076,000 to be paid at closing with an additional $1,200,000 to be paid over time from the companies' expected cash flow (the "September 2022 Stock Purchase Agreement").

12. Mr. Gorbach, Mr. Collins, and Mr. Maydanskyy operated Victoria Logistics Inc. and the four other trucking companies in the FedEx Transaction through their purported entity MGM Linehaul Inc.

13. Mr. Jacobs was the sole owner of Victoria between March of 2022 and December 5, 2022, which owned four of the thirty-five trucks contemplated in the September 2022 Stock Purchase Agreement.

14. Mr. Jacobs did not sign the September 2022 Stock Purchase Agreement.

15. Mr. Bryant signed the September 2022 Stock Purchase Agreement before he or any principals of Plaintiffs met Mr. Jacobs.

16. On September 6, 2022, MPT Microgrid Services (one of the members of GridKor) paid a deposit of $25,000 into escrow towards the purchase price of the five trucking companies outlined in the September 2022 Stock Purchase Agreement.

17. On September 13, 2022, MPT Microgrid Services sent a second wire transfer of $80,000 into escrow on behalf of GridKor as a deposit toward the purchase price of the five trucking companies outlined in the September 2022 Stock Purchase Agreement.

18. On October 21, 2022, MPT Microgrid Services made a $500,000 payment into escrow on behalf of GridKor as a deposit toward the purchase price of the five trucking companies outlined in the September 2022 Stock Purchase Agreement.

19. With respect to the dry van trailers, Defendant Jacobs received the promised $15,000 per month for two months, but then Defendant Gorbach stopped making the promised payments.

20. The guaranteed weekly salary payments to Defendant Jacobs for Victoria Logistics Inc. slowed down toward September and October 2022, leaving Defendant Jacobs owed backpay.

21. In September 2022, when Defendant Jacobs objected to Defendants Gorbach and Maydanskyy's failure to make the $15,000 per month payments promised with respect to the dry van trailers deal, they told him "you have to wait. We will pay it up, and we will make it up at the closing."

22. Defendant Jacobs understood this to mean that Defendants Gorbach and Maydanskyy would use the money they got from the closing of the sale of Victoria Logistics Inc. to Plaintiffs to repay Defendant Jacobs his principal for Victoria and money in arrears that was owed to him.

23. The purpose of Defendant Jacobs' loan [of $500,000 to Gorbach, Collins and Maydanskyy] was to facilitate the closing of the transaction with Plaintiffs in December 2022.

24. Defendants Gorbach, Collins, and Maydanskyy agreed to have Defendant Jacobs come to a meeting so that Plaintiffs could speak with him.

25. On November 7, 2022, Defendant Jacobs travelled to Pittsburgh to have a meeting with Defendants Gorbach, Collins, and Maydanskyy at Plaintiffs' offices followed by a dinner at the Capital Grille.

26. On November 7, 2022, the purported MGM representatives Mr. Gorbach, Mr. Collins, and Mr. Maydanskyy, met with the GridKor representatives Mr. Bryant, Paul Tobin, and Matt Tobin in Pittsburgh along with Mr. Jacobs at GridKor's offices (the "November 7 Meeting").

27. During the November 7 Meeting at GridKor's offices, Mr. Bryant forwarded a link to a Google Drive workspace to Mr. Collins, with the subject line: "GridKor x MGM Linehaul Google Drive Link."

28. Between November 7 and 10, 2022, Mr. Collins' son, Ken Collins, uploaded several due diligence documents to a MGM/GridKor Google Drive Workspace. 29. GridKor's Michael Bryant and Paul Tobin had access to the materials in the Google Drive workspace, including Victoria's FedEx settlement sheets by November 10, 2022 at the latest.

30. On November 7, 2022, Mr. Jacobs attended a dinner at the Capital Grille in Pittsburgh with the GridKor representatives Mr. Bryant, Paul Tobin, Matt Tobin and the purported MGM representatives Mr. Gorbach, Mr. Collins, and Mr. Maydanskyy.

31. At the dinner, GridKor's Paul Tobin asked Mr. Jacobs about the revenues of Victoria Logistics.

32. Defendant Jacobs told Paul Tobin that Victoria Logistics Inc.'s trucks were yielding, on average, $13,000 in gross revenue per truck per week.

33. Defendant Jacobs also told Paul Tobin that his profits on Victoria Logistics Inc.'s trucks were between 25 and 30 percent.

34. Defendant Jacobs, however, did not know what Victoria Logistics Inc.'s profits were and viewed the company's profits as irrelevant because he was receiving a guaranteed salary.

35. On December 5, 2022, GridKor representatives Mr. Bryant and Paul Tobin, along with Defendants Gorbach, Maydanskyy, and Collins as purported "Members" of "MGM Linehaul Consulting" signed a Stock Purchase Agreement by which Plaintiff GridKor, LLC purchased a 67 percent stake in each of the five trucking companies for $4,941,179.18 (the "December 2022 Stock Purchase Agreement").

36. Pursuant to the December 2022 Stock Purchase Agreement, a purported entity identified as "MGM Linehaul Consulting, LLC" would retain the remaining 33 percent stake in each of the five trucking companies.

37. Defendants Gorbach, Collins, and Maydanskyy each signed the Stock Purchase Agreement as "Member, MGM Linehaul Consulting."

38. Mr. Jacobs did not sign the December 2022 Stock Purchase Agreement.

39. On December 7, 2022, Plaintiffs sent or caused to be sent three wire transfers totaling $4,336,179.84, each of which was sent, pursuant to Defendant's direction, to what Plaintiffs understood to be the attorney trust account maintained by MGM's attorney.

40. Combined with the three previous payments made on behalf of GridKor in September and October, Plaintiffs thus paid the full amount of the $4,941,179.18 purchase price under the Stock Purchase Agreement.

41. No entity by the name of MGM Linehaul Inc., MGM Line Haul Consulting, Inc., MGM Linehaul Consulting, Inc., MGM Line Haul Consultants, LLC, or MGM Linehaul Consulting, LLC existed.

42. After the transaction with Plaintiffs closed, Defendant Jacobs received $950,000 [from Gorbach, Collins and Maydanskyy.]

