**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| GRIDKOR, LLC, *et al.*, | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | Civil No. 5:23-cv-03563-JLS |
| | : | |
| WILLIAM COLLINS, *et al.*, | : | |
| Defendants. | : | |

**MEMORANDUM**

**SCHMEHL, J. - */s/ JLS***                                                    **February 5, 2026**

**INTRODUCTION**

The background facts to this case are thoroughly detailed in the Court's Memorandum that was filed on September 26, 2024. [Doc. 104.] Presently before the Court is the Plaintiffs' renewed motion to show cause. Specifically, Plaintiffs request that Defendant Jonathan Jacobs ("Jacobs") show cause why he should not be found in civil contempt for violating this Court's September 18, 2023 Preliminary Injunction Order.[1] The Court held a hearing on the motion on October 3, 2025. Following the hearing, and after receiving additional memoranda from the parties, the Court makes the following Findings of Fact:

**FINDINGS OF FACT**

---

[1] On August 26, 2024, Plaintiffs filed a motion to show cause as to why the Defendants **Gorbach,** Collins, Maydanskyy, Matcharashvili, Jacobs, and Tupychak should not be held in contempt for dissipating assets in violating the Court's September 18, 2023 Preliminary Injunction Order. (Doc. 89.) The Court denied this motion without prejudice. (Doc. 123.) The renewed motion is apparently brought against only Jacobs because the other Defendants do not have any funds.

1. On September 18, 2023, Judge Smith[2] issued a Preliminary Injunction Order ("the September 18, 2023 Preliminary Injunction Order") restricting the transfer of assets by all the Defendant and their affiliates as follows:

> The defendants, Igor Gorbach, William Collins, Oleksandr Maydanskyy, Ucha Matcharashvili, Milos Mitic, Pavlo Tupychak and Jonathan Jacobs, along with their agents, representatives, servants, employees, affiliates, successors, or assigns, and any person or entity acting on their behalf or in concert or participation with them, are hereby ENJOINED from transferring, assigning, conveying, encumbering, pledging, or otherwise disposing of any interest in real, personal, or intangible property outside the ordinary course of business or ordinary uses to pay household expenses until $4,941,037.18 is placed in escrow with the court or adequate security in favor of the plaintiffs is otherwise posted by the defendants and proof thereof is provided to counsel for the plaintiffs and filed with the court[.]

[Doc. 11, ¶ 2.]

3. None of the Defendants, either individually or collectively, placed in escrow with the court any funds or other security in favor of Plaintiffs. (Court Docket, Case No. 5:23-cv-03563.)

4. Defendant Jonathan Jacobs had knowledge of the September 18, 2023 Preliminary Injunction Order "as soon as it was sent." (Doc. 159, Tr. of 10/3/25 Hearing at 5:7 – 6:24.)

5. On September 25, 2023, Jacobs, through his counsel, filed a motion for reconsideration of the September 18, 2023 Preliminary Injunction Order as it applied to him,

---

[2] This case was originally assigned to the late Honorable Edward G. Smith. Upon Judge Smith's untimely passing, it was reassigned to the docket of the undersigned on November 30, 2023. [ECF 50.]

claiming, *inter alia*, he was "not part of [the other Defendants'] group." (Doc. 14; Doc. 159, Tr. of 10/3/25 Hearing at 12:2-23.)

6. Following disclosures of information, provision of a sworn affidavit, and Jacobs' commitment to maintain assets equivalent to his exposure on Plaintiffs' equitable claim for unjust enrichment, Plaintiffs agreed to the entry of a modified preliminary injunction order governing Jacobs' transfers of his own assets. (Docs. 25, 26, & 143-1.)

7. Judge Smith subsequently issued an Order modifying the September 18, 2023 Preliminary Injunction Order (the "Modified Preliminary Injunction Order"), in part, as follows:

> Jacobs, along with his agents, representatives, servants, employees, affiliates, successors, or assigns, and any person or entity acting on his behalf or in concert of participation with him, is hereby ENJOINED from agreeing to or effecting any transfer, assignment, conveyance, encumbrance, pledge, or other disposition of any interest in real, personal, or intangible property that would have the effect of reducing Jacobs' net worth below $837,500, which represents his maximum potential liability in the event the plaintiffs were to prevail on count I for unjust enrichment (the sole count of the complaint at issue in the plaintiffs' motion for a preliminary injunction), without first obtaining leave of court upon a properly noticed motion;

[Doc. 26, ¶ 2]

8. The September 18, 2023 Preliminary Injunction Order was further modified "so as to remove all references to Jacobs." *Id*. at ¶ 4. Additionally, "upon the court's entry of [the] agreed order, the court's order dated September 18th, 2023 [would] cease to apply to Jacobs." *Id*.