43. On December 20, 2022, Defendant Jacobs attended a meeting at Plaintiffs' offices between representatives of Plaintiffs, Hank Muradov, and Defendants Gorbach, Collins, and Maydanskyy regarding Plaintiffs' potential purchase of a trucking company in Chicago owned by Mr. Muradov [Kings Mountain Trucking Company].

44. At the December 20, 2022 meeting, Defendant Jacobs heard discussions about how Plaintiffs "were going to have an IPO and they were going to have a value and they had a backing from Controlled Capital."

45. Defendant Jacobs then proceeded to buy Kings Mountain because Defendant Jacobs thought it was a good opportunity for a flip.

46. On or about January 12, 2023, Defendant Jacobs signed a Letter of Intent to purchase Kings Mountain for a price of $5,500,000.

47. Jacobs was expecting to sell Kings Mountain to GridKor for a price of $12 million, making a profit of $6.5 million, more than double what he paid for Kings Mountain.

48. Defendant Jacobs did not disclose to GridKor what he paid for Kings Mountain.

49. On January 19, 2023, Defendant Jacobs sent a wire transfer to GridKor in the amount of $112,500.

50. Defendant Jacobs sent the $112,500 payment to GridKor following a conversation with Defendants Gorbach and Collins in which they told him that "things were not going well post closing" and that Plaintiffs were not receiving the $245,000 in monthly profits they had been promised, therefore "it would be in [Defendant Jacobs'] best interest to send them at least half of that amount, and that would make things better and smooth things over and have a better chance of them buying Kings Mountain from [Defendant Jacobs]."

51. Defendant Jacobs asked Defendant Gorbach why things were not going well, but he did not receive a satisfactory answer to his level of understanding.

52. Defendant Jacobs felt like he had to send the $112,500 payment to Plaintiffs because, if he did not, they would not participate in a Kings Mountain transaction. 53. On February 8, 2023, Defendant Jacobs loaned Defendants Gorbach, Collins, and Maydanskyy another $800,000 in total.

54. Defendant Jacobs was told Defendants Gorbach, Collins, and Maydanskyy needed the $800,000 "to pay off previous bills that they had to make certain repairs on their premises and to pay for various truck expenses that they had accumulated over the months."

55. On February 28, 2023, GridKor and Jacam Trucking LLC executed a NonDisclosure Agreement.

56. On March 2, 2023, Jacam Trucking LLC closed its purchase of Kings Mountain National Carriers Inc. from Khusniddin Muradov for a price of $5.5 million pursuant to the terms of a Securities Purchase Agreement.

57. Jacam Trucking LLC is a Delaware limited liability company [of which Jacobs is the sole member and CEO.]

58. On March 7, 2023, GridKor and Jacam Trucking LLC executed a document entitled Letter of Intent.

59. On March 28 and 29, 2023, GridKor, the Amirian Group, and Jacam Trucking LLC each executed a document entitled Summary of Proposed Terms and Conditions.

60. On or around April 6, 2023, Plaintiff GridKor LLC and the purported entity "MGM Linehaul Inc." entered into an agreement (the "April 6 Agreement").

61. Pursuant to the April 6 Agreement, the purported entity "MGM Linehaul Inc." agreed to buy back GridKor's interests in all the trucking companies except PSI Logistics Inc., which GridKor kept.

62. Mr. Maydanskyy signed the April 6 Agreement acting as a purported "Member" of the purported entity "MGM Linehaul inc."

63. Defendants Gorbach, Collins, Maydanskyy, and Mitic further initialed various pages of the April 6 Agreement.

64. Mr. Jacobs did not sign the April 6 Agreement.

65. The April 6 Agreement was backed up by promissory notes, each executed by Mr. Gorbach, Mr. Collins, Mr. Maydanskyy, Mr. Mitic, and Mr. Matcharashvili.

66. Mr. Jacobs did not execute a promissory note.

Stipulation of Facts [ECF 126.]

In addition to the Stipulation of Facts, Plaintiffs have filed a "Statement of Additional Facts as to Which There is No Genuine Dispute." [ECF 128-1.] The Court has quoted many of them verbatim but has also made some amendments where applicable.

1. In July and August 2022, Plaintiffs began discussing with Gorbach, Collins, and Maydanskyy the acquisition of an interest in trucking companies performing services for FedEx which they represented generated net profits of 20 percent or more. (Verified Compl. ¶¶ 21-40.)

2. Gorbach, Collins, and Maydanskyy provided Plaintiffs with documents and information regarding the trucking companies proposed for acquisition by Plaintiffs, including "Weekly Settlement Statements" from FedEx and other documents purporting to show the financial performance and cash flow of the companies indicating profits in excess of 20 percent and broadly using a figure of $13,000 revenue per truck, per week. (Verified Compl. ¶¶ 34-38 & Exhs. 1, 2 & 3 thereto.)

3. By March of 2023, nothing had materialized from Jacobs' investment in DND Express. As a result, Jacobs demanded the return of his principal. (Exh. 1 to Plaintiffs' Motion for Summary Judgment, 7/2/2024 Jacobs Depo. Tr. at 7:20 – 8:14, 9:11 – 10:2; Exh. 2 to Plaintiff's Motion for Summary Judgment, 11/5/2024 Jacobs Depo. Tr. at 18:19 – 19:10.)

4. In August and September 2022, Defendant Jacobs was "on the fence" with respect to whether Defendants Gorbach and Maydanskyy were reliable people. (Exh. 2 to Plaintiffs' Motion for Summary Judgment, 11/5/2024 Jacobs Depo. Tr. at 22:1 – 23:6.)

5. By November 2022, Jacobs "had a hunch" that DND Express was a sham investment into which Gorbach and his affiliates had tricked him into entering. (Exh. 2 to Plaintiffs' Motion for Summary Judgment, 11/5/2024 Jacobs Depo. Tr. at 19:11 – 20:15.)

6. Jacobs testified that he understood that facilitating the December 2022 Stock Purchase Agreement transaction with Plaintiffs would help him recoup his money because Gorbach had told him that upon closing of the transaction with Plaintiffs, Gorbach would

be able to repay Jacobs for his backpay from Victoria and investment from the dry van trailers. (Exh. 2 to Plaintiffs' Motion for Summary Judgment , 11/5/2024 Jacobs Depo. Tr. at 27:10 – 29:6.)