9. The Modified Preliminary Injunction Order governing Jacobs' transfers of his own assets expressly provided that the September 18, 2023 Preliminary Injunction Order otherwise remained "in full force and effect" with respect to transfers by the other Defendants. (Doc. 26, ¶ 6.)

10. Jacobs testified that he understood that he was carved out of the September 18, 2023 Preliminary Injunction Order and that he was solely enjoined from dissipating his assets below $837,5000. (Doc. 159, Tr. of 10/3/25 Hearing at 12:24– 14:2; 44:16–45:1.)

11. Jacobs testified that he understood that the September 18, 2023 Preliminary Injunction Order still applied to the other Defendants, including Igor Gorbach ("Gorbach") William Collins ("Collins"), and Oleksandr Maydanskyy ("Maydanskyy"), and that they were not permitted to dissipate any assets other than for normal household expenses or in the ordinary course of business. (Doc. 159, Tr. of 10/3/25 Hearing at 10:13-23.)

12. Jacobs testified that he nevertheless "requested" payments of $200,000 from Collins and $300,000 from Gorbach. (Doc. 159, Tr. of 10/3/25 Hearing 35:17.)

13. Jacobs testified that he never threatened nor pressured any of the Defendants to make the payments. (Doc. 159, Tr. of 10/3/25 Hearing at 34:9–12; 35:13–37:9; 45:2–4.)

14. Gorbach testified that after this lawsuit was filed by Plaintiffs, Jacobs "was still demanding, pressuring, terrorizing, threatening with FBI, with everything. And he said I, I, I don't care, you just pay." (Doc. 159, Tr. of 10/3/25 Hearing at 53:21-24; see also id. at 80:5 – 82:6.)

15. Gorbach testified that he and Collins told Jacobs that their sending him money was a violation of the September 18, 2023 Preliminary Injunction Order. (Doc. 159, Tr. of 10/3/25 Hearing at 55:16 – 56:7.)

16. Gorbach testified that Jacobs' response to Gorbach was "that's going to be his problem. You just wire the money. It's going to be my problem, what I would do. …. Just wire the money." (Doc. 159, Tr. of 10/3/25 Hearing at 56:3-9.)

17. Gorbach testified that Jacobs followed the other Defendants' accounts through Collins and, when money hit their accounts, Jacobs demanded that Gorbach and the others send that money to him first. (Doc. 159, Tr. of 10/3/25 Hearing at 60:17 – 62:9.)

18. On November 8, 2023, Collins, through his company Mr. Route Inc., wired $200,000 to Jacobs. (Doc. 89-5 at Page 4 of 7 [Mr. Route Inc. Dime Community Bank Statement Ending 11/30/2023]; Doc. 89-9 [Affidavit of Dime Community Bank Custodian of Records]; Doc. 89-10 [6/21/2024 Jacobs Response to Interrogatory No. 1]; Doc. 89-11 [7/2/2024 W. Collins Response to Interrogatory No. 8].)

19. In or about December 2023, Jacobs drafted a Loan Repayment Agreement calling for Gorbach, Collins, and Maydanskyy to make payments to Jacobs in the amount of 3.17 million dollars. (10/3/2025 Hearing Exhibit P1;2; Doc. 159, Tr. of 10/3/25 Hearing at 39:16 – 40:6.)

20. Specifically, the Loan Repayment Agreement provided that "[a]s of today's date, 12/29/23, and with today's payment of $300,000, both parties agree that a total amount of $500,000 will have been paid back during the month of December 2023" and that Gorbach, Collins, and Maydanskyy would make further payments of "at least $250,000 per every 2 months" thereafter "until the entire amount of the balance owed is paid." (10/3/2025 Hearing Exhibit P1; Doc. 159, Tr. of 10/3/25 Hearing at .39:16 – 41:8.)

21. Jacobs prepared the Loan Payment Agreement to facilitate the payment of money to him by Gorbach, Collins, and/or Maydanskyy. (10/3/2025 Hearing Exhibit P1; Doc. 159, Tr. of 10/3/25 Hearing at 41:20-23.)

22. On January 4, 2024, Jacobs and his spouse, Michelle Jacobs, signed the Loan Repayment Agreement. (10/3/2025 Hearing Exhibit P1; Doc. 159, Tr. of 10/3/25 Hearing at

40:7- 23.) Neither Gorbach, Collins nor Maydanskyy ever signed the Loan Repayment Agreement. (10/3/2025 Hearing Exhibit P1.)