7. Jacobs testified that he believed that he could recoup his money through the December 2022 Stock Purchase Agreement. Indeed, Jacobs did not know of any other way that Gorbach, Collins, and Maydanskyy were going to be able to pay Jacobs what they owed him if the transaction with Plaintiffs did not close. (Exh. 2 to Plaintiff's Motion for Summary Judgment, 11/5/2024 Jacobs Depo. Tr. at 29:7 – 30:3.)

8. Prior to November 7, 2022, Defendant Jacobs loaned Defendants Gorbach, Collins, and Maydanskyy $500,000 to "facilitate the closing on December 7, to put money into the yard, into the shop, into the trucks, and to make sure that Gridkor got what they thought that they were going to get." (Exh. 2 to Plaintiffs' Motion for Summary Judgment, 11/5/2024 Jacobs Depo. Tr. at 24:13-17.)

9. Plaintiffs asked Defendants Gorbach, Collins, and Maydanskyy if they could speak to the owners of the companies that were to be the subject of the deal. (Exh. 4 to Plaintiffs' Motion for Summary Judgment, 12/4/2025 P. Tobin Depo. Tr. at 34:8-16.)

10. Plaintiffs were excited that Jacobs was joining the meeting because they hoped he could confirm their understanding of what they were getting in the deal. (Exh. 4 to Plaintiffs' Motion for Summary Judgment, 12/4/2025 P. Tobin Depo. Tr. at 26:22 – 29:15.)

11. On November 7, 2022, Paul Tobin asked Mr. Jacobs what the profits of Victoria Logistics were. (Exh. 4 to Plaintiff's Motion for Summary Judgment, 12/4/2025 P. Tobin Depo. Tr. at 26:22 – 28:13; Exh. 2, 11/5/2024 Jacobs Depo. Tr. at 35:7-9.)

12. Paul Tobin testified that he asked Jacobs during the November 7, 2022

dinner about the trucking companies as follows:

> So as you can see from the material that is out there, there is a lot of
> things that don't -- that are confusing in there, so I was real excited
> he was at the meeting and actually at the dinner that evening. You
> know, we were -- we were a little nervous about closing the deal
> because of the material that was just -- it was all over the place. It
> was -- you know, some was projection, some was this, some was
> that. Sometimes with smaller businesses you have a little bit of
> chaos in the accounting and in the records, so I was glad he was
> there as a hundred percent owner of one of the business we were
> buying and a historical investor with Igor and those guys. I said, hey,
> does this really happen like this. Are the trucks, as 100 percent
> owner of Victoria, do they really hit these numbers, you know, do
> they hit the revenue numbers and do they hit the profit numbers?
> Again, as the owner of one of the entities it was fantastic. And he
> said, yup, you know, whatever X amount per month in revenue and,
> of course, 25 to 35 percent profit, you know, month over month, you
> know, they are a great business. So, that was actually the piece that
> crossed us over to say, okay, look, we talked to one of the five
> business owners, you know, he is confident that the business is
> executing as this, let's go ahead and move the deal forward.

 (Exh. 4 to Plaintiff's Motion for Summary Judgment, 12/4/2025 P. Tobin Depo. Tr. at

27:2 – 28:13.)


13. Paul Tobin testified that it was Jacobs' statements confirming that the trucks for

Victoria Logistics had average weekly gross revenues of $13,000 per truck and returned

25-35% that sealed the deal for Plaintiffs. (Exh. 4 to Plaintiffs' Motion for Summary

Judgment, 12/4/2025 P. Tobin Depo. Tr. at 33:21 – 34:7.) Specifically, Tobin testified,

"That is why I was excited to talk to Jonathan that night, because he instilled confidence

in us that they were actually executing and, you know, it was a good deal." (*Id.* at 29:11-

15.)

14. To Jacobs' knowledge, there had not been a single week in which all four of the trucks operated in the name of Victoria Logistics Inc. had average gross revenues of $13,000 per truck. (Exh. 2 to Plaintiff's Motion for Summary Judgment, 11/5/2024 Jacobs Depo. Tr. at 53:22-23.)

15. Paul Tobin testified that Jacobs did not tell him that he was only drawing a salary from Victoria Logistics Inc. (Exh. 4 to Plaintiffs' Motion for Summary Judgment, 12/4/2025 P. Tobin Depo. Tr. at 120:15-18.)

16. Jacobs testified that he did not tell Plaintiffs about the money that Mr. Gorbach owed him from the dry van trailer venture or the back salary he was owed for Victoria Logistics Inc. or that he had loaned Gorbach the sum of $500,000 to close the transaction with Plaintiffs. (Exh. 2 to Plaintiffs' Motion for Summary Judgment, 11/5/2024 Jacobs Depo. Tr. at 30:11-18; 31:16-19.)

17. Defendant Jacobs did not tell Plaintiffs that he was hoping to recoup money owed to him through the closing of the transaction. (Exh. 2 to Plaintiffs' Motion for Summary Judgment, 11/5/2024 Jacobs Depo. Tr. at 34:24 – 35:4.)

18. Under the terms of the February 2023 promissory note, the loan was to be repaid "from Borrowers [sic] share of proceeds from the anticipated Kings Mountain Trucking Company flip sale to GridCor LLC [sic]." (Joint Stipulation of Facts, Exh. C.)

19. As information was provided and evaluated though, the numbers simply did not support that kind of price. (Exh. 2 to Plaintiffs' Motion for Summary Judgment, 11/5/2024 Jacobs Depo. Tr. at 121:13 – 122:8.)

20. GridKor, LLC and the Amirian Group remained willing to acquire Kings Mountain from Jacam Trucking LLC through a buyer-financed transaction at a purchase price

commensurate with the value of the company, but on May 27, 2023, Jacobs refused to do any deal that did not involve at least $10.5 million paid at closing and cut off the discussions. (Exh. 2 to Plaintiff's Motion for Summary Judgment, 11/5/2024 Jacobs Depo. Tr. at 121:13 – 122:14, 133:20 – 135:18.)

21. Paul Tobin testified on December 4, 2024 that Plaintiffs had received "some" of the due diligence materials prior to the November 7, 2022 dinner with Jacobs. Tobin testified these materials were "confusing" and therefore, requested that Gorbach make one of the owners available to alleviate the confusion. In response, Gorbach made Jacobs available. (Exhibit 7 to Plaintiffs' Response to Defenat Jacobs' Motion for Summary Judgment at pp. 27-34.)