23. On January 5, 2024, Gorbach, through his company Hunter Transportation, Inc., wired two separate payments of $150,000, a total of $300,000, to Jacobs. (Doc. 159, Tr. of 10/3/25 hearing at 57:15-58:9; Doc. 89-10 [6/21/2024 Jacobs Response to Interrogatory No. 1]; Doc. 142-1 [1/31/2024 Hunter Transportation Svcs Inc TD Bank Statement] at Page 10 of 16.)

24. Collins' and Gorbach's transfers of $500,000 to Jacobs were not to pay household expenses. (See Doc. 89-10 [6/21/2024 Jacobs Response to Interrogatory No. 1]; Doc. 89-12, 7/2/24 J. Jacobs Depo. Tr. at 6:10 – 8:14, 9:11 – 14:7.)

25. Jacobs has given inconsistent testimony regarding what the payments by Collins and Gorbach were for. In his July 2, 2024 deposition, Jacobs testified that Collins and Gorbach's transfers of $500,000 to Jacobs were "a payment for a previously [sic] payment for an investment which" Jacobs had "invested in with" Gorbach, Collins, and Maydanskyy in May of 2022, specifically the return of investments by Jacobs in a company called DND Express. (Doc. 89-12, 7/2/24 J. Jacobs Depo. Tr. at 6:10 – 8:14, 9:11 – 14:7.)

26. However, at the October 3, 2025 hearing, Jacobs testified that the transfers were repayments of a loan that Jacobs had made to Gorbach, Collins, and Maydanskyy in February 2023. (Doc. 159, Tr. of 10/3/25 Hearing at 23:5 – 24:8.)

27. Jacobs' prior investment had not been in either Mr. Route or Hunter Transportation. (Doc. 89-12, 7/2/24 J. Jacobs Depo. Tr. at 6:5 – 7:15, 14:19 – 15:25.)

28. Jacobs never had any relationship with Mr. Route or Hunter Transportation. (Doc. 89-12, 7/2/24 J. Jacobs Depo. Tr. at 6:5 – 7:15, 14:19 – 15:25.)

**6**

29. The payments by Gorbach and Collins "were not related to any ordinary sort of business that [Jacobs was] engaged in with those entities," i.e., Mr. Route and Hunter Transportation. (Doc. 89-12, 7/2/24 J. Jacobs Depo. Tr. at 16:21 – 17:2.)

30. In November 2023, when Collins caused Mr. Route to make the $200,000 payment to Jacobs, Jacobs had no ongoing business relationship of any kind with Collins. (Doc. 89-12, 7/2/24 J. Jacobs Depo. Tr. at 16:4-20.)

31. In January 2024, when Gorbach caused Hunter Transportation to make the two payments totaling $300,000 to Jacobs, Jacobs had no ongoing business relationship of any kind with Gorbach. (Doc. 89-12, 7/2/24 J. Jacobs Depo. Tr. at 16:4-20; Doc. 159, Tr. of 10/3/25 Hearing at 15:15-19, 50:3-12.)

32. Jacobs testified that he did not speak to anyone who told him that he could still receive money from Gorbach, Collins, or Maydanskyy while the September 18, 2023 Preliminary Injunction Order was in place. (Doc. 159, Tr. of 10/3/25 Hearing at 46:12-25.)

33. Jacobs admitted that the wire transfers to him from Gorbach and Collins violated the September 18, 2023 Preliminary Injunction Order. (Doc. 159, Tr. of 10/3/25 Hearing at 33:11-23.)

34. Jacobs admitted that "any wire that was sent [by Gorbach] to an LLC or a logistics, or anybody violated the [the September 18, 2023 Preliminary Injunction Order] because [Gorbach's] dissipating his assets." (Doc. 159, Tr. of 10/3/25 Hearing at 32:3 – 33:1.)

35. In fact, in December of 2023 and January 2024, while the September 18, 2023 Preliminary Injunction Order was in effect, Gorbach, through Hunter Transportation, made nearly a dozen payments to other LLCs and logistic entities. (Doc. 142-1A.)

**7**

36. Gorbach testified that these payments were a "mistake." (Doc. 159, Tr. of 10/3/25 Hearing at 76:4-77:2.)

37. Jacobs testified that he did not have the ability to make Gorbach or any of the Defendants pay him on demand. (Doc. 159, Tr. of 10/3/25 Hearing at 45:5-13.)

38. Jacobs testified that it was his understanding that at the time he received the payments from Gorbach and Collins he was not in violation of the September 18, 2023 Preliminary Injunction Order "because this was money that was due to me." (*Id*. at 34:24-35-2.)