22. Bryant gave no indication during his deposition testimony on December 3, 2024 that he or the other Plaintiffs had received any due diligence documents, including the FedEx settlement sheets, prior to November 7, 2022. (Exhibit A to Jacobs' Reply in Further Support of Motion for Summary Judgment at pp. 64-65; 174-176.)

24. Bryant signed the September 2022 Stock Purchase Agreement before he or any principals of Plaintiffs met Mr. Jacobs. (12/4/2024 P. Tobin Tr. 126:5-8)

[ECF 128-1.]

Plaintiffs first seek summary judgment on their claim against Jacobs for unjust enrichment (Count One). Plaintiffs seek to recover the sum of $950,000 Jacobs received from Gorbach after the close of the December 2022 Stock Purchase Agreement minus the sum of $112,500 that Jacobs paid to Plaintiffs on January 19, 2023 for a total of $837,500. Plaintiffs argue that, because they contend that MGM Linehaul is a sham entity, the December 2022 Stock

Purchase Agreement (as well as the other agreements with MGM) Linehaul Consulting were void from the onset.

Under Pennsylvania law, unjust enrichment claims fall into one of two categories: (1) a quasi-contract theory of liability, in which case the unjust enrichment claim is brought as an alternative to a breach of contract claim; or (2) a theory based on unlawful or improper conduct established by an underlying claim, such as fraud, in which case the unjust enrichment claim is a companion to the underlying claim. *Dockery v. Heretick*, 2019 WL 2122988, at *21 (E.D. Pa. May 14, 2019) (citing *Zafarana v. Pfizer, Inc.*, 724 F. Supp. 2d 545, 561 (E.D. Pa. 2010)).

As to the first theory, an unjust enrichment claim based on a theory of quasi-contract may be pleaded as an alternative to a breach of contract claim. *Lugo v. Farmers Pride, Inc.*, 967 A.2d 963, 970 (Pa. Super. Ct. 2009). "A quasi-contract imposes a duty, not as a result of any agreement, whether express or implied, but in spite of the absence of an agreement, when one party receives unjust enrichment at the expense of another." *AmeriPro Search, Inc. v. Fleming Steel Co.*, 787 A.2d 988, 991 (Pa. Super. Ct. 2001). A quasi-contract theory is "typically invoked ... when [the] plaintiff seeks to recover from [the] defendant for a benefit conferred under an unconsummated or void contract." *Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.*, 171 F.3d 912, 936 (3d Cir. 1999).

"To prevail on an unjust enrichment claim in Pennsylvania, a plaintiff must demonstrate the following elements: (1) a benefit conferred on the defendant by the plaintiff; (2) appreciation of such benefit by the defendant; and (3) acceptance and retention of such benefit under circumstances such that it would be inequitable for the defendant to retain the benefit without payment to the plaintiff." *EBC, Inc. v. Clark Bldg. Sys., Inc.*, 618 F.3d 253, 273 (3d Cir. 2010) (citing *AmeriPro*, 787 A. 2d at 991.) "The most significant element of the doctrine is

whether the enrichment of the defendant is unjust; the doctrine does not apply simply because the defendant may have benefited as a result of the actions of the plaintiff." *Id*. Instead, "'a claimant must show that the party against whom recovery is sought either wrongfully secured or passively received a benefit that ... would be unconscionable for her to retain.'" *Sovereign Bank v. BJ's Wholesale Club, Inc.,* 533 F.3d 162, 180 (3d Cir.2008) (quoting *Torchia v. Torchia,* 346 Pa.Super. 229, 499 A.2d 581, 582 (1985)). In determining if the doctrine applies, the Court does not focus on the intention of the parties, but rather focuses on whether the defendant has been unjustly enriched. *AmeriPro,* 787 A.2d at 991.

In this case, the December 2022 Stock Purchase Agreement entered into between Plaintiffs and Defendants Gorbach, Maydanskyy, and Collins as purported "Members" of "MGM Linehaul Consulting" is clearly void as it is undisputed that "MGM Linehaul Consulting" was never a viable entity. Yet, strictly as a result of the $4,941,179.18 payment Plaintiffs made to pursuant to this void SPA, Jacobs was able to recover the sum of $950,000 which represented the amount Gorbach, Collins and Maydanskyy owed Jacobs for his principal in Victoria Logistics and monies in arrears that Gorbach, Collins and Maydanskyy owed to him for the dry van trailers. SOF 22. Indeed, Jacobs testified that he did not know of any other way that Gorbach, Collins, and Maydanskyy were going to be able to pay Jacobs what they owed him if the transaction with Plaintiffs did not close. (Exh. 2, 11/5/2024 Jacobs Depo. Tr. at 29:7 – 30:3.)

As a result, Jacobs took actions to facilitate Plaintiffs entering into transaction with Defendants by agreeing to meet with Plaintiffs at the November 7, 2022 dinner in the hope of convincing them to go forward with the transaction, despite admittedly being "on the fence" with

respect to whether Defendants Gorbach and Maydanskyy were reliable people. (Exh. 2 to Plaintiffs' Motion for Summary Judgment, 11/5/2024 Jacobs Depo. Tr. at 22:1 – 23:6.)

Specifically, Jacobs informed Tobin at that dinner that Victoria Logistics, Inc.'s trucks were yielding, on average, $13,000 in gross revenue per truck per week and that his profits on Victoria Logistics Inc.'s trucks were between 25 and 30 percent. SOF 32, 33. Defendant Jacobs, however, did not know what Victoria Logistics Inc.'s profits were and viewed the company's profits as irrelevant because he was receiving a guaranteed salary. SOF 34. Indeed, to Jacobs' knowledge, there had not been a single week in which all four of the trucks operated in the name of Victoria Logistics Inc. had average gross revenues of $13,000 per truck. (Exh. 2, 11/5/2024 Jacobs Depo. Tr. at 40:1 – 42:21, 51:4 – 54:17; Exh. 5 [11/5/2024 Jacobs Depo. Exh. 3].)