39. On May 5, 2025, Plaintiffs and Gorbach filed a Stipulation of Dismissal, dismissing all of Plaintiff's claims against Gorbach. (Doc. 129.)

40. On August 11, 2025, Plaintiffs submitted a Declaration from Gorbach in support of their renewed motion to show cause and hold Jacobs in contempt. (Doc. 141-1.)

41. Gorbach testified that he wrote the Declaration with Plaintiff's counsel and signed it. (Doc. 159, Tr. of 10/3/25 Hearing at 65:10-67-9.) Gorbach testified that he did not make any edits or comments to the contents of the Declaration. (*Id*. 72:22-73:10.)

42. Gorbach testified that he signed the Declaration "because we have a hearing against [Jacobs] and I said I would help in any way I can." (*Id*. 73:14-15.)

43. Gorbach testified that he does not like Jacobs. (*Id*. 72:7-9.)

44. Gorbach testified at the contempt hearing via Zoom from Spain (*Id*. 64:24-65:1.)

45. On September 11, 2025, Plaintiffs submitted another supplement to their Renewed Motion for Order to Show Cause, that included text messages between Jacobs and Maydanskyy that they had acquired from Maydanskyy. (Doc. 148-1.)

**8**

46. These text messages indicate that Jacobs has continued to seek payments from Defendants subject to the September 18, 2023 Preliminary Injunction Order. (Doc. 148-1.)

47 Specifically, in May 2024, Jacobs sought a $250,000 payment from Maydanskyy. (Doc. 148-1.)

48. Jacobs apparently again sought a $250,000 payment from Maydanskyy in July 2025, responding to Maydanskyy's concern that they would "get in trouble" with a demand that "I need my money asap." (Doc. 148-1.)

## DISCUSSION

A movant must prove "'three elements by clear and convincing evidence to establish that a party is liable for civil contempt: (1) that a valid order of the court existed; (2) that the defendants had knowledge of the order; and (3) that the defendants disobeyed the order.'" *Marshak v. Treadwell*, 595 F.3d 478, 485 (3d Cir. 2009) quoting *Roe v. Operation Rescue*, 54 F.3d 133, 137 (3d Cir. 1995)

Any ambiguities must be resolved in favor of the party charged with contempt. *John T. ex rel. Paul T. v. Delaware County Intermediate Unit*, 318 F. 3d 545, 552 (3d Cir. 2003). Since willfulness is not a necessary element of civil contempt, good faith is not a defense. *Harley–Davidson, Inc. v. Morris,* 19 F.3d 142, 148–49 (3d Cir.1994).

With regard to the first two elements, there is no dispute that the September 18, 2023 Preliminary Injunction Order was a valid court order. Jacobs testified that he had knowledge of the September 18, 2023 Preliminary Injunction Order "as soon as it was sent." He testified that he understood that while that Order no longer applied to him, the Order still applied to the other Defendants, including Collins, Gorbach, and Maydanskyy, and that they were not

permitted to dissipate any assets other than for normal household expenses or in the ordinary course of business. (Doc. 159, Tr. of 10/3/25 Hearing at 10:13-23.)

The third inquiry is whether Jacobs disobeyed the September 18, 2023 Preliminary Injunction Order. Injunctions apply not only to named parties, but also to those legally identified with the named party such as their "officers, agents, servants, employees, and attorneys" and all "other persons who are in active concert or participation" with the named parties. Fed. R. Civ. P. 65(d)(2); *Marshak*, 595 F.3d at 486 ("Courts...have admitted a significant exception to the general maxim that only parties and their privies may be bound by an injunction."); *Operation Rescue*, 54 F.3d at 140 ("[I]ndividuals, who are neither parties to a proceeding nor named in the court order at issue, may nonetheless be subject to the court's contempt powers.").

Courts have further found that "non-parties 'guilty of aiding or abetting or acting in concert with a named defendant or his privy in violating the injunction ... may be held in contempt.'" *Marshak*, 595 F.3d at 486 (quoting *Savarese v. Agriss*, 883 F.2d 1194, 1209 (3d Cir. 1989) (alteration in original)). *Max's Seafood Cafe ex rel. Lou–Ann, Inc. v. Quinteros,* 176 F.3d 669, 674 (3d. Cir.1999) ("One with knowledge of a court order who abets another in violating the order is surely in contempt."); accord *Havens v. James*, 76 F. 4th 103, 116 (2d Cir. 2023) ("A nonparty acts 'in active concert or participation' if the nonparty aids and abets an enjoined party's violation of the injunction, which requires showing that the challenged action was taken for the benefit of, or to assist, a party subject to the decree in violating it.") *Goya Foods, Inc. v. Wallack Mgmt. Co.*, 290 F.3d 63, 75 (1st Cir. 2002) ("[I]t has long been recognized that a non-party may be held in civil contempt if, and to the extent that, he knowingly aids or abets an enjoined party in transgressing a court order ...; the challenged action must be taken for the