Jacobs even loaned an additional $500,000 to Defendants Gorbach, Collins, and Maydanskyy to "facilitate the closing on December 7, to put money into the yard, into the shop, into the trucks, and to make sure that Gridkor got what they thought that they were going to get." (Exh. 1, 7/2/2024 Jacobs Depo. Tr. at 22:7 – 23:1; Exh. 2, 11/5/2024 Jacobs Depo. Tr. at 24:13-17; SOF 23. Jacobs never advised Tobin or Bryant of this loan at the November 7, 2022 dinner. (Exh. 2, 11/5/2024 Jacobs Depo. Tr. at 31:16- 19.)

Under these undisputed circumstances, Jacobs' actions clearly resulted in Jacobs receiving, appreciating and retaining a benefit in the amount of $950,000 that, given his actions in getting Plaintiffs to close on the transaction, would be unconscionable for him to retain. Therefore, the Court will enter judgment in favor of Plaintiffs and against Defendant Jacobs in the amount of $837,500 (the $950,000 Jacobs received from Gorbach minus the $112,500 Jacobs paid to Plaintiffs in January 2023).

Plaintiffs next seek summary judgment on their claim against Jacobs for civil conspiracy (Count II) in the amount of $4,941,179.18. (Plaintiffs seek the same amount on Counts IX and XV all as one recovery.)

Plaintiffs argue that "Jacobs combined with at least Gorbach, Collins, and Maydansky for the purpose of convincing Plaintiffs to proceed with closing the December 2022 Stock Purchase Agreement. They did so by means of false statements and concealment of material facts, not the least of which were entering into the transaction under the auspices of a sham entity ("MGM Linehaul") and making false statements about the revenues and profits of the entities." ECF 128 at p. 18. Plaintiffs also argue that Jacobs himself committed many overt acts in support of the conspiracy, including "loaning $500,000 to facilitate the closing, traveling to Pittsburgh to participate in meetings with Plaintiffs, and making statements to Plaintiffs about Victoria Logistics profits and revenues." *Id*.

To establish a claim for civil conspiracy under Pennsylvania law, a plaintiff must satisfy the following elements: "'(1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose; (2) an overt act done in pursuance of the common purpose; and (3) actual legal damage.'" *Gen. Refractories Co. v. Fireman's Fund Ins. Co.*, 337 F.3d 297, 313 (3d Cir. 2003) (quoting *Strickland v. Univ. of Scranton*, 700 A.2d 979, 987-88 (Pa. Super. Ct. 1997)). Proof of malice (an intent to injure) is "essential in proof on conspiracy" and "this unlawful intent must be absent justification." *Thompson Coal Co. v. Pike Coal Co.*, 488 Pa. 198, 211 (1979). "Bald assertions that certain actions were malicious are insufficient; it must be alleged that the 'sole purpose of the conspiracy was to injure the plaintiffs.'" *North Penn Towns, LP v.*

*Concert Golf Partners, LLC*, 554 F. Supp. 3d 665, 713 (E.D. Pa. 2021) (*quoting Morilus v.*

*Countrywide Home Loans, Inc.*, 651 F. Supp 292, 312 (E.D. Pa. 2008)

      The majority of courts within the Third Circuit have found that the "malice", i.e. intent to

injure, element of a Pennsylvania law civil conspiracy claim, requires an allegation that the sole

purpose of the conspiracy was to injure the plaintiff. *See, e.g.*, *North Penn Towns*, 554 F. Supp

3d at 713; *DePuy Synthes Sales, Inc. v. Globus Med., Inc.*, 259 F. Supp. 3d 225, 248 (E.D. Pa.

2017) ("[A] showing that a person acted for professional reasons, and not solely to injure the

plaintiff, negates a finding of malice."); *Arsenal, Inc. v. Ammons*, 2014 WL 6771673, at *4 (E.D.

Pa. Dec. 2, 2014) ("Under Pennsylvania law, a defendant acts with malice only when the sole

purpose of the agreement is to injure the plaintiff."); *see also Liberty Mut. Ins. Co. v. Gemma*,

301 F. Supp. 3d 523, 544-45 (W.D. Pa. 2018); *Spear v. Fenkell*, 2016 WL 5661720, at *55-56

(E.D. Pa. Sept. 30, 2016), *clarified on denial of reconsideration*, 2016 WL 7475814 (E.D. Pa.

Dec. 29, 2016); *Sarpolis v. Tereshko*, 26 F. Supp. 3d 407, 423-24 (E.D. Pa. 2014), *aff'd*, 625 F.

App'x 594 (3d Cir. 2016).

      On the other hand, a "minority of courts have taken a different view, holding that when

improper actions form the basis for the civil conspiracy claim, then the injured party can

adequately allege an intent to injure even if the conspirators also monetarily benefitted from the

conspiracy." *PDC Machines. Inc. v. Nel Hydrogen A/S*, 2018 WL 3008531, at *5 (E.D. Pa.

2018) citing, 2014 WL 1725041, at *6 (E.D. Pa. Apr. 30, 2014); *Ozburn-Hessey Logistics, LLC*

*v. 721 Logistics, LLC*, 40 F. Supp. 3d 437, 454 n.4 (E.D. Pa. 2014); *RDK Truck Sales & Serv.*

*Inc. v. Mack Trucks, Inc.*, 2009 WL 1441578, at *32 (E.D. Pa. May 19, 2009); *Daniel Boone*

*Area Sch. Dist. v. Lehman Bros., Inc.*, 187 F. Supp. 2d 400, 411-12 (W.D. Pa. 2002).

This Court has recently adopted the majority view. *Manco v. St. Joseph's University*, 2024 WL 299265, at *19 (E.D. Pa. Jan. 25, 2024).

Plaintiffs have not alleged in their Complaint, nor does the record reveal, that Jacobs acted with any intent, let alone the sole intent, to injure the Plaintiffs. Rather the record reflects that his only intent was to recoup the monies owed to him by Gorbach, Collins and Maydanskyy. (Exh. 2 to Plaintiff's Motion for Summary Judgment , 11/5/2024 Jacobs Depo. Tr. at 29:7 – 30:3.)

Since Plaintiffs have failed to prove malice for purposes of claim for civil conspiracy, as a matter of law, the Court will grant summary judgment in favor of Jacobs on Plaintiffs' civil conspiracy claim.

Next, Plaintiffs seek summary judgment against Jacobs on their claim for fraudulent misrepresentation (Count IX).