**10**

benefit of, or to assist, a party subject to the decree.") *Waffenschmidt v. MacKay*, 763 F.2d 711, 714–15 (5th Cir. 1985); *Alemite Mfg. Corp. v. Staff*, 42 F.2d 832, 832-33 (2d Cir. 1930) (L. Hand, J.) ("[A] person who knowingly assists a defendant in violating an injunction subjects himself to civil as well as criminal proceedings for contempt. This is well settled law.")

In *Havens*, the Second Circuit stated that a nonparty's motives are irrelevant as to whether aiding and abetting occurred. *Id*. at 115. Rather, the "necessary inquiry" is whether the "nonparty was 'acting independently' or was aiding and abetting a named party…" *Id*. quoting *Eli Lilly & Co. v. Gottstein*, 617 F. 3d 186, 193 (2d Cir. 2010).

Although Jacobs was carved out from the September 18, 2023 Preliminary Injunction Order, Jacobs testified that he understood that the September 18, 2023 Preliminary Injunction Order remained in full force and effect as to the remaining Defendants, including Gorbach and Collins. Despite knowing that the September 18, 2023 Preliminary Injunction Order was still in full force and effect as to all the Defendants except Jacobs and that the September 18, 2023 Preliminary Injunction Order specifically prohibited the Defendants, other than Jacobs, from dissipating any of their assets, Jacobs "requested" that Gorbach and Collins make payments totaling $500,000 to him. Jacobs took the further step of drafting a Loan Repayment Agreement to facilitate the payment of the monies to him by Gorbach and Collins. The Loan Payment Agreement actually sought the total sum of $3.17 million from Gorbach, Collins and Maydanskyy and provided that "[a]s of today's date, 12/29/23, and with today's payment of $300,000, both parties agree that a total amount of $500,000 will have been paid back during the month of December 2023" and that Gorbach and Collins would make further payments of "at least $250,000 per every 2 months" thereafter until the balance was paid. (10/3/2025 Hearing Exhibit P1; Doc. 159, Tr. of 10/3/25 Hearing at .39:16 – 41:8.). Jacobs' actions in requesting the

payments from Gorbach and Collins and then drafting the Loan Payment Agreement facilitated and assisted Gorbach and Collins in violating the September 18, 2023 Preliminary Injunction Order. Although neither Gorbach, Collins nor Maydanskyy ever signed the Loan Repayment Agreement, the Agreement is noteworthy because it reveals that Jacobs was intending to collect $3.17 million from them despite his knowledge that the September 18, 2023 Preliminary Injunction Order remained in place.

The fact that Jacobs' motivation behind aiding and abetting Gorbach and Collins to violate the September 18, 2023 Preliminary Injunction Order may have been to simply get repaid is irrelevant. Nor is it any defense that Jacobs may have believed he was acting in good faith in requesting the monies from Gorbach and Collins and preparing the Loan Repayment Agreement. The critical fact is that Jacobs was not acting independently but was acting to facilitate and assist the enjoined parties, Gorbach and Collins, in violating the September 18, 2023 Preliminary Injunction Order by dissipating their assets by making payments to Jacobs. *Havens*, 76 F. 4th at 115. Therefore, the Court finds that Jacobs is in contempt of the September 18, 2023 Preliminary Injunction Order.

**RELIEF**

"The relief granted in civil contempt proceedings is compensatory or coercive and usually takes the form of a fine in the amount of the damages sustained by petitioner and an award of costs and attorney's fees." *Quinter v. Volkswagen of America*, 676 F. 2d 969, 975 (3d Cir. 1982). Jacobs knowingly requested that Gorbach and Collins repay him in the amount of $500,000 despite having knowledge of the September 18, 2023 Preliminary Injunction Order that prohibited Gorbach and Collins from dissipating any funds. As a result, Jacobs gained $500,000 that the injunction was designed to ensure remained available to satisfy a judgment in favor of

Plaintiffs. Therefore, the Court will order Jacobs to remit to Plaintiffs the $500,000 he received from Defendants Collins and Gorbach, plus interest as well as reasonable attorneys' fees in connection with Plaintiffs' efforts to enforce the September 18, 2023 Preliminary Injunction Order.