Plaintiffs contend that Jacobs is liable for fraud because he "(1) made knowingly false material statements to Paul Tobin on November 7, 2022 regarding the profits and revenues of Victoria Logistics, (2) he concealed material facts from Plaintiffs (i.e., ), and (3) he combined at least with Gorbach, Collins, and Maydanskyy to defraud Plaintiffs by loaning them money to facilitate the closing of the transaction, lending his presence and support at the November 7, 2022 meeting, making a payment of $112,500 to Plaintiffs to smooth things over when Gorbach, Collins, and Maydanskyy were unable to perform, and loaning Gorbach, Collins, and Maydansky more money to help them prolong the fraud and/or delay its discovery." ECF 128 at pp. 11-12.

Under Pennsylvania law, in order to establish a claim for fraudulent misrepresentation, a plaintiff must establish each of the following elements by clear and convincing evidence: "(1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge

of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) resulting injury proximately caused the reliance." *Porreco v. Porreco*, 571 Pa. 61, 811 A.2d 566, 570 (2002) (citations omitted).

It is undisputed that Jacobs made two representations to Paul Tobin at the November 7, 2022 dinner. First is that Victoria Logistics Inc.'s trucks were yielding, on average, $13,000 in gross revenue per truck per week and second that Jacobs' profits on Victoria Logistics Inc.'s trucks were between 25 and 30 percent. SOF 32, 33.

It cannot be disputed that such representations were material to Plaintiffs' decision whether or not to close the December 2022 Stock Purchase Agreement with the Defendants. In fact, Tobin testified that it was Jacobs' statements confirming that the trucks for Victoria Logistics had average weekly gross revenues of $13,000 per truck and returned 25-35% that "sealed the deal" for Plaintiffs. (Exh. 4 to Plaintiffs' Motion for Summary Judgment, 12/4/2025 P. Tobin Depo. Tr. at 26:22 – 29:15, 33:21 – 34:7.)

The representations were made by Jacobs with knowledge as to their falsity. The parties stipulated that Jacobs did not receive any distributions or profits from Victoria Logistics Inc. SOF 4. The parties also stipulated that Jacobs "did not know what Victoria Logistics Inc.'s profits were and viewed the company's profits as irrelevant because he was receiving a guaranteed salary." SOF 34. In addition, Jacobs testified that, to his knowledge, there had not been a single week in which all four of the trucks operated in the name of Victoria Logistics Inc. had average gross revenues of $13,000 per truck. PUF 14; (Exh. 2 to Plaintiffs' Motion for Summary Judgment, 11/5/2024 Jacobs Depo. Tr. at 40:1 – 42:21, 51:4 – 54:17.

There is also no dispute that Jacobs made these representations with the intent of having Plaintiffs rely on them. On August 30, 2022, Defendant Gorbach told Defendant Jacobs that Plaintiffs were interested in getting into the trucking business and that Defendant Jacobs stood to receive $900,000 from the sale of Victoria Logistics Inc. to Plaintiffs as part of a potential deal based on his ownership of Victoria Logistics Inc. SOF 10. Just five months earlier, Jacobs had originally purchased 100% of the stock of Victoria Logistics for $600,000. SOF 1.

Jacobs testified that he understood that facilitating the December 2022 Stock Purchase Agreement with Plaintiffs would help him recoup his money because Gorbach had told him that upon closing of the transaction with Plaintiffs, Gorbach would be able to "repay me my principal for Victoria and money in arrears that was owed to me." (Exh. 2, 11/5/2024 Jacobs Depo. Tr. at 27:10 – 29:6.) Indeed, Jacobs testified that he did not know of any other way that Gorbach, Collins, and Maydanskyy were going to be able to pay Jacobs what they owed him if the transaction with Plaintiffs did not close. (Exh. 2, 11/5/2024 Jacobs Depo. Tr. at 29:7 – 30:3.)

There is also no dispute that Plaintiffs relied on the statements made by Jacobs at the November 7, 2022 dinner in deciding to complete the transaction with Defendants. Tobin testified, "That is why I was excited to talk to Jonathan that night, because he instilled confidence in us that they were actually executing and, you know, it was a good deal." *Id.* at 29:11-15.

The ultimate question, however, is did the Plaintiffs **justifiably** rely on Jacobs' misrepresentations. "[W]hen analyzing the justifiable reliance element of a fraud claim, the Pennsylvania Supreme Court has 'hesitate[d] to find reliance justified where the party claiming reliance had an adequate opportunity to verify the allegedly fraudulent statements.'" *North Penn Towns,* 554 F. Supp. 3d at 709 (quoting *Porreco* 811 A.2d at 571.)

Tobin testified that the questions he posed to Jacobs at the November 7, 2024 dinner concerning the revenues and profits of Victoria Logistics were in response to confusion Plaintiffs had over the due diligence materials that Defendants allegedly provided to Plaintiffs prior to the November 7, 2024 dinner. (Exh. 4 to Plaintiff's Motion for Summary Judgment, 12/4/2025 P. Tobin Depo. Tr. at 27:2 – 28:13.) He testified that because Jacobs at the dinner allayed his concerns about the revenues and profits earned by one of the five trucking companies (Victoria Logistics), he decided to seal the deal. Yet, Bryant testified on the day before Tobin's deposition that the Plaintiffs did not do any due diligence because they did not obtain the settlement sheets from Defendants until November 10, 2022 at the earliest. (Exhibit A to Jacobs' Reply in Further Support of Motion for Summary Judgment at pp. 64-65; 174-176.)

As a result, there is a discrepancy as to whether Plaintiffs received some of the settlement sheets prior to the November 7, 2022 dinner and relied on Jacobs representations to clear up confusion about the contents of these settlement sheets or whether Plaintiff did not receive any settlement sheets until November 10, 2022 and therefore could not have relied on the representations made by Jacobs at the November 7, 2022 dinner.

Even if Plaintiffs had indeed received the settlement sheets in August of 2022 prior to the November 7, 2022 dinner, they would have had ample time to confirm the information contained therein by consulting an accounting or financial expert rather than relying solely on the representations of Jacobs. Even assuming the Plaintiffs did not receive the settlement sheets until November 10, 2022 (SOF 29), they still would have had nearly a month to confirm the information contained in the settlement sheets and Jacobs' representations before executing the December 2022 Stock Purchase Agreement.

In addition, it is undisputed that Jacobs was a passive investor in Victoria Logistics and owned only four of the 35 trucks that were part of the transaction which again raises an issue of whether the Plaintiffs' reliance on Jacobs' misrepresentations was justifiable.  We stress, as have the Pennsylvania courts, that the issue of whether reliance on a representation is reasonable (or justifiable) is generally a question of fact that should be presented to the jury. *Silverman v. Bell Sav. & Loan Ass'n,* 367 Pa.Super. 464, 533 A.2d 110, 115 (1987), *appeal denied,* 518 Pa. 642, 542 A.2d 1371 (1988).   Therefore, the Court will deny Plaintiffs' (and Jacobs') motions for summary judgment as to Plaintiff's fraudulent misrepresentation claim.

As part of their claim for fraudulent misrepresentation, Plaintiffs also assert a claim against Jacobs for fraudulent concealment. Specifically, Plaintiffs argue that Jacobs concealed from Plaintiffs during the November 7, 2022 dinner that: (1) "he was only drawing a guaranteed salary from Victoria Logistics, (2) even that had not always been paid and Gorbach was in arrears on that obligation, (3) he was also owed $15,000 monthly payments he had been promised by Gorbach in connection with the dry van trailers deal, (4) Jacobs was hoping to recoup the money owed him through the closing of the transaction with Plaintiffs, or (5) Jacobs had loaned Gorbach and the others $500,000 for the express purpose of facilitating the closing." ECF 128 p. 15.

In order to establish a claim for fraudulent concealment under Pennsylvania law, Plaintiffs must show: "(1) [Defendant caused] an omission; (2) the omission was material to the transaction at hand; (3) the omission was made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) the omission was made with the intent of misleading another into relying on it; (5) the plaintiff justifiably relied on the omission; and (6)

the resulting injury was proximately caused by the reliance." *Marcum v. Columbia Gas Transmission*, *LLC*, 423 F. Supp. 3d 115, 121 (E.D. Pa. 2019).

"In addition to those six elements, Plaintiffs also must show a special relationship that would give rise to a duty to speak between them and the party that fraudulently concealed the information." *Id.* "Most commonly, this means showing a fiduciary relationship between Plaintiffs and Defendant." *Id.* "[T]he confidential or fiduciary relationship that triggers the duty to speak arises in limited circumstances such as where there is an agreement between the parties; as a result of one party's reliance on the other's representations, if one party is the only source of information to the other party or the problems are not discoverable by other reasonable means; when disclosure is necessary to prevent an ambiguous or partial statement from being misleading; where subsequently acquired knowledge makes a previous representation false; or where the undisclosed fact is basic to the transaction." *Bucci v. Wachovia Bank, N.A.*, 591 F. Supp. 2d 773, 783 (E.D. Pa. 2008) citing *Duquesne Light Co. v. Westinghouse Electric Corp.,* 66 F.3d 604, 612 (3d Cir.1995). *See also North Penn Towers, LP v. Concert Golf Partners, LLC*, 554 F. Supp 3d at 705. Moreover, the duty to speak does not arise where "'both the plaintiff and defendant were sophisticated business entities, entrusted with equal knowledge of the facts.'" *Id.* quoting *Duquesne*, *supra*.

Plaintiffs argue, without elaborating, that disclosure by Jacobs of the five undisclosed items just referenced was necessary to prevent an ambiguous or partial statement from being misleading and that the undisclosed information was basic to the transaction. However, Jacobs did not utter any ambiguous or partial statement to Plaintiffs. He specifically told Paul Tobin that Victoria Logistics Inc.'s trucks were yielding, on average, $13,000 in gross revenue per truck per

week and that his profits on Victoria Logistics Inc.'s trucks were between 25 and 30 percent. SOF at 32, 33.

With respect to whether the undisclosed information was basic to the transaction, the Court notes that Plaintiffs are sophisticated business parties. Plaintiffs do not contend that Jacobs had sole access to the undisclosed information. In fact, Plaintiffs may well have been able to uncover the undisclosed information by hiring an attorney, accountant or financial expert to review the "due diligence" materials provided by the Defendants.

Because the Court finds that Jacobs did not have a duty to speak based on a lack of fiduciary duty between Plaintiffs and Jacobs, the Court will enter judgment in favor of Jacobs on Plaintiffs' fraudulent concealment claim.

Turning to Plaintiffs' claim against Jacobs for violation of the Pennsylvania Securities Act (Count XV), the Court notes that Plaintiffs allege, *inter alia*:

> In connection with the offer and sale of securities, Defendants Gorbach, Collins, Matcharashvili, Maydanskyy, Mitic, Tupychak, and Jacobs each employed devices, schemes, or artifices to defraud; made untrue statements of material fact and/or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; and engaged in acts, practices, or courses of business which operated as a fraud or deceit upon Plaintiff, in violation of 70 Pa. Stat. Ann. §§ 1-401 and 1-501(a)

ECF 1 at ¶ 219.

Section 1–401 of the Pennsylvania Securities Act prohibits the use of any "device, scheme or artifice to defraud" and the omission of any "material fact necessary in order to make statements made, in light of the circumstances under which they were made, not misleading." § 1–401(a), (b). Section 1–401 "is modeled after Rule 10b–5 of the federal securities laws, and requires virtually the same elements of proof" *GFL Advantage Fund, Ltd., v. Colkitt,* 272 F.3d

189, 214 (3d Cir.2001); *Leder v. Shinfeld*, 609 F. Supp. 2d 386, 395 (E.D. Pa. 2009); *Majer v. Sonex Research, Inc.,* 541 F.Supp.2d 693, 712–13 (E.D.Pa. 2008) (same); *Fox Int'l Relations,* 490 F.Supp.2d at 602 (same); *Joyce v. Bobcat Oil & Gas, Inc.,* 2008 WL 919724, at *13–14 (M.D.Pa. Apr.3, 2008) (same); *Gilliland v. Hergert,* 2007 WL 4105223, at *1–2 (W.D.Pa. Nov. 15, 2007) (same); *Susquehanna Capital Group v. Rite Aid Corp.,* 2002 WL 31528490, at *3 (E.D.Pa. Sept.17, 2002) (same**).** *Rosen v. Communication Serv. Group, Inc.,* 155 F.Supp.2d 310, 321 n. 14 (E.D. Pa.2001).

Rule 10b–5 makes it unlawful for any person "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary to make the statements made in the light of the circumstances under which they were made, not misleading ... in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b–5(b).

Plaintiff must show that a defendant "(1) made a misstatement or an omission of a material fact (2) with scienter (3) in connection with the purchase or the sale of a security (4) upon which the plaintiff reasonably relied and (5) that the plaintiff's reliance was the proximate cause of his or her injury." *Semerenko v. Cendant Corp.*, 223 F.3d 165, 174 (3d Cir.2000). "The 'reasonable reliance' element of a Rule 10b–5 claim requires a showing of a causal nexus between the misrepresentation and the plaintiff's injury, as well as a demonstration that the plaintiff exercised the diligence that a reasonable person under all of the circumstances would have exercised to protect his own interests." *AES Corp. v. Dow Chemical Co*., 325 F.3d 174, 178 (3d Cir. 2003). Factors courts may consider are: (1) whether a fiduciary relationship existed between the parties; (2) whether the plaintiff had the opportunity to detect the fraud; (3) the sophistication of the plaintiff; (4) the existence of long-standing business or personal

relationships; and (5) the plaintiff's access to the relevant information. *Straub v. Vaisman and Co., Inc.,* 540 F. 2d 591, 598 (3d Cir. 1976).

As with Plaintiffs' fraudulent representation claim, the Court finds that whether the Plaintiffs **reasonably** relied on any misrepresentations by Jacobs is a question best decided by a jury.

Jacobs has filed a counterclaim against Plaintiff/Counterclaim Defendants GridKor, KorDev, Michael Bryant, Paul Tobin, and Matt Tobin, consisting of one count of fraud and one count of promissory estoppel. With respect to the fraud claim, Jacobs alleges that Plaintiffs misrepresented several material facts to Jacobs with knowledge of those statements' falsity, or with at least recklessness as to the truth or falsity of the statements:

> a. that GridKor ever wanted to purchase Kings Mountain from Jacobs;

> b. that GridKor secured funding in the amount of $250 million from Controlled Development Partners based on the "proof of funds" letter dated January 11, 2023;

> c. that, in the February 9, 2023 news release, a "purchase and sale agreement was executed" between GridKor and Kings Mountain on January 11, 2023;

> d. that GridKor would pay $1 million upon the execution of the definitive purchase agreement as stated in the LOI dated March 7, 2023;

> e. that, during the March 8, 2023 meeting, Bryant said that, in exchange for $4.5 million off of the purchase price for Kings Mountain, Bryant would return twenty FedEx linehaul trucks he acquired from the deal outlined in the Complaint, knowing those trucks were not operational;

> f. that GridKor would pay Jacobs $12 million in cash at closing in a four month window post-closing, as stated by Amirian at the March 21, 2023 meeting and memorialized in the second LOI dated March 29, 2023; and

> g. that GridKor was ever ready to close the purchase of Kings Mountain by May 31, 2023.

ECF 51, Counterclaim at ¶ 82.

In addition, Jacobs claims the Plaintiffs concealed the following material facts from Jacobs:

> a. That GridKor, Bryant, and Alyssa Bryant were served with a lawsuit on January 31, 2023 in the United States District Court of the Eastern District Virginia for fraud; and

> b. that GridKor had insufficient funds to ever purchase Kings Mountain.

*Id*. at ¶ 83.

Plaintiffs argue that these counterclaims must be dismissed because Jacobs lacks prudential standing to assert them.[2] The Court agrees.  "A shareholder does not have standing to institute a direct suit for a harm that is peculiar to the corporation and that is only indirectly injurious to the shareholder."  *Potter v. O'Connor,*  2023 WL 2054264, at *3 (E.D. Pa. Feb. 16, 2023) (quoting *Hill v. Ofalt*, 85 A.3d 540, 548 (Pa. Super. Ct. 2014)). Rather, "to sue individually, the shareholder must allege a direct, personal injury—that is, independent of any injury to the corporation—and the shareholder must be entitled to receive the benefit of any recovery." *Id.* at *4 (quoting *Hill*, 85 A.3d at 548-49).

Jacam Trucking LLC is a Delaware limited liability company [of which Jacobs is the sole member and CEO.] SOF 57. It was Jacam Trucking that executed a NonDisclosure Agreement with Gridkor on February 28, 2023. SOF 55. It was Jacam Trucking that closed its purchase of

---

[2] Although Jacobs has Article III standing to give this Court jurisdiction to hear the counterclaims, he does not have prudential standing to assert the counterclaims on behalf of Jacam Trucking, the real party in interest. *Potter v. Cozen*, 46 F. 4th 148, 155-157 (3rd Cir. 2022).

Kings Mountain National Carriers Inc. from Khusniddin Muradov on March 2, 2023 for a price of $5.5 million pursuant to the terms of a Securities Purchase Agreement. SOF 56. It was Jacam Trucking that executed a document entitled Letter of Intent with Gridkor on March 7, 2023. SOF 58. And, it was Jacam Trucking that along with GridKor and the Amirian Group, each executed a document entitled Summary of Proposed Terms and Conditions on March 28 and 29, 2023. SOF 59.

Jacobs has simply not alleged any direct, personal injury that is separate from the injury experienced by Jacam Trucking to its purchase of Kings Mountain. Indeed, in his counterclaim for fraud, Jacobs seeks to recover "the purchase price of Kings Mountain, the net losses Kings Mountain suffers each month, and the cost of acquiring the mounds of due diligence requested by GridKor, lost profits and/or dividends, and other compensatory and/or consequential damages." ECF 51 at 86. These are all damages suffered by Jacam Trucking, not Jacobs. In the words of the Superior Court in *Hill*, Jacobs "willingly chose to create the separate entity named [Jacam Trucking]" and that decision has consequences in that "[r]edress for any injury done to [Jacam Trucking] belongs to [Jacam Trucking] ... [and Jacobs'] attempt to directly recover for [Jacam Trucking's] injuries ... fails." *Hill*, 85 A.3d at 557.

Therefore, the Court will enter judgment in favor of Plaintiffs/Counterclaim Defendants on Jacobs' counterclaims.